# 11-2475-cv

## United States Court of Appeals

*for the*

## Second Circuit

EUROPEAN COMMUNITY, acting on its own behalf and on behalf of the
Member States it has power to represent, KINGDOM OF BELGIUM,
REPUBLIC OF FINLAND, FRENCH REPUBLIC, HELLENIC REPUBLIC,
FEDERAL REPUBLIC OF GERMANY, ITALIAN REPUBLIC, GRAND
DUCHY OF LUXENBOURG, KINGDOM OF THE NETHERLANDS,
PORTUGUESE REPUBLIC, KINGDOM OF SPAIN, Individually, KINGDOM
OF DENMARK, CZECH REPUBLIC, REPUBLIC OF LITHUANIA,
REPUBLIC OF SLOVENIA, REPUBLIC OF MALTA,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

KRUPNICK CAMPBELL MALONE BUSER
SLAMA HANCOCK LIBERMAN
& McKEE
12 Southeast 7th Street, Suite 801
Fort Lauderdale, Florida 33301
(954) 763-8181

– and –

SPEISER KRAUSE NOLAN & GRANITO
Two Grand Central Tower
140 East 45th Street, 34th Floor
New York, New York 10017
(212) 661-0011

*Attorneys for Plaintiffs-Appellants*

REPUBLIC OF HUNGARY, REPUBLIC OF IRELAND, REPUBLIC OF ESTONIA, REPUBLIC OF BULGARIA, REPUBLIC OF LATVIA, REPUBLIC OF POLAND, REPUBLIC OF AUSTRIA, KINGDOM OF SWEDEN, REPUBLIC OF CYPRUS, SLOVAK REPUBLIC, ROMANIA,

*Plaintiffs-Appellants*,

v.

RJR NABISCO, INC., R.J. REYNOLDS TOBACCO COMPANY, R.J. REYNOLDS TOBACCO INTERNATIONAL, INC., RJR ACQUISITION CORP., FKA NABISCO GROUP HOLDINGS CORP., RJR NABISCO HOLDINGS CORP., R.J. REYNOLDS TOBACCO HOLDINGS, INC., NABISCO GROUP HOLDINGS CORP., R.J. REYNOLDS GLOBAL PRODUCTS, INC., REYNOLDS AMERICAN INC., R.J. REYNOLDS TOBACCO COMPANY, a North Carolina Corporation,

*Defendants-Appellees*.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF ISSUES ................................................................. 1

INTRODUCTION ............................................................................. 3

STATEMENT OF THE CASE............................................................ 4

STATEMENT OF FACTS .................................................................. 6

    European Community ................................................................ 6

    Member States ......................................................................... 10

    RJR Defendants ....................................................................... 10

    Wrongdoing by RJR Defendants and Co-Conspirators ............... 12

    RJR's Money Laundering Customers .......................................... 16

    The RJR Money Laundering Enterprise...................................... 17

    Kurdistan Workers' Party/Hussein Regime ................................. 18

SUMMARY OF ARGUMENT ........................................................... 19

STANDARD OF REVIEW ................................................................ 22

ARGUMENT ................................................................................... 23

    I.     DIVERSITY JURISDICTION EXISTS IN THIS CASE................. 23

          A.    The EC Is An "Agency or Instrumentality" Under the FSIA .. 23

               1.    The Term "Organ" Should Be Broadly and Flexibly Construed .................................................................... 24

               2.    European Treaty-Based Entities Are "Agencies or Instrumentalities"........................................................ 26

               3.    The EC Is an "Organ" Within the Meaning of the FSIA .................................................................... 28

i

B.    Alternatively, This Court Should Remand for Further Proceedings ............................................................... 38

    1.    The District Court Overlooked Alienage Jurisdiction... 39

    2.    The District Court Overlooked Controlling Law .......... 43

II.    THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFFS' RICO CLAIMS ................................................................... 47

A.    Plaintiffs' RICO Claims Are Not "Extraterritorial" Under *Norex* ................................................................. 48

B.    RICO Is Not Limited To "Domestic Enterprises" .................. 50

C.    The District Court Overlooked Claims Under §§1962(a)-1962(b) ................................................................... 51

D.    The District Court Erred In Denying Leave to Amend ........... 54

III.    THE DISTRICT COURT ERRED IN DISMISSING THE FEDERAL COMMON LAW CLAIMS WITHOUT COMMENT... 59

CONCLUSION ................................................................... 61

CERTIFICATE OF COMPLIANCE ................................................ 62

# TABLE OF AUTHORITIES

## U.S. Cases

Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143 (1987) ..48

Autocephalous Greek-Orthodox Church v. Goldberg & Feldman Fine Arts, Inc., 917 F.2d 278 (7th Cir. 1990) .........................................................41

Baxter v. Sturm, Ruger & Co., Inc., 32 F.3d 48 (2d Cir. 1994) ..............................39

Boyle v. United States, 129 S.Ct. 2237 (2009)................................................. 25, 50

City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114 (2d Cir.  2011) ....60

Cohn v. Rosenfeld, 733 F.2d 625 (9th Cir. 1984) ...................................................41

Connecticut v. Am. Elec. Power Co., 582 F.3d 309 (2d Cir. 2009), aff'd in relevant part by an equally divided court, 131 S.Ct. 2527 (2011) ....................... 59, 60

EAL (Delaware) Corp. v. European Organisation for the Safety of Air Navigation, 1994 U.S. Dist. LEXIS 20528 (D. Del. 1994)................................. 26, 27, 37

European Community v. RJR Nabisco, Inc., 150 F.Supp.2d 456 (E.D.N.Y. 2001) ......................................................................................................42

Filler v. Hanvit Bank, 378 F.3d 213 (2d Cir. 2004) ....................................... passim

Gates v. Victor Fine Foods, 54 F.3d 1457 (9th Cir. 1995)......................... 26, 31, 34

Granville Gold Trust-Switzerland v. Commissione Del Fullimento/Inter Change Bank, 924 F. Supp. 397 (E.D.N.Y. 1996), aff'd, 111 F.3d 123 (2d Cir. 1997) ......................................................................................................25

H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989) ................... 21, 38, 48

Ideal Steel Supply Corp. v. Anza, 2011 U.S. App. LEXIS 13176 (2d Cir. June 28, 2011) ........................................................................................... 50, 54

In re Air Crash Disaster Near Roselawn, 96 F.3d 932 (7th Cir. 1996) ...... 26, 31, 37

In re Methionine Antitrust Litig., MDL No. 00-1311 CRB (N.D. Cal. 2002) ........27

In re Terrorist Attacks on September 11, 2001, 538 F.3d 71 (2d Cir. 2008) ..........29

JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd., 536 U.S. 88 (2002).................................................................................................. 41, 43

Kelly v. Syria Shell Petroleum Dev. B.V., 213 F.3d 841 (5th Cir. 2000)...............29

LeDonne v. Gulf Air, Inc., 700 F. Supp. 1400  (E.D. Va. 1988) .................... 26, 37

Mangattu v. M/V Ibn Hayyan, 35 F.3d 205 (5th Cir. 1994) ..................................26

McGuire v. Warren, 490 F. Supp. 2d 331 (S.D.N.Y. 2007), on remand from, 207 Fed. Appx. 34 (2d Cir. 2006).........................................................................55

Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi, 546 U.S. 450 (2006) .........................................................................39

Morgan v. Council of Europe, et al., 02-CV-0891(CBA), 02-CV-1471(CBA) (E.D.N.Y. 2002), appeal dismissed, Order (2d Cir. June 3, 2004) ...............27

Morgan v. United States, European Union, et al., 04-CV-0672 (CBA) (E.D.N.Y. Feb. 26, 2004), appeal dismissed, Order (2d Cir. Aug. 3, 2004) ............................................................................................27

Morrison v. National Australia Bank Ltd., 130 S.Ct. 2869 (2010) .............. 5, 21, 55

Murphy v. Korea Asset Mgmt. Corp., 421 F. Supp. 2d 627 (S.D.N.Y. 2005), aff'd, 190 Fed. Appx. 43 (2d Cir. 2006) .................................................... 25, 29, 33

Nat'l Org. for Women v. Scheidler, 510 U.S. 249 (1994).......................................52

Nippon Fire & Marine Ins. Co., Ltd. v. Skyway Freight Sys., Inc., 235 F.3d 53 (2d Cir. 2000).....................................................................................................42

Norex Petroleum Ltd. v. Access Indus., Inc., 631 F.3d 29 (2d Cir. 2010)...... passim

Patrickson v. Dole Food Co., 251 F.3d 795 (9th Cir. 2001) , aff'd, 538 U.S. 468 (2003)...............................................................................................................33

Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd., 476 F.3d 140 (2d Cir. 2007)............................................................................................ 29, 33

Perrin v. United States, 444 U.S. 37 (1979) ...........................................................38

iv

_Republic of the Philippines v. Marcos_, 806 F.2d 344 (2d Cir. 1986)............... 59, 60

_Rios v. Marshall_, 530 F. Supp. 351 (S.D.N.Y. 1981).................................................27

_Ronzani v. Sanofi S.A._, 899 F.2d 195 (2d Cir. 1990) ............................................55

_Rotella v. Wood_, 528 U.S. 549 (2000) .....................................................................48

_Samantar v. Yousuf_, 130 S.Ct. 2278 (2010)..................................................... passim

_SEC v. Goldman Sachs & Co._, 2011 U.S. Dist. LEXIS 62487 (S.D.N.Y. 2011) ...55

_Stiftung v. Plains Mktg., L.P._, 603 F.3d 295 (5th Cir. 2010) ..................................41

_United Food & Commercial Workers Union, Local 919 v. Centermark Properties Meriden Square, Inc._, 30 F.3d 298 (2d Cir. 1994) .........................................39

_United States v. Altese_, 542 F.2d 104 (2d Cir. 1976)...............................................50

_United States v. Connolly_, 552 F.3d 86 (2d Cir. 2008) ...........................................38

_United States v. Gonzales_, 520 U.S. 1 (1997) .........................................................25

_United States v. Huber_, 603 F.2d 387 (2d Cir. 1979).............................................51

_United States v. Parness_, 503 F.2d 430 (2d Cir. 1974).................................... 21, 50

_USX Corp. v. Adriatic Ins. Co._, 345 F.3d 190 (3d Cir. 2003)................................26

_Weixel v. Bd. of Educ. of City of N.Y._, 287 F.3d 138 (2d Cir. 2002) ...................22

**Statutes**

15 U.S.C. §6201 _et seq._...................................................................................... 35, 36

15 U.S.C. §77v(c) ......................................................................................................5

18 U.S.C. §§1956, 1957..........................................................................................48

18 U.S.C. §1961(1)(B)............................................................................................48

18 U.S.C. §1962(a) .......................................................................................... passim

18 U.S.C. §1962(a)-(d) ...........................................................................50

18 U.S.C. §1962(b) ............................................................ 51, 52, 53, 54

18 U.S.C. §1962(c) ...........................................................................52

18 U.S.C. §1964(c) .................................................................... passim

28 U.S.C. §1291 ..................................................................................1

28 U.S.C. §1331 ..................................................................................1

28 U.S.C. §1332(a)(2) ................................................................ passim

28 U.S.C. §1332(a)(4) ................................................................ passim

28 U.S.C. §1602 ......................................................................... passim

28 U.S.C. §1603(a) ...........................................................................24

28 U.S.C. §1603(a)-(b) .....................................................................25

28 U.S.C. §1603(b) ...........................................................................24

28 U.S.C. §2107(a) ..............................................................................1

84 Stat. 947, Sec. 904(a) (Oct. 15, 1970).........................................51

Judiciary Act of 1789, ch. 20, § 11, 1 Stat. 73.................................41

**Treaties, Protocols, and Related Authorities**

Protocol on the Privileges and Immunities of the European Communities, art. 12(a)
(Brussels, 8 April 1965)................................................................34

Regulation No 31 (EEC), 11 (EAEC), laying down the Staff Regulations of
Officials and the Conditions of employment of other servants of the
European Economic Community and the European Atomic Energy
Community.  See OJ L 45/1385 (14 June 1962) ...........................34

Treaty Establishing the European Community (Consolidated Version of the Treaty
Establishing the European Community), O.J. C 340/3 (1997).............. passim

Treaty of Lisbon Amending the Treaty on European Union and the Treaty
    Establishing the European Community, Dec. 13, 2007, O.J. (C 306) 1... 7, 31


**Foreign Cases**

Case 22/70, Commission v. Council (ERTA), [1971] E.C.R. 263 .........................35

Case 6/64, Costa v. ENEL, [1964] E.C.R. 585................................................. 40, 43

Donckerwolcke v. Procureur de la République, Case 41/76, [1976] E.C.R. 1921..35

Federal Constitutional Court Decision Concerning the Maastricht Treaty, 89
    BVerfGE 155 (F.R.G.) (Oct. 12, 1993) (translated and reprinted in 33 I.L.M.
    388 (1994)) ....................................................................................................36

Kramer and Bais SNC v. The Netherlands, Joined Cases 3, 6/76, [1976] E.C.R.
    1279 ...............................................................................................................35

Opinion 1/91 of 14.12.1991, [1991] E.C.R. I-6079...................................... 7, 40, 43

Re the O.E.C.D. Understanding on a Local Cost Standard, Opinion 1/75, [1975]
    E.C.R. 1355....................................................................................................35

Re Treaty on European Union, Case No. 1236/92, Spanish Constitutional Court
    (Plenary Session) (July 1, 1992)....................................................................37

Sayag v. Leduc, [1968] E.C.R. 395 ........................................................................34

United States of America v. Ivey, 139 D.L.R. (4th) 570 (Ontario CA 1996) ..........60

Van Gend & Loos v. Nederlandse Administratie Der Belastingen, [1963] E.C.R. 1
    ................................................................................................................. passim


**Other Authorities**

Blakey, The RICO Civil Fraud Action in Context: Reflections on Bennett v. Berg,
    58 Notre Dame L. Rev. 237 (1982)................................................................52

G.F. Mancini, Europe: The Case for Statehood, 4 Eur. L.J. 29 (1998)...................40

H.R. Rep. 103-72, 103d Cong. 2d Sess. (1994)................................................ 36, 43

H.R. Rep. No. 94-1487, 94th Cong. 2d Sess. (1976)...............................................25

Her Majesty the Queen in Right of Canada v. Northern Brands International, Inc.,
    Ontario Court of Justice, Agreed Upon Statement of Facts Containing
    Admissions Made Pursuant to §655 of the Criminal Code ...........................3

Press Release, U.S. Department of Justice (December 22, 1998) ...........................3

Random House Dictionary of the English Language (1966)...................................38

Rosalyn Higgins, Problems & Process: International Law and How We Use It,
    (Oxford 1995) ...................................................................................45

SEC Form 8-K of Reynolds American, Inc., Exhs. 10.2 & 99.1 (April 13, 2010) ...3

Shorter Oxford English Dictionary (1959) ..............................................................38

Stephen Breyer, Changing Relationships Among European Constitutional Courts,
    21 Cardozo L. Rev. 1045 (2000) ..................................................................32

The Extra-National State: American Confederate Federalism and the European
    Union, 7 Colum. J. Eur. L. 173  (2001).......................................................37

Tobacco's Other Secret, 60 Minutes II (Feb. 11, 2009) ...........................................4

## Rules

Fed. R. Civ. P. 12(b)(1)................................................................................. 1, 2, 22

Fed. R. Civ. P. 12(b)(6)................................................................................. 1, 2, 22

Fed. R. Civ. P. 15 ......................................................................................................55

## Treatises

Restatement (Second) of Foreign Relations Law of the United States (1965). 40, 46

# JURISDICTIONAL STATEMENT

The District Court for the Eastern District New York had diversity jurisdiction to entertain state common law claims under 28 U.S.C. §1332(a)(4) or 28 U.S.C. §1332(a)(2). The District Court had federal question jurisdiction under 28 U.S.C. §1331, as this is a civil action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1964(c) ("RICO"), and federal common law. This appeal is from a final judgment (May 16, 2011) that disposed of all of the Plaintiffs' claims, and this Court has jurisdiction under 28 U.S.C. §1291. A timely notice of appeal was filed June 10, 2011. See 28 U.S.C. §2107(a).

# STATEMENT OF ISSUES

1. Did the District Court err in dismissing Plaintiffs' state-law claims under Fed. R. Civ. P. 12(b)(1) for lack of jurisdiction under 28 U.S.C. §1332(a)(4) and ruling that the EC was not  an "agency or instrumentality" of a foreign state under the Foreign Sovereign Immunities Act, 28 U.S.C. §1602, *et seq.* ("FSIA")?

2. Did the District Court err in dismissing, without comment, Plaintiffs' state-law claims under Fed. R. Civ. P. 12(b)(1)  for lack of diversity jurisdiction, even though those claims could be heard by the federal courts under the alienage diversity statute (28 U.S.C. §1332(a)(2))?

1

3.   Did the District Court err in dismissing Plaintiffs' state-law claims under Fed. R. Civ. P. 12(b)(1) for lack of jurisdiction under 28 U.S.C. §1332(a)(4) on the ground that the European Community ("EC") did  not qualify as a "foreign state" under the FSIA?

4.   Did the District Court err in dismissing Plaintiffs' RICO claims under Fed. R. Civ. P. 12(b)(6), ruling that RICO is limited to "domestic enterprises" and Plaintiffs' claims -- which were based on acts by U.S. defendants that were committed in the United States -- were impermissibly extraterritorial?

5.   Did the District Court err in denying Plaintiffs' multiple requests for leave to replead in response to changes in the governing law?

6.   Did the District Court err in dismissing, without comment, Plaintiffs' federal common law claims, which provided an independent basis for federal jurisdiction?

## INTRODUCTION

For many years, RJR[1] has been engaged in a corrupt conspiracy with organized crime by which it launders criminal proceeds and pursues illicit trade in myriad U.S.-based schemes. RJR's U.S.-based subsidiary admitted criminal wrongdoing through guilty pleas in the United States and Canada.[2] An RJR executive pled guilty to laundering $72 million in the Northern District of New York and confirmed that "RJR" made "a conscious decision to enter the illegal

---

[1] This action is brought against U.S. defendants, namely:  RJR Nabisco, Inc., R.J. Reynolds Tobacco Company, RJR Acquisition Corp., RJR Nabisco Holdings Corp., R.J. Reynolds Tobacco Holdings, Inc., Reynolds American, Inc., and R.J. Reynolds Tobacco Company (collectively, "RJR," "Defendants" or "RJR Defendants" except where otherwise indicated).

[2] See Her Majesty the Queen in Right of Canada v. Northern Brands International, Inc., Ontario Court of Justice, Agreed Upon Statement of Facts Containing Admissions Made Pursuant to §655 of the Criminal Code (NBI, a Delaware corporation based in Winston-Salem, N.C., pled guilty to a criminal conspiracy in aid of illicit trade and was fined C$75,000,000; R.J. Reynolds Tobacco Company agreed to pay C$325,000,000 to Canada); SEC Form 8-K of Reynolds American, Inc., Exhs. 10.2 & 99.1 (April 13, 2010); Press Release, U.S. Department of Justice (December 22, 1998) ("An affiliate of R.J. Reynolds Tobacco International Inc. -- Northern Brands International Inc. -- pleaded guilty today and agreed to pay a total of $15 million in criminal fines and forfeitures for aiding and abetting customers who evaded more than $2.5 million in U.S. excise taxes by fraudulently transporting within the United States cigarettes that were intended to be exported").

cross border business" which was directly managed in the United States.[3]   This

action seeks to combat and enjoin RJR's ongoing scheme.

## STATEMENT OF THE CASE

Plaintiffs appeal from a judgment of the U.S. District Court for the Eastern

District of New York (Hon. Nicholas G. Garaufis, U.S.D.J.) entered May 16, 2011

and underlying orders entered March 8, 2011 and May 13, 2011, which dismissed

their Second Amended Complaint ("SAC").[4]

As alleged in the SAC, RJR's conduct gives rise to Plaintiffs' claims under

RICO, New York common law[5] and federal common law. The main objective of

this action is to obtain enforceable equitable relief that will enjoin the scheme, and

compel RJR to adopt the same standards of corporate conduct already embraced by

other large multinational tobacco companies, which have already entered into

cooperation agreements with the EC and all of its Member States. See A-1365;

Dkt. 87 at 14 n.9.

---

[3]   Tobacco's Other Secret, 60 Minutes II (Feb. 11, 2009):
http://www.cbsnews.com/stories/2000/01/18/60II/main150825.shtml?tag=mncol;lst;5 (last visited September 18, 2011).

[4] See Joint Appendix at A-333-481.

[5] The state common law claims include fraud, public nuisance/damages, public nuisance/injunctive relief, unjust enrichment, negligence, negligent misrepresentation, conversion, and money had and received.

On April 30, 2010, Defendants moved to dismiss the SAC. During the pendency of the motion, the Supreme Court decided <u>Morrison v. National Australia Bank Ltd.</u>, 130 S.Ct. 2869 (2010) which disallowed extraterritorial application of federal securities laws.[6] This Court applied <u>Morrison</u> to RICO, and held that a case having only "slim contacts" with the United States fell outside of RICO's territorial reach. <u>Norex Petroleum Ltd. v. Access Indus., Inc.</u>, 631 F.3d 29, 33 (2d Cir. 2010). The District Court ordered supplemental briefing on <u>Morrison</u> and <u>Norex</u>. By Memorandum and Order dated March 8, 2011, the District Court announced a new rule that RICO was limited to "domestic enterprises" and held that Plaintiffs' RICO allegations were therefore impermissibly extraterritorial. SPA-1-15. The District Court dismissed the RICO claims on that basis, and denied Plaintiffs' motion for reconsideration to clarify the ruling. SPA-16-21.

Upon dismissal of the RICO claims, the District Court inquired whether diversity jurisdiction existed over the state-law claims. SPA-14-15. The District Court noted that diversity would unquestionably exist if the EC were not a party plaintiff, and directed the EC to state whether it would voluntarily withdraw from the suit. SPA-24. On April 5, 2011, Plaintiffs informed the Court that the EC would not voluntarily withdraw. A-1644-1645.

---

[6] Congress overruled <u>Morrison</u> (in part). <u>See</u> 15 U.S.C. §77v(c).

5

The District Court, without conducting oral argument, dismissed the state-law claims for lack of diversity by Memorandum and Order dated May 13, 2011. SPA-22-52. The District Court overlooked Plaintiffs' argument that diversity existed under the alienage jurisdiction statute (28 U.S.C. §1332(a)(2)). It ruled that the EC was not an "agency or instrumentality" of a foreign state, or a "foreign state," and diversity therefore was lacking under 28 U.S.C. §1332(a)(4). The District Court denied leave to replead. SPA-51-52. The Court also dismissed Plaintiffs' federal common law claims without comment. Final judgment was entered May 16, 2011. SPA-53-54.

## STATEMENT OF FACTS

**European Community.** The EC is a governmental body created through collaboration among the majority of the nations of Europe. SAC ¶5. When this action was commenced, the EC existed under the Treaty of Amsterdam amending the Treaty on European Union, the Treaties establishing the European

Communities and certain related acts (SPA-37).[7] The European Union (EU) is today the legal successor to the EC.[8]

The EC is a body politic that governs the territory of its constituent Member States.[9] It is a treaty-based entity that today consists of 27 Member States.[10] The EC has legal personality.[11] EU citizenship is conferred on all nationals of the Member States of the EU.[12]

---

[7] See Consolidated Version of the Treaty Establishing the European Community, O.J. C 340/3 (1997) ("EC Treaty"), which was the specific legal basis of the EC at the time of the commencement of this action, and will be cited herein as "EC Treaty."

[8] Under the Treaty of Lisbon Amending the Treaty on European Union and the Treaty Establishing the European Community, Dec. 13, 2007, O.J. (C 306) 1 ("Lisbon Treaty"), the European Union (EU) became the legal successor to the EC. The District Court determined that there have been "great changes" concerning the EC during the course of this litigation (SPA-25). However, with respect to matters relevant for the present appeal, the EC has not materially changed during the pendency of this case, and the District Court's unprecedented and incorrect treatment of the EC implicates significant, present-day concerns as discussed below.

[9] See EC Treaty, art. 299.

[10] The EC Treaty constitutes the "constitutional charter of a Community based on the rule of law." See Opinion 1/91 of 14.12.1991, [1991] E.C.R. I-6079, ¶ 21.

[11] See EC Treaty, art. 281 ("The Community shall have legal personality"); see also id., art. 282 ("In each of the Member States, the Community shall enjoy the most extensive legal capacity accorded to legal persons under their laws; it

The governmental institutions of the EC are established under the EC Treaty. The EC's institutional balance is marked by a triangular structure involving three main institutions: the European Parliament (which directly represents the EU's citizens and is democratically elected by them);[13] the Council of Ministers (which represents and acts for the individual Member States);[14] and the European Commission (the EC's executive arm, which represents and upholds the interests of the EC as a whole).[15] The Council and the Parliament adopt legislation applicable throughout the EC. The EC has its own judicial system with the European Court of Justice as its highest court.[16] The EC has a vast array of competences for a large number of matters which are set forth by the EC Treaty.[17]

---

may, in particular, acquire or dispose of movable and immovable property and may be a party to legal proceedings").

[12] See EC Treaty, art. 17.

[13] See EC Treaty, art. 189- 201.

[14] See EC Treaty, art. 202-210.

[15] See EC Treaty, art. 211-219.

[16] See EC Treaty, art. 220-245.

[17] Under Article 2 of the EC Treaty, the EC is mandated to establish a common market and an economic and monetary union. According to Article 3(1) of the EC Treaty, the EC possessed competences to legislate and adopt legally binding acts in numerous areas, including, for example, a common commercial policy; an internal market to allow free movement of goods, persons, services, and capital as between the Member States; a common policy or measures in the spheres of agriculture, fisheries, transport, environment, development cooperation, energy,

The EC engages in foreign relations and has entered into many treaties and international agreements.[18]

The Member States have established the EC and endowed its institutions with sovereign rights that are exercised for common objectives. Addressing the European Economic Community, the EC's predecessor, the European Court of Justice has held:

> The objective of the EEC Treaty, which is to establish a Common Market, the functioning of which is of direct concern to interested parties in the Community, implies that this Treaty is more than an agreement which merely creates mutual obligations between the contracting states. This view is confirmed by the preamble to the Treaty, which refers not only to governments but to peoples. It is also confirmed more specifically by the establishment of institutions endowed with sovereign rights, the exercise of which affects Member States and also their citizens . . . The conclusion to be drawn from this is that the Community constitutes a new legal order of international law for the benefit of which the states have limited their sovereign rights, albeit within limited fields, and the subjects of which comprise not only Member States but also their nationals.

Case 26/62, Van Gend & Loos v. Nederlandse Administratie Der Belastingen, [1963] E.C.R. 1, 12. The EC possesses delegated "sovereign rights." Id.

---

civil protection and tourism; and a system ensuring that competition in the internal market is not distorted.

[18] A full listing of such agreements may be found at: http://ec.europa.eu/world/agreements/searchByOrganization.do?id=4&letter=E (last visited September 18, 2011).

**Member States**.    Twenty-six Member States of the EC are party plaintiffs to this action. SAC ¶6. "Many of the MEMBER STATES act in a commercial capacity in regard to cigarettes in that they now or have in the past manufactured, sold, and/or been bulk purchasers" and "the illegal conduct of the RJR DEFENDANTS has directly harmed the commercial interests of the Plaintiffs and has caused them to suffer a loss of money and property." Id.

**RJR Defendants.** The RJR Defendants are an integrated group of companies whose primary business is making and selling cigarettes.

The SAC divides the RJR Defendants into two groups based upon their status before and after a merger that occurred on or about July 30, 2004. In that merger, the "original" RJR Defendants, including R.J. Reynolds Tobacco Company and RJR Nabisco, Inc., merged with the U.S.-based domestic operations of Brown & Williamson Tobacco Corporation (SAC ¶102) which had been a subsidiary of British American Tobacco Company ("BAT"). As a result of the merger, various new corporations were created, including the parent company now known as Reynolds American, Inc. As will be described below, the status of the pleadings and the need to amend the pleadings are largely dictated by the merger, the Defendants' post-merger conduct, and negotiated cooperation agreements between the Plaintiffs and other entities including JT International S.A. ("JTI") -- a subsidiary of Japan Tobacco, Inc. -- and BAT. A-1365; Dkt. 87 at 14 n.9.

In 1999, JTI acquired RJR's international operations and at the same time assumed the legal duty to defend and indemnify the RJR Defendants for any misconduct of the RJR International operations prior to May 1999. At a later date, the RJR Defendants reacquired some of the international operations which they had previously sold to JTI.

In December 2007, Plaintiffs entered into a comprehensive cooperation agreement with JTI which resulted in not only a complete release of all claims against JTI, but also resulted in a partial release for the RJR Defendants releasing many claims assertable against the RJR Defendants for conduct prior to December 14, 2007. See, e.g., SAC ¶145. This agreement, along with the resulting partial release of the RJR Defendants, necessitated the exclusion from the SAC of a significant number of factual allegations that related to the conduct of the RJR Defendants prior to December 2007.

On or about July 30, 2004, the RJR Defendants acquired the U.S. operations of Brown & Williamson Tobacco Company, the U.S. subsidiary of BAT. SAC ¶¶18, 100. On May 27, 2010, the Plaintiffs entered into a comprehensive cooperation agreement with BAT. Thereafter, the Plaintiffs limited their allegations of RJR misconduct involving Brown & Williamson brands. Overall, the Plaintiffs excluded from the SAC approximately 37 pages of factual allegations that had existed in prior versions of the complaint. The Plaintiffs did this with the

11

expectation that they would be able to amend their complaint to add new allegations concerning the post-merger Defendants if the Court found the complaint to be factually deficient.

### **Wrongdoing by RJR Defendants and Co-Conspirators**

***Background*.** The SAC alleges that RJR -- in contrast to other major international cigarette manufacturers -- has continued to use illicit trade as an integral part of its business plan. The RJR Defendants "knowingly sell their products to organized crime, arrange for secret payments from organized crime, and launder such proceeds in the United States or offshore venues known for bank secrecy." SAC ¶ 2. "The RJR Defendants have laundered the illegal proceeds of Italian, Russian, and Colombian organized crime through financial institutions in New York City, including the Bank of New York, Citibank N.A., and Chase Manhattan Bank." SAC ¶2.

The RJR Defendants have knowingly laundered drug money for almost 20 years. In 1994, an RJR consultant put RJR on direct notice that "Colombian cocaine barons" launder and "repatriate cocaine profits earned in the United States through cigarette purchases." SAC ¶61. The SAC alleged:

> The RJR Defendants wished to increase their market share in certain
> target markets, including the European Community, by obtaining
> additional customers for their product on whom they could rely to sell

12

the products in the markets targeted by the RJR Defendants. . . .
Accordingly, the RJR Defendants reached an agreement with their
coconspirators, the narcotics traffickers and money launderers, that
the RJR Defendants would provide these criminals with the capability
to launder the proceeds of their criminal activities, including narcotics
trafficking, by purchasing the RJR Defendants' tobacco products.
The RJR Defendants arranged for secret delivery of the cigarettes and
secret means by which the coconspirators could pay for the cigarettes,
an essential component of the money-laundering scheme. In return,
the narcotics traffickers and money launderers agreed to sell the
products in the markets targeted by the RJR Defendants and sold the
cigarettes under the instructions of the RJR Defendants. In this way,
the proceeds of enormous amounts of Colombian cocaine money and
Russian heroin money derived from narcotics sales in the United
States and the European Community . . . were laundered through the
purchase and sale of the RJR Defendants' products.

SAC ¶53.

The SAC specifically alleged the RJR Defendants' direction, control and

management of the money laundering scheme:

• "The RJR DEFENDANTS controlled every aspect of the financial

transactions involving the purchase of their cigarettes. The RJR DEFENDANTS

set either favorable or unfavorable financing terms for their customers as a means

to reward, punish, and/or control the customers. The RJR DEFENDANTS also

controlled the exact methods and means by which the RJR DEFENDANTS were

paid for the cigarettes. In this way, the RJR DEFENDANTS structured their

payment schemes to maximize their own security from detection by U.S. and

European law enforcement." (SAC ¶ 56).

13

• "The criminal proceeds utilized to pay for the aforesaid cigarettes passed through financial institutions in the EUROPEAN COMMUNITY and ultimately into the coffers of REYNOLDS AMERICAN INC. in the United States."  (SAC ¶ 114).

• The SAC delineates the 12 or more different ways that RJR controlled these illegal activities from its offices and through its employees located in the United States.  (SAC ¶49).  RJR currently does not maintain significant offices outside the borders of the United States.   All the aforesaid activities and the ultimate receipt of funds occurred in the United States.

• The SAC also describes the methodical differences between how RJR treated its legitimate customers and the covert ways in which RJR managed and traded with criminal customers.  (SAC ¶¶67-69).

• To conceal its involvement with organized crime, RJR channeled its products to the EC through a select group of companies that maintained lists of "direct customers of RJR" which were involved in organized crime.  SAC ¶58. Products sold to the "direct customers of RJR" were handled with secrecy.

The SAC explains how RJR's employees knowingly transported large volumes of cash narcotics proceeds.  For example:

14

• The SAC alleges "it was virtually a monthly routine that employees of the RJR DEFENDANTS would travel from the US to Colombia by way of Venezuela. These employees, traveling with authorized RJR distributors, would enter Colombia illegally, paying bribes to guards at the Colombian border so that they could enter the country without their passports being stamped.  They would then travel by car to various locations such as Maicao where they would meet face to face with money launderers and narcotics traffickers.  There the RJR employees would receive payments for cigarettes in the form of bulk cash that may be denominated in U.S. dollars or Venezuelan bolivars.  They would also receive easily transferable instruments such as third-party checks, cashier's checks, and other such instruments. . . ."  (SAC ¶71).

• "Once the employees of the RJR DEFENDANTS reached a major Venezuelan city such as Maracaibo they would, by direct or indirect means, wire transfer the funds to bank accounts of the RJR DEFENDANTS in the United States, thereby completing the money-laundering cycle."  (SAC ¶71).

• RJR also developed and controlled a sophisticated scheme by which U.S. Brady Bonds were used as a vehicle to launder narcotics proceeds and pay for RJR cigarettes.  (SAC ¶¶73-74).

- The SAC identifies specific dates on which RJR made shipments that were paid for with narcotics proceeds.  (SAC ¶¶101, 105-107).  Many more dates and details could be added if the SAC were amended at this time.

**RJR's Money Laundering Customers.**  RJR's money laundering scheme was effectuated by RJR's direct sales from the United States, and the repatriation of the illegal proceeds to banks in the United States.

**Giovannex**.  RJR employed money laundering as part of its business model, including the use of massive shipments of cigarettes into and through the Colon Free Trade Zone in Panama. SAC ¶¶65-67.  Subsequent to the creation of Reynolds American Inc. in 2004, the RJR Defendants "made, sold and shipped both RJR and Brown & Williamson-brand cigarettes to Panama and elsewhere, and received criminal proceeds in payment for cigarettes" on many occasions, including in August 2004, March 2005, April 2005, May 2005, and October 2005.  SAC ¶101.  Specifically, RJR sold U.S.-manufactured product to Giovannex (a so-called "cut out" or intermediary) in Panama, and Giovannex sold the cigarettes into the European Community.  SAC ¶¶45, 105.  Narcotics proceeds were used to pay for the cigarettes.  SAC ¶¶38, 42-45, 65-66.

**UETA**.  RJR used other distributors including UETA and its affiliated companies as part of its money laundering conspiracy.  SAC  ¶¶45, 106.  On the

motion to dismiss, Plaintiffs explained that UETA's activities have a substantial U.S. nexus: among other things, UETA is based in Hollywood, Florida; UETA is a direct customer of Reynolds American and orders cigarettes directly from Reynolds American; Reynolds American has full knowledge of UETA's operations, including its customers; UETA sells massive quantities of cigarettes into illegal markets and to money launderers; and RJR delivers cigarettes to UETA at warehouses in Laredo, Texas and other U.S. locations. Dkt. 97 at 5-6.

**Maritrade.** In another variation on the money laundering scheme, Reynolds American manufactured cigarettes and sold them to Maritrade Investments Ltd., a company with offices in Kenilworth, NJ. Payment for these "made in USA" cigarettes was transmitted through EU banks (i.e., American Express Bank in Frankfurt, Germany), and ultimately remitted to Reynolds American's accounts in the United States. Such cigarette transactions have occurred, for example, on specific dates in 2006 and 2007. SAC ¶107.

**The RJR Money Laundering Enterprise.** The RJR/Brown & Williamson merger of July 30, 2004, represented an instance in which RJR knowingly and intentionally used and invested proceeds of racketeering activity to acquire a domestic enterprise "for the purpose of expanding upon [RJR's] illegal cigarette sales and money-laundering activities." See SAC ¶¶102-103; 162-163; 168-169. This acquisition and the misconduct that followed it are well-delineated in the

17

SAC at ¶¶100-108. Plaintiffs specifically pled that the acquisition and maintenance of that enterprise was a RICO violation.  <u>See</u>, <u>e.g.</u>, SAC Counts I, II.  This was a U.S.-based transaction in which one U.S. company acquired another U.S. company, and merged the entities into a new domestic entity (Reynolds American); there is no convincing basis to claim it was extraterritorial.

As the SAC demonstrates, RJR needed to acquire the Brown & Williamson brands because RJR had sold the bulk of its international operations to JTI.  This transaction inhibited RJR's ability to market and sell its own brands outside the United States, including within the EU.  By acquiring the Brown & Williamson brands, which also had substantial popularity in the EU, RJR dramatically enhanced its ability to compete in the market for illegal cigarettes and reap the vast rewards of selling to customers who paid in cash and were more concerned about laundering their drug money than making a profit on cigarettes.  The acquisition of Brown & Williamson brands and key criminal customers such as Giovannex has been central to the profitability of RJR's illegal operations.  SAC ¶¶101-103, 105.

**Kurdistan Workers' Party/Hussein Regime.**  RJR's illicit trade in cigarettes funded terrorist groups such as the Kurdistan Workers' Party (PKK), and the former Saddam Hussein regime.  The SAC details RJR's illicit sales into Iraq, including RJR's manufacture of Barton and Easton brands in the United States, with massive shipments of cigarettes  (often through the EU) into Iraq on specified

days in specified quantities in 2001 and 2002. RJR "maintained control over the shipping, handling, and ultimate delivery of the cigarettes up to and including the time the cigarettes entered Iraq." SAC ¶¶75-79. Cigarettes sold through the EU and into Iraq fueled and financed the Saddam Hussein regime and terrorist groups, including the PKK, which is a "Foreign Terrorist Organization" under U.S. law (SAC ¶81) and EC law. See SAC ¶83.

## SUMMARY OF ARGUMENT

The District Court summarily and incorrectly dismissed Plaintiffs' state common law claims for lack of diversity jurisdiction. At a minimum, the EC is an "agency or instrumentality" of the Member States and, as such, may invoke diversity jurisdiction under 28 U.S.C. §1332(a)(4). In reaching the opposite conclusion, the District Court overlooked the dispositive point that the EC is a European, treaty-based entity through which the Member States pool sovereignty and act jointly in order to achieve important governmental aims. It is well-established that European treaty-based entities performing governmental functions -- including the EU, Council of Europe, Eurocontrol, and Europol -- are deemed agencies or instrumentalities of foreign states under the FSIA. The District Court's unprecedented and incorrect conclusion that the EC was not an "agency or instrumentality" was reached without any oral argument, and based upon selective excerpts of outdated law review articles that were not cited by Plaintiffs or

Defendants.  This Court should hold that the EC is an "agency or instrumentality" under the FSIA, and allow the EC (and 26 Member States) to invoke diversity jurisdiction under 28 U.S.C. §1332(a)(4).

Alternatively, this Court should remand the case for further proceedings to allow the District Court to consider, in the first instance and under the applicable legal standards, whether the EC and the Member States may invoke diversity jurisdiction (i) under the alienage diversity statute (28 U.S.C. §1332(a)(2)); or (ii) under 28 U.S.C. §1332(a)(4) as a foreign state within the meaning of the FSIA.  In the District Court, the EC argued that the EC may be deemed a citizen or subject of the Member States and thus may invoke alienage diversity; that argument was based, in part, on the District Court's prior ruling that the EC was an "alien" for purposes of diversity.  The District Court ignored the EC's argument and its own prior ruling.  Moreover, the EC argued in the alternative that it may invoke diversity as a "foreign state" as defined by the Supreme Court in <u>Samantar v. Yousuf</u>, 130 S.Ct. 2278, 2286 (2010); however, the District Court overlooked the EC's sovereign rights, ruled on a record that it viewed as "unclear," and failed to address the EC's legal status under <u>Samantar's</u> controlling definition of foreign state.  Under these circumstances, if this Court does not hold outright that the EC is an "agency or instrumentality" of foreign states, it should remand the case for the District Court to address, in the first instance and under the controlling legal

20

standards, whether the EC may invoke diversity jurisdiction on alternative grounds.

The District Court also erred in dismissing the RICO claims as extraterritorial. Plaintiffs' RICO claims are asserted exclusively against U.S. defendants, and are based upon U.S. defendants' conduct in violation of U.S. law on U.S. soil -- including money laundering through domestic financial institutions and the acquisition of and investment in a domestic enterprise (B&W's U.S. operations). The District Court overlooked these domestic links, and denied leave to amend to allow Plaintiffs to bolster the domestic links in the aftermath of Morrison and Norex. Instead, the District Court fashioned and applied a new and incorrect legal test and, on that basis, found the RICO claims extraterritorial. It held that RICO's exclusive "focus" is the "domestic enterprise"-- even though the Supreme Court has specifically held that Congress "had organized crime as its focus" in enacting RICO. See H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 248 (1989). According to the District Court, RICO's scope is limited to "domestic enterprises" -- even though this Court, addressing the "focus" of RICO, specifically held that RICO is not limited to "domestic enterprises." See United States v. Parness, 503 F.2d 430, 439-440 (2d Cir. 1974). The District Court erred in engrafting new limitations upon RICO, and in dismissing the claims under a

21

new and incorrect legal standard.  Given these errors, the dismissal of the RICO claims should be reversed.

The District Court also erred in dismissing Plaintiffs' federal common law claims without comment. This Court has held that governments (foreign and domestic) may assert claims under federal common law to abate and remedy cross-border tortious conduct.  Federal common law provides an alternative basis for federal jurisdiction to enjoin RJR's illicit conduct that harms Plaintiffs and the public; interferes with and damages the single marketplace of the EC which the EC is bound to protect; and, most seriously, fuels and finances organized crime and terrorist groups.  Since the District Court never considered the jurisdictional basis for Plaintiffs' federal common law claims, this Court should remand the case to the District Court to determine whether jurisdiction exists on that alternative ground.

## STANDARD OF REVIEW

This Court reviews *de novo* a District Court's dismissal of state common law claims for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). Mackensworth v. S.S. Am. Merchant, 28 F.3d 246, 252 (2d Cir. 1994). This Court likewise reviews *de novo* the District Court's dismissal of RICO claims for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d 138, 145 (2d Cir. 2002).  The District Court's refusal to grant leave

22

to amend a complaint is reviewed for abuse of discretion.  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007).

## ARGUMENT

## POINT I

## DIVERSITY JURISDICTION EXISTS IN THIS CASE.

The District Court ruled that the EC may not bring claims in federal court based on diversity. SPA-50. This is an issue of first impression, international significance, and "solemnity." SPA-15.  Yet, the District Court did not conduct oral argument on this issue, overlooked controlling law and Plaintiffs' arguments, and reached its own, incorrect conclusions about the EC's status under U.S and foreign law.  Diversity was properly alleged (SAC ¶¶5, 6, 27), and the District Court possessed diversity jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. §1332(a)(4) or 28 U.S.C. §1332(a)(2).

**A**.  **The EC Is An "Agency or Instrumentality" Under the FSIA.**

The EC is an "agency or instrumentality of a foreign state" under the FSIA. Complete diversity exists on that basis.  See 28 U.S.C. §1332(a)(4) (diversity jurisdiction exists between a "foreign state" and "citizens of a State").

For purposes of diversity jurisdiction, "foreign state" is defined by reference to 28 U.S.C. §1603(a) (see 28 U.S.C. §1332(a)(4)), and includes "an agency or instrumentality of a foreign state." 28 U.S.C. §1603(a). Congress has defined "agency or instrumentality" as "any entity":

> (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title [28 U.S.C. 1332(c) and (e)] nor created under the laws of any third country.

See 28 U.S.C. §1603(b). There is no dispute that the EC meets that definition's first element (SPA-36-37; the EC is a separate legal person for purposes of the FSIA), and the third element (SPA-49-50; the EC was not formed under the laws of a third country). The District Court concluded, however, that the EC did not qualify as an "organ" of the Member States within the meaning of the FSIA. SPA-49. That conclusion was wrong as a matter of law.

## 1. **The Term "Organ" Should Be Broadly and Flexibly Construed.**

Congress intended the terms "agency or instrumentality" and "organ" to be construed and applied in a broad, flexible, and inclusive manner.

The term "agency or instrumentality" covers a wide range of entities. This construction is compelled by the broad statutory definition of "foreign state" which "includes" agencies and instrumentalities of "any" form. 28 U.S.C. §§1603(a)-(b).[19] See also H.R. Rep. No. 94-1487, 94th Cong. 2d Sess. at 10 (1976) ("entities which meet the definition of an 'agency or instrumentality of a foreign state' could assume a variety of forms" including for example "a corporation, association, [or] foundation"). The courts have uniformly accorded the terms "organ" and "agency or instrumentality" a broad construction. See, e.g., Murphy v. Korea Asset Mgmt. Corp., 421 F. Supp. 2d 627, 640 (S.D.N.Y. 2005) ("the term 'organ' should be interpreted broadly"), aff'd, 190 Fed. Appx. 43 (2d Cir. 2006); Granville Gold Trust-Switzerland v. Commissione Del Fullimento/Inter Change Bank, 924 F. Supp. 397, 405 (E.D.N.Y. 1996) ("The legislative history of the FSIA is clear that the term 'agency or instrumentality' should be interpreted broadly"), aff'd, 111 F.3d 123 (2d Cir. 1997); Gates v. Victor Fine Foods, 54 F.3d 1457, 1460 (9th Cir.

---

[19] Congress defined "foreign state" as a term that "*includes*" political subdivisions, agencies and instrumentalities. 28 U.S.C. §1603(a) (emphasis added). This use of the term "includes" (rather than "means") evidences Congress's clear intent to set forth a broad, non-exhaustive list of covered entities. See Boyle v. United States, 129 S.Ct. 2237, 2243 & n.2 (2009). Additionally, "foreign state" includes "*any* entity" meeting the criteria of "agency or instrumentality of a foreign state." 28 U.S.C. §1603(b) (emphasis added). This use of the term "any" "ensures that the definition has a wide reach." Boyle, 129 S.Ct. at 2243. Accord United States v. Gonzales, 520 U.S. 1, 5 (1997) (same).

25

1995) ("The Act's legislative history suggests that Congress intended the terms 'organ' and 'agency or instrumentality' to be read broadly"); <u>USX Corp. v. Adriatic Ins. Co.</u>, 345 F.3d 190, 208 (3d Cir. 2003) (a "flexible approach" in evaluating organ status is appropriate).

### 2. <u>European Treaty-Based Entities Are "Agencies or Instrumentalities."</u>

Where, as here, foreign states pool sovereign rights and act jointly through an entity of their creation, that entity will be deemed an "organ" of the foreign states under the FSIA.  <u>See</u>, <u>e.g.</u>, <u>LeDonne v. Gulf Air, Inc.</u>, 700 F. Supp. 1400, 1406 (E.D. Va. 1988) (recognizing "the well-established international practice of states acting jointly through treaty-created entities for public or sovereign purposes" and holding that an entity created by a treaty among four Persian Gulf states qualifies as an agency or instrumentality); <u>EAL (Delaware) Corp. v. European Organisation for the Safety of Air Navigation</u>, 1994 U.S. Dist. LEXIS 20528 (D. Del. 1994) ("<u>Eurocontrol</u>") (holding that Eurocontrol, an entity created by treaty among Member States of the EC, is an agency or instrumentality); <u>Mangattu v. M/V Ibn Hayyan</u>, 35 F.3d 205, 208 (5th Cir. 1994) (holding that United Arab Shipping Co, an entity created by governments of the six nations for economic purposes, is an  "agency or instrumentality"); <u>In re Air Crash Disaster Near Roselawn</u>, 96 F.3d 932, 938-939 (7th Cir. 1996) (holding that an entity created by an intergovernmental agreement between France and Italy is an agency

26

or instrumentality); see also Rios v. Marshall, 530 F. Supp. 351, 371 (S.D.N.Y. 1981) (British West Indies Central Labour Organization, an unincorporated not-for-profit association of the Caribbean Regional Labour Board, is an organ of its eleven member states).

Under the foregoing rule, it is well-established that European treaty-based organizations among the Member States which perform governmental functions -- such as the EC -- are "agencies or instrumentalities" of foreign states. See, e.g., Eurocontrol, supra (Eurocontrol is an agency or instrumentality); see also A-1575-1577; A-1579-1582 (State Department deemed Europol -- a "European treaty-based organization" -- to be akin to "national government agencies" for purposes of the FSIA); Morgan v. Council of Europe, et al., 02-CV-0891(CBA), 02-CV-1471(CBA) (E.D.N.Y. 2002) (Council of Europe is an "agency or instrumentality" of a foreign state under the FSIA); appeal dismissed, Order (2d Cir. June 3, 2004) (A-1600-1614 & A-1604 n.6); Morgan v. United States, et al., 04-CV-0672 (CBA), at 3 & n.1 (E.D.N.Y. 2004) (European Union is afforded privileges and immunities of the FSIA), appeal dismissed, Order (2d Cir. Aug. 3, 2004) (see A-1616-1620; A-1618 n.1); see also In re Methionine Antitrust Litig., MDL No. 00-1311 CRB, slip op. at 13 (N.D. Cal. 2002) (European Commission is akin to a "foreign government" and entitled to comity) (A-1584, 1596).

In conflict with the foregoing authorities, the District Court strictly and narrowly construed the term "organ" and concluded that the EC was not an "organ" within the meaning of the FSIA. The District Court reached this conclusion without oral argument and relied upon selective excerpts of outdated law review articles that were not cited in either Plaintiffs' or Defendants' submissions. Significantly, RJR had effectively conceded that the EC was an agency or instrumentality of "its twenty-seven Member States collectively." Dkt. 95 at 15. Accordingly, the District Court erred in concluding that the EC is not an "organ" under the FSIA.

### 3.  **The EC Is an "Organ" Within the Meaning of the FSIA.**

"Although there is no specific test for 'organ' status under the FSIA, various factors are relevant: (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law." Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir. 2004). In weighing these factors, the courts have emphasized that all of them are not required to be present. The courts should "engage in a balancing process, without particular emphasis on any given factor and without requiring that every factor weigh in favor of, or against, the entity

28

claiming FSIA [organ status]." In re Terrorist Attacks on September 11, 2001, 538 F.3d 71, 85 (2d Cir. 2008) (citation omitted), abrogated on other grounds by Samantar, 130 S.Ct. at 2278; Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd., 476 F.3d 140, 143 (2d Cir. 2007) (four of five Filler factors were satisfied). A court should "*not* apply [the factors] mechanically." Kelly v. Syria Shell Petroleum Dev. B.V., 213 F.3d 841, 847 (5th Cir. 2000) (emphasis in original); see also USX, 345 F.3d at 207-208. The District Court made findings under Filler and the record is complete for purposes of appellate review on the issue of "agency or instrumentality" status. This Court should rule that the EC possesses "organ" status under Filler.

   **_National purpose_**. It has never been contested that the EC was formed by the Member States for a national purpose. The District Court found this factor was met. SPA-40-41. This is the "most significant[]" consideration in ascertaining "organ" status. See Murphy, 421 F.Supp.2d at 646.

   Confirming that the EC was formed for a national purpose, the District Court held that the Member States created the EC "to 'establish[] a common market and an economic monetary union . . . to promote throughout the Community a harmonious, balanced and sustainable development of economic activities, . . . and economic and social cohesion and solidarity among Member States.'" SPA

29

40-41, *citing* EC Treaty, art. 2. The maintenance of economic stability is a quintessential national purpose. <u>USX</u>, 345 F.3d at 211.

The conclusion that the EC was formed for a national purpose is reinforced by other provisions of the EC Treaty, by which the Member States delegated "sovereign rights" and governmental competences to the EC, which exercises them on behalf of the Member States and their nationals. <u>See</u> <u>Van Gend & Loos</u>, [1963] E.C.R. at 12. The EC Treaty and subsequent amendments were approved, voluntarily and democratically, by all of the Member States under their respective constitutional procedures, including popular referenda. The EC Treaty sets forth several national purposes that the EC was intended to serve, including: "to ensure the economic and social progress of their countries by common action to eliminate barriers which divide Europe" (EC Treaty (preamble) at ¶2); to achieve the essential objective of the "constant improvement of the living and working conditions of their peoples" (<u>id.</u> at ¶3); the "pooling [of] their resources to preserve and strengthen peace and liberty (<u>id.</u> at ¶8); and promoting "the development of the highest possible knowledge for their peoples through a wide access to education and through its continuous updating." <u>Id.</u> at ¶9. The EC thus satisfies the "national purpose" factor.

***Supervision***. Courts also consider "whether the foreign state actively supervises the entity." <u>Filler</u>, <u>supra</u>. The District Court held that "the Member

30

States did not actively supervise the European Community as a whole" (SPA-42) and, on this basis, the EC did not meet the "supervision" factor.  That was error.

Under the EC Treaty, the Member States have delegated sovereign, governmental powers to the EC in prescribed areas.  The EC acts within the scope of the delegated powers.  See EC Treaty, art. 5 ("The Community shall act within the limits of the powers conferred upon it by this Treaty and of the objectives assigned to it therein"); art. 7 ("Each institution shall act within the limits of the powers conferred upon it by this Treaty").   The EU Treaties have been ratified by all Member States and can be amended only in the same fashion.  See Lisbon Treaty, art. 48.   The Member States define the powers and competences of the EC and are masters of the treaty.  Accordingly, the "supervision" factor is met.  See Gates, 54 F.3d at 1461 ("organ" status is established where the government, through the authority creating the entity, defines "the entity's ability to act independently"); Roselawn, 96 F.3d at 939 (agency or instrumentality status exists where the entity "has government controls in its charter").

Moreover, the Member States have a direct role in the work of the EC through the Council of Ministers.  As Justice Breyer has observed:

> The Council of Ministers, headquartered in Brussels, is the EC's primary policy-making and legislative body.  It has fifteen members, one representing each state, although the individual representative of each member state varies depending upon the subject matter to be discussed. When the subject is finance, for example, each state will

31

likely send its finance minister to Brussels for the discussion. When the matter relates to particularly important economic issues, including the move toward a single currency, each state sends its Prime Minister.

Stephen Breyer, <u>Changing Relationships Among European Constitutional Courts</u>, 21 Cardozo L. Rev. 1045, 1046 (2000). The Member States have <u>direct</u> representation in "the EC's primary policy-making and legislative body" (<u>id.</u>); the District Court's conclusion -- that there was no Member State supervision of the EC -- is unsustainable.

Indeed, there is no dispute that the Member States nominated and, as a group, had ultimate appointment power concerning key EC officials under the EC Treaty. SPA-42. <u>See</u>, <u>e.g.</u>, EC Treaty, art. 214(2) ("the President [of the Commission] and the other Members of the Commission shall be appointed by common accord of the governments of the Member States"); art. 223 (Judges of the European Court of Justice "shall be appointed by common accord of the governments of the Member States"); art. 247(3) (Members of the Court of Auditors, an EU institution directly involved with "supervision," are appointed by the Council based on proposals made by each Member State). The District Court, however, discounted these appointments because, in some instances, the Member States' appointment power was not "unchecked." <u>Id.</u> The District Court did not consider that it was the *Member States* -- through the EC Treaty -- that established the appointment system and its "checks." Indeed, it was the *Member States*, as a

32

group, that usually embodied the so-called "checks" on appointment of key EC officials. The Member States' appointment of key EC officials, pursuant to a treaty-based regime established by the Member States, further supports the existence of supervision.

***Public Employees***.  Courts consider whether the foreign state requires the hiring of public employees and pays their salaries (Filler, supra); however, this factor has been accorded little weight. See, e.g., Peninsula, 476 F.3d at 143 (finding "organ" status where the foreign state did not "require[] the hiring of public employees"); Murphy, 421 F.Supp.2d at 644, 646 ("organ" status found where entity's employees were not paid by the foreign government).

Here, the District Court ruled that "although the employees of the European Community may have met the definition of 'public employees' of the Community itself, they were not public employees of the Member States." SPA-45. That conclusion missed the point.

Filler does not require that the entity's "hiring of public employees" occur in any particular manner.  Rather, courts look to the "civil servant" status of the entity's employees. See, e.g., Patrickson v. Dole Food Co., 251 F.3d 795, 808 (9th Cir. 2001) (whether employees were "treated as civil servants" is a relevant factor in defining "organ" status), aff'd, 538 U.S. 468 (2003). The EC has hired employees through its civil service system, which is governed by Staff Regulations

33

adopted by the Council of Ministers.  See EC Treaty, art. 283.[20]  The EC's hiring of civil service personnel, pursuant to the treaty regime prescribed by the Member States, satisfied Filler.

"Organ" status exists where the entity's employees are accorded immunity for carrying out their official duties.  See Gates, 54 F.3d at 1461.  By treaty, the EC is accorded a number of privileges and immunities, as set out in the Protocol on Privileges and Immunities.[21]  Moreover, its officials and employees are accorded immunity,[22] for actions taken in an "official capacity."  Cf. Case 5/68, Sayag v. Leduc, [1968] E.C.R. 395, 401 (recognizing that EC employees have immunity for actions taken in an official capacity, but holding that immunity was not warranted because the employee was not an acting in an official capacity during the time of the motor vehicle accident).  EC officials and employees are unquestionably "public employees."

---

[20]  See Regulation No 31 (EEC), 11 (EAEC), laying down the Staff Regulations of Officials and the Conditions of employment of other servants of the European Economic Community and the European Atomic Energy Community. See OJ L 45/1385 (14 June 1962).

[21]  See EC Treaty, art. 291 ("The Community shall enjoy in the territories of the Member States such privileges and immunities as are necessary for the performance of its tasks, under the conditions laid down in the Protocol of 8 April 1965 on the privileges and immunities of the European Communities").

[22]  See Protocol on the Privileges and Immunities of the European Communities, art. 12(a) (Brussels, 8 April 1965).

34

*__Exclusive Rights__*.  Courts also consider "whether the entity holds exclusive rights to some right in the [foreign] country."  Filler, supra.  The District Court correctly concluded that the EC possessed exclusive rights in specific areas.  SPA-46-47.  The District Court held that the EC possessed at least "two 'exclusive rights'" specifically:  (1) "'the exclusive right to authorize the issue of banknotes within the Community'" and (2) the "'exclusive competence'" to "'conclude the Multilateral Agreements on Trade in Goods'" Id.  (citations omitted).

The EC clearly has exclusive rights in a number of areas, including trade (Re the O.E.C.D. Understanding on a Local Cost Standard, Opinion 1/75, [1975] E.C.R. 1355; Donckerwolcke v. Procureur de la République, Case 41/76, [1976] E.C.R. 1921); fisheries (Kramer and Bais SNC v. The Netherlands, Joined Cases 3, 4, 6/76, [1976] E.C.R. 1279) and monetary policy. SPA-46-47.  Moreover, when the EC adopts common rules, it acquires the exclusive competence to negotiate and conclude international agreements that could affect such rules.  See Case 22/70, Commission v. Council (ERTA), [1971] E.C.R. 263.

U.S. law also recognizes the EC's exclusive rights. Under the International Antitrust Enforcement Assistance Act of 1994, 15 U.S.C. §6201 *et seq*. ("IAEAA"), Congress enacted a statutory framework of antitrust cooperation between the United States and the EC (among others).  In enacting the IAEAA, Congress acknowledged the important antitrust cooperation between the EC and

35

the United States.  See H.R. Rep. 103-72, 103d Cong. 2d Sess. at 8 (Oct. 3, 1994).

Confirming that the EC was within the IAEAA's scope, Congress determined that

the EC has "*sovereign* authority to administer or enforce its antitrust laws, and to

prohibit and regulate disclosure of information that is obtained in the course of an

antitrust investigation."  Id. at 14 (emphasis in original).

> ***EC's Treatment by Member States.***  Courts also consider how the entity is
> "treated under foreign state law."  Filler, supra.  The District Court concluded that
> the Member States do not treat the EC as an "organ."  SPA-48.  That conclusion
> ignored landmark authorities in the Member States and the fundamental principle
> that the Member States "act jointly" through the EC.  See Federal Constitutional
> Court Decision Concerning the Maastricht Treaty, 89 BVerfGE 155 (F.R.G.) (Oct.
> 12, 1993) (translated and reprinted in 33 I.L.M. 388, 423-424 (1994)) (hereinafter
> "Maastricht").

In Maastricht, the German Federal Constitutional Court held: "The Member

States have established the European Union in order to perform some of their

duties and to exercise some of their sovereignty jointly."  Id. at 423 (emphasis

added).  Similarly, France amended its constitution to confirm that Member States

"will act jointly in the European Union and the European Communities in the

fulfillment of their responsibilities."  Id. at 424 (citation omitted) (emphasis added).

All Member States recognize that they have jointly pooled their sovereignty to

achieve important national purposes through the EC. <u>See</u>, <u>e.g.</u>, EC Treaty (preamble) (the EC embodied a "pooling [of] resources [of the Member States] to preserve and strengthen peace and liberty"). The EC is thus an instrument or means by which sovereign powers are jointly exercised. This type of "joint sovereign act" is sufficient to establish "organ" status. <u>See</u> <u>Roselawn</u>, 96 F.3d at 939 (entity created by France and Italy); <u>Eurocontrol</u>, <u>supra</u> (entity created by Member States); <u>LeDonne</u>, 700 F. Supp. at 1406 (entity created by Persian Gulf states).

In reaching the opposite conclusion, the District Court misread <u>Re Treaty on European Union</u>, Case No. 1236/92, Spanish Constitutional Court (Plenary Session) (July 1, 1992). The District Court wrote that "the Constitutional Court of Spain specifically disclaimed 'ownership' over the European Community," and asserted other Member States also held that view. SPA-48-49 *citing* Larry Catá Backer, <u>The Extra-National State: American Confederate Federalism and the European Union</u>, 7 Colum. J. Eur. L. 173, 205-206 (2001)) *citing* <u>Re Treaty on European Union</u>. Nothing in <u>Re Treaty on European Union</u> supports the District Court's conclusion. <u>Re Treaty on European Union</u> simply confirmed that the Spanish Constitution permits the national government to delegate to the EC the ability to "exercise" sovereign powers, without ceding ownership or entitlement to those sovereign rights. Therefore, under <u>Re Treaty on European Union</u>, the EC

37

acts upon the grant of delegated powers of the national government, and the EC is an instrument or means through which such powers are jointly exercised.[23]

## B.  Alternatively, This Court Should Remand for Further Proceedings.

At a minimum, the EC is an "agency or instrumentality" of the Member States. Diversity therefore exists under 28 U.S.C. §1332(a)(4). The record is complete on the EC's status as an "agency or instrumentality" and this Court should reverse the judgment below on that basis.

In contrast, the record is not complete as to alternative grounds for diversity jurisdiction. First, the District Court totally overlooked Plaintiffs' argument that subject matter jurisdiction exists under the alienage diversity statute, 28 U.S.C. §1332(a)(2). Second, acting upon an "unclear" record, the District Court

---

[23] The conclusion that the EC is an "organ" under Filler is supported by the "ordinary, contemporary, common meaning" of the term "organ." See Perrin v. United States, 444 U.S. 37, 42 (1979). Courts may consider the ordinary and natural meaning of a term by resort to dictionaries. See, e.g., H.J. Inc., 492 U.S. at 238 (Oxford English Dictionary); United States v. Connolly, 552 F.3d 86, 90 n.3 (2d Cir. 2008) (Oxford English Dictionary).  The term "organ" is defined as "[a] means of action or operation, an instrument, a 'tool'; a person, body of persons, or thing by which some purpose is carried out or some function performed." The Shorter Oxford English Dictionary, at 1384 (1959); accord Random House Dictionary of the English Language, at 1014 (1966) (defining "organ" as "an instrument or means, as of action, performance, etc.").  Under Filler, and the ordinary meaning of the term "organ," the EC is a means or instrument of action by the Member States and thus is an "organ" under the FSIA.

overlooked basic legal principles in holding that the EC is not a "foreign state" under the FSIA, 28 U.S.C. §1332(a)(4).

If this Court does not hold that the EC is an "agency or instrumentality" of the Member States, it should vacate the judgment and remand the case for further proceedings to allow the District Court to address, in the first instance, those alternative grounds for diversity jurisdiction. See Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi, 546 U.S. 450, 453 (2006) (reversing and remanding where the Court of Appeals did not consider, and the governmental entity had no reasonable opportunity to argue, a legal point bearing upon the entity's status under the FSIA); United Food & Commercial Workers Union, Local 919 v. Centermark Properties Meriden Square, Inc., 30 F.3d 298, 302 (2d Cir. 1994) ("we believe it prudent to remand the issue and . . . allow the district court to make an initial determination as to whether complete diversity of citizenship exists in this case"); Baxter v. Sturm, Ruger & Co., Inc., 32 F.3d 48, 49 (2d Cir. 1994) (reversing and remanding where "district court did not discuss" a relevant legal issue "although it was fairly before that court").

## 1. **The District Court Overlooked Alienage Jurisdiction.**

The District Court went to great lengths to find that the EC is an ordinary "international organization" operating under a treaty that defined only the

39

relationships among the Member States.  SPA 33-34. That finding was incorrect.[24]

Nonetheless, having found that the EC is an ordinary "international organization," the District Court was bound to address the juridical status of the EC as a so-called "international organization" and consider Plaintiffs' argument that the EC is a "citizen or subject" of foreign states for purposes of the alienage diversity statute, 28 U.S.C. §1332(a)(2).  This argument was properly before the District Court.  See Dkt. 97 at 9-10; A-1645.  The District Court totally overlooked this argument, and this Court should remand to the District Court to consider this argument in the first instance.

Alienage jurisdiction is as old as this Nation. "[The] penchant of the state courts to disrupt international relations and discourage foreign investment led

---

[24] The European Court of Justice rejected the notion that the EC was an ordinary international organization operating under "an agreement which merely creates mutual obligations between the contracting states." Van Gend & Loos, [1963] E.C.R. at 12; accord Opinion 1/91, supra, at ¶¶ 20-21 (the EEC Treaty is more than an agreement "which, essentially, merely creates rights and obligations between the Contracting Parties"); Case 6/64, Costa v. ENEL, [1964] E.C.R. 585, 593 (the EEC Treaty is not an "ordinary" international treaty). See also G.F. Mancini, Europe: The Case for Statehood, 4 Eur. L.J. 29 (1998) ("[t]he European Community differed from [international organisations] in many respects"). The District Court's conclusion was based on outdated commentary (SPA-33-34 citing Restatement (Second) of Foreign Relations Law of the United States §5 cmt. b (1965) ("Restatement")), which commentary in turn was based on a 1957 treaty concerning the EEC (the predecessor to the EC) (id.), and which did not consider the post-1957 judgments in Van Gend & Loos, Opinion 1/91, and Costa holding that the EEC was not an ordinary international organization.

directly to the alienage jurisdiction provided by Article III of the Constitution." JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd., 536 U.S. 88, 94 (2002). The Framers made it clear that alienage diversity was designed to protect the litigation interests of "'foreigners.'" Id. at 95-96 (citation omitted). Congress immediately implemented this constitutional grant of authority to address litigation interests of "aliens." See Judiciary Act of 1789, ch. 20, § 11, 1 Stat. 73, 78.

Today, the alienage diversity statute grants federal district courts jurisdiction over disputes between "citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. §1332(a)(2). "[T]he similarity of §1332(a)(2) to Article III bespeaks a shared purpose" which is to protect the litigation interests of all "'aliens,'" "'foreigners,'" "'nationals,'" or "'citizens or subjects'" of foreign states. See JPMorgan, 536 U.S. at 95-99 (citations omitted).

The alienage diversity statute's coverage is not limited to natural persons. See, e.g., JPMorgan, 536 U.S. at 93. "Section 1332(a)(2) applies to foreign legal entities of all kinds." Cohn v. Rosenfeld, 733 F.2d 625, 629 (9th Cir. 1984) (Liechtenstein "anstalt"); see Autocephalous Greek-Orthodox Church v. Goldberg & Feldman Fine Arts, Inc., 917 F.2d 278, 285 (7th Cir. 1990) (Cypriot church); Stiftung v. Plains Mktg., L.P., 603 F.3d 295, 299 (5th Cir. 2010) (Liechtenstein "stiftung").

It would be particularly appropriate for the District Court to address alienage jurisdiction because the same District Judge previously held that the EC was an "alien" for diversity purposes.  European Community v. RJR Nabisco, Inc., 150 F.Supp.2d 456, 502 (E.D.N.Y. 2001).  In an earlier action, the EC (acting as the sole plaintiff) brought suit against RJR and JTI (an alien) under federal and state law.  RJR moved to dismiss the EC's state-law claims for lack of diversity because "aliens are on both sides" of the matter.  A-1566-1568.  Adopting RJR's argument, the District Court ruled that "[t]here is no diversity jurisdiction over Plaintiff's state law claims because complete diversity between the parties is lacking" since "aliens are on both sides of the matter." European Community, 150 F.Supp.2d at 502 (citations omitted).

The EC's capacity to invoke alienage jurisdiction arises directly from the EC Treaty, which states: "the Community shall enjoy the most extensive legal capacity accorded to *legal persons*" under the laws of the Member States.  EC Treaty, art. 282 (emphasis added). The Treaty thereby endows the EC with all the attributes and capacities of national "legal persons."  Such national "legal persons" may invoke the alienage diversity statute.  Compare Nippon Fire & Marine Ins. Co., Ltd. v. Skyway Freight Sys., Inc., 235 F.3d 53, 59 n.2 (2d Cir. 2000) (Japanese corporation was "citizen[] or subject[] of a foreign state" for purpose of

42

diversity/alienage jurisdiction). The EC should be afforded at least the same access to the federal courts as a foreign corporation.

JPMorgan confirms this result. The Supreme Court unanimously ruled that British Virgin Island companies are "citizens or subjects" of the United Kingdom within the meaning of §1332(a)(2) because the UK was the BVI entity's "ultimate political authority." JPMorgan, 536 U.S. at 93. Here, the District Court did not conduct such an inquiry. The EC ultimately owes its "existence" to the Member States. Id. Accordingly, there should be a remand to determine whether the EC should be permitted to invoke alienage jurisdiction.

## 2.  The District Court Overlooked Controlling Law.

In the District Court, the EC argued that diversity jurisdiction existed under 28 U.S.C. §1332(a)(4) because it met the definition of "foreign state" in Samantar. See Dkt. 97 at 11; A-1645. In reaching the opposite conclusion, the District Court overlooked controlling law.

Specifically, the District Court overlooked the EC's "sovereign rights" as recognized by EC and U.S. law. See Van Gend & Loos, supra (EC "institutions endowed with sovereign rights"); Opinion 1/91, supra, at ¶ 21 (same); Costa, supra, at 593 (same); H.R. Rep. 103-72 at 14 (the EC has "*sovereign* authority to administer or enforce its antitrust laws") (emphasis in original). Instead, the

43

District Court incorrectly concluded that the EC Treaty did nothing to affect the "sovereignty of [EC] member states." SPA-33. The District Court thereby overlooked the delegation of "sovereign rights" by the Member States to the EC that defines the EC's juridical status.

Moreover, the District Court addressed the EC's "foreign state" status even though it found the record to be unclear. Addressing the EC's governmental competence in the territory of the EC, the District Court found the record on that central point to be "less clear" than the EC's legal status as "'an entity with a defined territory and population.'" SPA-33 (citation omitted). The status of Europol -- a European treaty-based entity accorded protection under the FSIA -- was also deemed "unclear." SPA-31 n.2. The District Court's findings were inherently unclear because they were based on the "Maastricht Treaty" (SPA-34, 47 n.3, 50), the "Amsterdam Treaty" (SPA-37, 41-45), the "Treaty of Nice" (SPA-42), and the "Lisbon Treaty" (SPA-33) -- despite its holding that only the "Amsterdam Treaty" should be considered. SPA-37. The District Court should have conducted oral argument to allow clarification on these and other basic points, as welcomed by Plaintiffs. A-1645.

Finally, the District Court made no findings concerning the EC's status under the Supreme Court's controlling definition of "foreign state." The Supreme Court, defining "foreign state" for purposes of the FSIA, held that: "[t]he term

'foreign state' on its face indicates a body politic that governs a particular territory." <u>Samantar</u>,  130 S.Ct. at 2286. The Supreme Court's definition was consistent with established usage. <u>See</u> Brief of the United States as Amicus Curiae, <u>Samantar v. Yousuf</u>, No. 08-1555 at 14 (2010) ("At the time of the FSIA's enactment, the term 'state' had long been understood to refer to a group of people within a defined territory . . .").

The District Court noted the <u>Samantar</u> definition (SPA-32), but made no findings as to whether the EC met it.  Instead, the District Court incorrectly found that the EC was not a "foreign state" under the Restatement. SPA-32.  The case should be remanded to allow the District Court to consider whether, in light of <u>Samantar</u>, an alternative basis for diversity jurisdiction exists under 28 U.S.C. §1332(a)(4).

The concept of "state" has "always been interpreted and applied flexibly, depending on the circumstances and the context in which the claim of statehood is made." <u>See</u> Rosalyn Higgins, <u>Problems & Process: International Law and How We Use It</u>, at 39 (Oxford 1995). "'[S]tatehood' sought for a "limited purpose is viewed more flexibly than 'statehood' for the more comprehensive claim of UN membership." <u>Id.</u> at 42.  In the former context, "there has been no policy interest in a narrow interpretation of the term 'state.'" <u>Id.</u>  The EC can establish its status as a foreign state under <u>Samantar</u> for the limited purpose of §1332(a)(4) .

45

Under the EC Treaty, the EC is a body politic comprised of "citizen[s] of the Union" each of whom has prescribed, direct rights under Community law, including "the right to move and reside freely within the territory of the Member States," vote and stand as a candidate in elections, and petition the European Parliament and other EC institutions. EC Treaty, Articles 17-21. The EC itself is vested with "legal personality" (Article 281), "extensive legal capacity" including the power to acquire property (Article 282), and the capacity to have contractual and non-contractual liability. See Article 288. The EC is a "body politic" in every sense of the term.

The EC governs a particular territory. Under the EC Treaty, the EC possesses its own government, including the European Parliament (Articles 189-201), the Council of Ministers (Articles 202-210), and the European Commission. See Articles 211-219. EC governance extends to its defined territory. See EC Treaty, art. 299. In areas in which it has competence, the EC may enact legislation that has "direct effect" throughout its territory. See Van Gend & Loos, [1963] E.C.R. at 13. The European Court of Justice ensures that the law is observed in the interpretation and application of the EC Treaty. See EC Treaty, arts. 220-245. Thus, the EC can meet the Samantar definition of "foreign state."

The District Court sidestepped Samantar's definition of "foreign state" and concluded that the EC is not a "foreign state" under the Restatement §4 (defining

46

"state" as "an entity that has a defined territory and population under the control of a government and that engages in foreign relations"). The District Court acknowledged that the EC has "a defined territory and population" (SPA-33); possesses a government with executive, legislative and judicial institutions (SPA-41-42) that "performs many of the governmental functions of a state" (SPA-34), including in areas of exclusive competence (SPA-46-47); and engages in foreign or external relations. SPA-47 (competence to conclude international agreements). The District Court made no findings under <u>Samantar's</u> controlling standard, and for this reason there should be a remand for further proceedings.

## POINT II

### THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFFS' RICO CLAIMS.

This Court has held that RICO does not apply extraterritorially and RICO claims with only "slim contacts with the United States" are beyond the scope of RICO. <u>Norex</u>, 631 F.3d at 33. Here, however, the District Court did not apply <u>Norex's</u> "slim contacts" test. Acting on the incorrect assumption that this Court "has not addressed the 'focus' of RICO" (SPA-8), the District Court held that RICO's exclusive "focus" is the "enterprise" and RICO is limited to cases involving "domestic enterprises." <u>Id.</u> The District Court erred in treating

47

Plaintiffs' allegations as extraterritorial and in engrafting new limitations upon RICO.

### A. <u>Plaintiffs' RICO Claims Are Not "Extraterritorial" Under *Norex*.</u>

Congress "had organized crime as its focus" in enacting RICO. <u>See</u> <u>H.J. Inc.</u>, 492 U.S. at 248. <u>See</u> <u>also</u> <u>Rotella v. Wood</u>, 528 U.S. 549, 557 (2000) (the "object of civil RICO" is to eliminate "racketeering activity"); <u>Agency Holding Corp. v. Malley-Duff & Associates, Inc.</u>, 483 U.S. 143, 154 (1987) ("the heart of any RICO complaint is the allegation of a *pattern* of racketeering") (emphasis in original).

Plaintiffs' RICO claims seek to eradicate a U.S.-based organized criminal conspiracy and thus fall well within RICO's purview under <u>Norex</u>. The racketeering activities giving rise to Plaintiffs' claims -- including the pattern of racketeering activity, and the use of its proceeds to commit RICO violations -- occurred in the United States. The RJR Defendants who committed the racketeering activities were all U.S. defendants doing business in the United States. Plaintiffs have submitted evidence showing RJR's domestic wrongdoing. (A-1563-1564). By including within RICO's scope predicate acts that implicate cross-border conduct (<u>see</u>, <u>e.g.</u>, money laundering (18 U.S.C. §1961(1)(B) <u>citing</u> 18 U.S.C. §§1956, 1957), Congress expressed its specific intent that RICO reach

48

cross-border schemes, including those conducted from the United States.   The Plaintiffs' claims include far more than "slim contacts with the United States" and, on this basis, are not impermissibly extraterritorial under <u>Norex</u>.

Nonetheless, the District Court ruled that RICO's exclusive focus is the "enterprise" (SPA-10) and dismissed Plaintiffs' claims as extraterritorial.  SPA-14. The District Judge overlooked the domestic nature of the overarching "RJR Money-Laundering Enterprise." <u>See</u> SAC ¶158. The enterprise includes RJR Defendants, all of which are U.S. citizens (<u>id.</u>) and which orchestrated the scheme from the United States.  <u>See</u> SAC §§49, 101, 105.

The RJR Defendants used and invested the proceeds of racketeering activity (SAC ¶159), which were repatriated to them in the United States (SAC ¶¶61, 107, 129) through financial institutions in New York City, including the Bank of New York, Citibank N.A., and Chase Manhattan Bank (SAC ¶ 2). The RJR Defendants used those racketeering proceeds to acquire, establish and operate the RJR Money-Laundering Enterprise, for example, by acquiring the U.S.-based "domestic operations of Brown & Williamson, for the purpose of expanding upon [RJR's] illegal cigarette sales and money-laundering activities." <u>See</u> SAC ¶¶102-103; 162-163; 168-169.  RJR created a new domestic company -- Reynolds American -- into which it merged the domestic operations, assets and brands of B&W, and thereby branched out into new money laundering activities that injured the Plaintiffs.  <u>See</u>

49

SAC ¶ 19. These allegations state a claim under RICO. See, e.g., Ideal Steel Supply Corp. v. Anza, 2011 U.S. App. LEXIS 13176 (2d Cir. June 28, 2011) (reversing dismissal of §1962(a) claim based on defendants' investment of the proceeds of racketeering).

### B. RICO Is Not Limited To "Domestic Enterprises".

The District Court's holding that RICO is limited to cases involving a "domestic enterprise" has been squarely rejected by this Court. See Parness, supra. In Parness, specifically addressing RICO's "focus," this Court held that RICO is not limited to "domestic enterprises." Id., 503 F.2d at 439-440; accord United States v. Altese, 542 F.2d 104, 107 n.5 (2d Cir. 1976). This Court founded its conclusion in Parness on RICO's text and legislative history, which confirm that RICO extends to "any" enterprise and "permit[] no inference that the Act was intended to have a parochial application." Parness, 503 F.2d at 439. To restrict RICO to "domestic enterprises" would frustrate the "salutary purposes of the Act" and this Court squarely "reject[ed] any such construction." Id.

The District Court erred in engrafting a new "domestic enterprise" limitation on RICO's text in conflict with Parness. RICO's clear language covers "any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. §§1962(a)-(d). The use of "the term 'any' ensures that the definition has a wide reach." Boyle, 129 S.Ct. at 2243. The breadth of the

50

term "enterprise" is reinforced by RICO's mandate that the Act be "liberally construed to effectuate its remedial purposes." See 84 Stat. 947, Sec. 904(a) (Oct. 15, 1970); United States v. Huber, 603 F.2d 387, 394 (2d Cir. 1979). Having fashioned and applied a new and incorrect legal standard, the District Court necessarily reached the wrong result, and its judgment should be reversed.

### C. **The District Court Overlooked Claims Under §§1962(a)-1962(b).**

Even if RICO were found to be limited to "domestic enterprises," Plaintiffs have nonetheless stated cognizable claims under RICO. The District Court ignored the ***domestic*** enterprise that is at the heart of Plaintiffs' claims under 18 U.S.C. §§1962(a) and 1962(b), and failed to address Plaintiffs' claims under those sections.

Plaintiffs alleged five RICO claims:

Count I -- 1962(a); SAC ¶¶157-165 -- use and investment of racketeering proceeds to acquire, purchase and subsidize domestic entities.

Count II -- 1962(b); SAC ¶¶166-169 -- acquiring and maintaining an interest in and control of an enterprise through a pattern of racketeering activity.

Count III -- 1962(c); SAC ¶¶170-173 – participating in the operation and management of an enterprise through a pattern of racketeering activity.

51

Count IV --1962(d); SAC ¶¶174-180 -- conspiracy to violate 1962(a), 1962(b) and 1962(c).

Count V -- 1964(a); SAC ¶¶181-188 -- other remedies.

The District Court collapsed five RICO claims into a cursory summary: "Plaintiffs assert that Defendants participated in the management of the enterprise through a pattern of racketeering activity, (Id. ¶171), and conspired with the other entities involved in the enterprise to violate RICO (id. ¶¶174-80)." SPA-12. The District Court thus addressed the merits of only Counts III and IV. See SPA-12-14. Because the District Court failed to address Plaintiffs' claims under §§1962(a) and 1962(b), the judgment must be reversed.

The District Court fashioned a new "nerve center" test to determine the geographic location of the enterprise, but that standard can have no application to Plaintiffs' claims under §§1962(a) and 1962(b). The Supreme Court has held that the term "enterprise" is used differently in each of the four subdivisions of §1962. Under §§1962(a) and 1962(b), the "enterprise" is the "victim of unlawful activity" (Nat'l Org. for Women v. Scheidler, 510 U.S. 249, 259 (1994) (emphasis added)), or the "prize."[25] In contrast, under 18 U.S.C. §1962(c), the "enterprise" is

---

[25] See also id. 510 U.S. at 259 n. 5 *citing with approval* Blakey, The RICO Civil Fraud Action in Context: Reflections on Bennett v. Berg, 58 Notre Dame L. Rev. 237, 307-308 (1982) ("A violation involving an unlawful investment [under 1962(a)] will usually cast the enterprise in the role of a 'prize.' Typically, a

"generally the <u>vehicle</u> through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity." <u>Id.</u> at 259 (emphasis added).

The District Court's newly-constructed "nerve center" test -- which looks to the "'place where overall corporate policy originates'" (SPA-11) (citation omitted) -- has no logical application to Plaintiffs' claims under §§1962(a) and 1962(b). The enterprise, as a "prize" or "victim," makes no "overall corporate policy" giving rise to RICO liability. Any application of the "nerve center" test to dismiss Plaintiffs' claims under §§1962(a) and 1962(b) would be erroneous.

Had the District Court addressed the claims under §§1962(a) and 1962(b), it would have been clear that this case involves a domestic enterprise. For example, the RJR Defendants (U.S. citizens) used and invested the proceeds of racketeering activity (SAC ¶159), which were repatriated to them in the United States (SAC ¶¶61, 107, 129) through financial institutions in New York City (SAC ¶ 2), to acquire a ***domestic*** enterprise, namely the U.S.-based "domestic operations of Brown & Williamson, for the purpose of expanding upon [RJR's] illegal cigarette sales and money-laundering activities." <u>See</u> SAC ¶¶102-103; 162-163; 168-169. The RJR Defendants created a new domestic company -- Reynolds American -- into which they merged the newly-acquired domestic business of B&W, and

---

violation involving an unlawful acquisition [under 1962(b)] will find the enterprise in the role of 'prize' or 'victim'").

branched out into new money laundering activities through the overarching RJR Money-Laundering Enterprise. SAC ¶¶18-19; 100-103; 158. These allegations state a claim under §§1962(a) and 1962(b). See, e.g., Ideal Steel Supply Corp., supra.

### D. __The District Court Erred In Denying Leave to Amend.__

In the District Court, Plaintiffs maintained that their allegations were not extraterritorial in nature but, if the District Court determined otherwise, Plaintiffs requested leave to amend to address Norex.[26] As demonstrated above, Plaintiffs met both Norex's "slim contacts" test and the District Court's newly-fashioned "domestic enterprise" test. If there is any doubt, Plaintiffs should be allowed to replead.

The SAC was filed on November 23, 2009 -- 10 months before Norex. The District Court acknowledged that "Plaintiffs requested leave to amend in the event the court concluded that their federal claims were impermissibly extraterritorial." (SPA-51). It further acknowledged Plaintiffs' representation that they "possessed additional facts that could have aided the court's determination" on the subject of extraterritoriality. Id.; see Dkt. 97 at 5-7 (detailing allegations). Nonetheless, the

---

[26] During the pendency of the motion to dismiss, Plaintiffs made multiple requests to the District Court for leave to amend their complaint. See, e.g., Dkt. 97 at 5-7.

District Court denied leave to amend, finding that Plaintiffs had ample opportunity in prior complaints (in this and previous actions) to allege a "domestic enterprise" under RICO.  Yet, there was no "domestic enterprise" requirement in this Circuit prior to the decision below.  Under those circumstances, the District Court abused its discretion in denying leave to amend.

When a motion to dismiss is granted, "the usual practice is to grant leave to amend the complaint."  Ronzani v. Sanofi S.A., 899 F.2d 195, 198 (2d Cir. 1990).  Where, as here, there has been a change in the law during the pendency of litigation, the plaintiff is routinely allowed to amend the complaint. See, e.g., McGuire v. Warren, 490 F. Supp. 2d 331, 336 (S.D.N.Y. 2007) (granting leave to amend complaint in light of new Supreme Court authority), on remand from, 207 Fed. Appx. 34, 37 (2d Cir. 2006) ("McGuire should be given the opportunity to replead the facts as she believes them to be in order to attempt to meet the change in applicable law since she filed her complaint"); SEC v. Goldman Sachs & Co., 2011 U.S. Dist. LEXIS 62487 (S.D.N.Y. 2011) (noting grant of leave to amend because the complaint was filed before Morrison).

Rule 15(a)'s mandate to allow liberal amendment has particular force where, as here, Plaintiffs' original complaint was drafted under law that has been superseded.  The District Court did not hold that the amendment was proffered in bad faith, reflected a repeated failure to cure deficiencies for which amendment

was previously allowed, inflicted undue prejudice upon Defendants, or was futile. Rather, the District Court faulted Plaintiffs for not pleading a "domestic enterprise" in prior pleadings. This element, of course, was newly-created by the District Court.  Plaintiffs had no reason to anticipate that the District Court would redefine the "focus" of RICO and impose a pleading requirement directly at odds with Parness. In light of the change in the law, the judgment should be vacated and Plaintiffs should be permitted to amend their complaint.

RJR should not be heard to argue that the request for an additional opportunity to amend is somehow abusive.  Prior to the orders which are on appeal, the District Court never questioned the clarity, completeness, or plausibility of the Plaintiffs' complaint.  The SAC was required, not because there was were any purported deficiencies in the complaint, but rather to reflect the merger which created new corporate defendants. As described above, in the aftermath of agreements between the Plaintiffs and other related tobacco companies (BAT and JTI), Plaintiffs excluded 37 pages of factual allegations from the SAC.  Plaintiffs' previous pleadings, the original Complaint (A-35) and the Amended Complaint ("AC" (A-184)), were virtually identical.  Each contained extraordinarily detailed allegations of the way the RJR Defendants laundered narcotics proceeds and provided details as to the U.S. nexus of this money-laundering scheme.  For example, the Amended Complaint included five pages of allegations explaining the

56

way the RJR Defendants laundered Russian drug proceeds through the Bank of New York (AC ¶¶ 69-76) in the Eastern District of New York.[27]  Paragraph 71 of the AC listed ten specific transactions as examples of this money laundering, including the date of transaction, the payee, and the exact amount of each payment, with payments ranging from $125,000 to over one million dollars each.

The AC identified by name numerous senior RJR executives based in Miami, Florida, who were responsible for RJR's money-laundering scheme (AC ¶¶ 94-97).  The AC also provided names of clients, names of RJR executives, names of intermediary companies, names of ships, and/or descriptions of bank accounts for RJR-controlled money-laundering schemes.  <u>See</u> AC ¶¶ 49-68; 89-93.  If amendment had been allowed by the District Court, those factual allegations would have been replaced with equally detailed factual allegations concerning the RJR Defendants' current U.S. activities.

---

[27] "The RJR DEFENDANTS received millions of dollars per month in payments through the Bank of New York that constituted the proceeds of Russian organized criminal activity, including narcotics trafficking. . . .  The RJR DEFENDANTS continued for years to sell cigarettes to these customers and received these criminal proceeds in New York.  The transfer of these illicit funds to and through the Bank of New York was accomplished through a continuing use of the U.S. wires and mails."  (AC ¶ 69)  "Between 1996 and 1999, Sinex Bank laundered up to Seven Billion Dollars in criminal proceeds. . . .  Cigarettes sold by the RJR DEFENDANTS were a part of this money-laundering conspiracy, and all or part of the funds laundered through the aforesaid conspiracy were laundered within the Eastern District of New York."  (AC ¶¶ 73 & 76).

If leave to amend had been granted, Plaintiffs could have added great detail to the allegations made in regard to UETA (SAC ¶¶45, 106) and Giovannex (SAC ¶¶45, 105) to demonstrate that each was in fact a U.S.-based scheme where cigarettes were ordered, manufactured, sold, shipped, received, and paid for in the United States.  In addition, in their opposition brief (Dkt. 87 at 1 n. 2) and their supplemental brief (Dkt. 97), Plaintiffs notified the District Court that they had recently discovered another aspect of the RJR scheme which was based in the Eastern District of New York and involved Russian organized crime. Plaintiffs notified the court that they were prepared to plead that Ricardo Fanchini and Nikolai Dozortsev, two alleged narcotics smugglers operating in the Eastern District of New York, were transporting heroin and other narcotics into the United States and laundering their criminal proceeds by the purchase of cigarettes which they then smuggled into the European Union,[28] including RJR-brand cigarettes. These and other recent fact patterns would be added to the complaint if leave to amend were granted.

---

[28] Multiple prongs of this scheme began or were discovered after November 2009, when the SAC was filed in the District Court.

# POINT III

## THE DISTRICT COURT ERRED IN DISMISSING THE FEDERAL COMMON LAW CLAIMS WITHOUT COMMENT.

The SAC asserts claims under federal common law. <u>See</u>, <u>e.g.</u>, SAC ¶4 ("this civil action is . . . based upon violations of standards of common law, including fraud, negligence, unjust enrichment, public nuisance (federal and state common law), and conspiracy to commit such torts"); <u>see also</u> SAC ¶27 (federal question jurisdiction exists under "federal common law"); SAC ¶¶155-156 (seeking equitable relief under "federal common law").[29] In the District Court, Plaintiffs argued that dismissal would be improper, particularly since their federal common law claims provided a jurisdictional predicate for equitable relief in this case. <u>See</u> Dkt. 87 at 14-15; A-1374-1375. The District Court did not address the federal common law claims and this Court should reverse the judgment below.

Claims by governments seeking to abate and remedy cross-border tortious conduct may be governed by federal common law. <u>See</u> <u>Republic of the Philippines v. Marcos</u>, 806 F.2d 344, 353 (2d Cir. 1986); <u>Connecticut v. Am. Elec. Power Co.</u>, 582 F.3d 309 (2d Cir. 2009) (sustaining federal court jurisdiction over federal

---

[29] Plaintiffs' federal common law claims are advanced in the alternative, and should be considered in the event that dismissal of their state law claims is affirmed. <u>Connecticut</u>, 582 F.3d at 392.

59

common law claim seeking to abate cross-border public nuisance), aff'd in relevant part by an equally divided court, 131 S.Ct. 2527, 2535 (2011).

Plaintiffs' federal common law claim to abate a public nuisance is an example. See SAC ¶¶4, 27, 155-156, 215. The SAC alleges that RJR's money laundering and related criminal activities in the United States harm the public (as well as Plaintiffs), interfere with and damage the marketplace for tobacco products, fuel organized crime and terrorism, and constitute a public nuisance. SAC ¶¶209-218. On that basis, Plaintiffs seek equitable relief, including an injunction against the money-laundering activities. SAC ¶ 218. See Marcos, 806 F.2d at 353 (affirming injunctive relief in federal common law action).

Governmental entities may bring public nuisance claims to abate and remedy cross-border tortious conduct. See City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114 (2d Cir. 2011). Applying New York law, this Court reaffirmed that, in a civil governmental action alleging a public nuisance that extends across jurisdictional lines, the District Court has equitable power to enjoin a party from committing acts outside its territorial jurisdiction. Mickalis, 645 F.3d at 146 n.30 (citations omitted); see Connecticut, 582 F.3d at 332-349 (governmental entities have standing to abate a cross-border public nuisance); United States of America v. Ivey, 139 D.L.R. (4th) 570, 574 (Ontario CA 1996)

(U.S. may seek remedial relief in action akin to "common law claim for nuisance").

The District Court's dismissal of Plaintiffs' federal common law claims -- without comment -- should be reversed and the claims remanded for discovery and trial.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's judgment or, alternatively, vacate the judgment and remand for further proceedings.

Respectfully Submitted,

*/s/ Kevin A. Malone*

| | |
|---|---|
| John J. Halloran, Jr. | Kevin A. Malone |
| SPEISER, KRAUSE, NOLAN | Carlos A. Acevedo |
| & GRANITO | KRUPNICK CAMPBELL MALONE |
| Two Grand Central Tower | BUSER SLAMA HANCOCK LIBERMAN |
| 140 East 45th Street (34th Floor) | & MCKEE, P.A. |
| New York, New York 10017 | Legacy Bank Building |
| (212) 661-0011 | 12 S.E. 7th Street, Suite 801 |
| | Fort Lauderdale, FL 33301 |
| | (954) 763-8181 |
| | |
| | Attorneys for Plaintiffs-Appellants |
| September 27, 2011 | |

61

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(a) and Cir. Rule 32.1(a), I certify that the foregoing brief complies with the length limitations set forth in Fed. Rule App. Proc. 32(a)(7) because it contains 13,855 words, as counted by Microsoft Word.

*/s/ Kevin A. Malone*

**SPECIAL APPENDIX**

# TABLE OF CONTENTS

**Page**

Memorandum and Order of the Honorable Nicholas
    G. Garaufis, Appealed From, dated March 7, 2011   SPA-1

Memorandum and Order of the Honorable Nicholas
    G. Garaufis, dated April 14, 2011 ......................... SPA-16

Memorandum and Order of the Honorable Nicholas
    G. Garaufis, Appealed From, dated May 12, 2011. SPA-22

Judgment, Appealed From, filed May 16, 2011......... SPA-53

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
The EUROPEAN COMMUNITY, *acting on its own behalf and on behalf of the Member States it has power to represent, and the* REPUBLIC OF AUSTRIA, KINGDOM OF BELGIUM, REPUBLIC OF BULGARIA, REPUBLIC OF CYPRUS, CZECH REPUBLIC, KINGDOM OF DENMARK, REPUBLIC OF ESTONIA, REPUBLIC OF FINLAND, FRENCH REPUBLIC, FEDERAL REPUBLIC OF GERMANY, HELLENIC REPUBLIC, REPUBLIC OF HUNGARY, REPUBLIC OF IRELAND, ITALIAN REPUBLIC, REPUBLIC OF LATVIA, REPUBLIC OF LITHUANIA, GRAND DUCHY OF LUXEMBOURG, REPUBLIC OF MALTA, KINGDOM OF THE NETHERLANDS, REPUBLIC OF POLAND, PORTUGUESE REPUBLIC, ROMANIA, SLOVAK REPUBLIC, REPUBLIC OF SLOVENIA, KINGDOM OF SPAIN, and KINGDOM OF SWEDEN, *individually,*

                                  Plaintiffs,

            -against-

RJR NABISCO, INC., R.J. REYNOLDS TOBACCO COMPANY, RJR ACQUISITION CORP., f/k/a NABISCO GROUP HOLDINGS CORP., RJR NABISCO HOLDINGS CORP., R.J. REYNOLDS TOBACCO HOLDINGS, INC., R.J. REYNOLDS GLOBAL PRODUCTS, INC., REYNOLDS AMERICAN INC., and R.J. REYNOLDS TOBACCO COMPANY,

                                  Defendants.

------------------------------------------------------------X

**MEMORANDUM & ORDER**

**02-CV-5771 (NGG) (VVP)**

IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 08 2011 ★

BROOKLYN OFFICE

NICHOLAS G. GARAUFIS, United States District Judge.

The European Community and twenty-six European countries (the "Member States"),

captioned above (collectively, "Plaintiffs"), bring this action against various corporate entities of

American cigarette manufacturer R.J. Reynolds (collectively, "Defendants") for five violations

1

of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and for

nine common-law torts in relation to Defendants' sales practices respecting their cigarettes. (2d

Am. Compl. (Docket Entry # 73).)  Defendants move to dismiss Plaintiffs' Second Amended

Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Defs.' Mot. (Docket

Entry # 83).)  As set forth below, the court grants Defendants' motion to dismiss in part and

reserves decision on the remainder of Defendants' motion pending a response from Plaintiffs'

counsel as to whether the European Community will proceed in this action.

I.      **BACKGROUND**

    **A.      Procedural History**

       Defendants' motion is the latest chapter in what is now a decade of litigation between the

parties.  On November 3, 2000, the European Community filed a complaint against all of the

current Defendants, and others, generally alleging that Defendants engaged in a practice of

smuggling and money laundering in relation to their cigarettes, in violation of RICO.  (Compl.,

European Community v. RJR Nabisco, Inc., No. 00-cv-6617 (NGG) (VVP) (E.D.N.Y. Nov. 3,

2000) (Docket Entry # 110).)  On July 16, 2001, the court dismissed the European Community's

RICO claims and then dismissed the remainder of the action for lack of subject matter

jurisdiction.  European Community v. RJR Nabisco, Inc. (EC I), 150 F. Supp. 2d 456, 500-502

(E.D.N.Y. 2001).

       On August 6, 2001, the European Community filed another complaint in this court,

adding ten European countries as plaintiffs,[1] against substantially the same defendants.  (Compl.,

European Community v. RJR Nabisco, Inc., No. 01-cv-5188 (NGG) (VVP) (Aug. 6, 2001)

(Docket Entry # 1).)  On the defendants' motion to dismiss, the court again dismissed the

---

[1] Those countries included the Kingdom of Belgium, the Republic of Finland, the French Republic, the Hellenic Republic, the Federal Republic of Germany, the Italian Republic, the Grand Duchy of Luxembourg, the Kingdom of the Netherlands, the Portuguese Republic, and the Kingdom of Spain, all members of the European Community.

plaintiffs' complaint. European Community v. Japan Tobacco, Inc. (EC II), 186 F. Supp. 2d

231, 233 (E.D.N.Y. 2002).

Plaintiffs took a two-pronged approach to that decision: they filed yet another

complaint—the Original Complaint in this action (Compl. (Docket Entry # 1))—and appealed

the court's decision in EC II to the United States Court of Appeals for the Second Circuit (Pls.'

Notice of Appeal, European Community v. RJR Nabisco, Inc., No. 01-cv-5188 (NGG) (VVP)

(E.D.N.Y. Mar. 25, 2002) (Docket Entry # 84)). On appeal, the Second Circuit affirmed this

court's decision in EC II against all of the defendants except Japan Tobacco, Inc., and its

subsidiaries and affiliates. European Community v. RJR Nabisco, Inc. (EC III), 355 F.3d 123,

127 (2d Cir. 2004).[2]

Following EC III, the parties stipulated to Plaintiffs filing an amended complaint in the

instant action while the court stayed the proceedings so Plaintiffs could petition for a writ of

certiorari to the Supreme Court of the United States. (See Docket Entry ## 41, 47.) On May 2,

2005, the Supreme Court granted certiorari and summarily vacated and remanded EC III in light

of the Court's ruling in Pasquantino v. United States, 544 U.S. 349 (2005), decided the same

term. European Community v. RJR Nabisco, Inc., 544 U.S. 1012, 1012 (2005). On remand, the

Second Circuit concluded that Pasquantino did not change its analysis in EC III, and reinstated

its decision. European Community v. RJR Nabisco, Inc. (EC IV), 424 F.3d 175, 182-83 (2d Cir.

2005). Plaintiffs again petitioned the Supreme Court for a writ of certiorari, but the Court denied

the petition on January 9, 2006. European Community v. RJR Nabisco, Inc., 546 U.S. 1092

(2006).

---

[2] The Second Circuit vacated this court's decision in EC II with respect to Japan Tobacco, Inc. because, at the time of this court's decision in EC II, "Japan Tobacco had not yet been served in the action and had not appeared or joined the motion to dismiss." EC III, 355 F.3d at 139.

From 2006 to 2007, Plaintiffs engaged in settlement discussions with Japan Tobacco. (See Mem. & Order (Docket Entry # 72) at 2.)  No parties had any contact with the court until March 2009, when Plaintiffs moved to file a Second Amended Complaint—their fifth in nine years—to add new defendants, new European nation-plaintiffs, and new factual allegations that had apparently developed since their last filing.  (See id.)  The court granted Plaintiffs' motion, and Plaintiffs filed their Second Amended Complaint.  (2d Am. Compl.)  On April 30, 2010, Defendants filed their fully briefed motion to dismiss the Second Amended Complaint.  (Defs.' Mot. (Docket Entry # 83); Defs.' Mem. (Docket Entry # 84); Pls.' Opp'n (Docket Entry # 87); Defs.' Reply (Docket Entry # 88).)

Since Defendants have filed their motion, the Supreme Court decided Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010), which prohibits the extraterritorial application of federal statutes that are silent on or unclear concerning extraterritoriality. Applying Morrison, the Second Circuit concluded that RICO is silent on extraterritorial application.  Norex Petroleum Ltd. v. Access Indus., Inc. (Norex II), No. 07-cv-4553, 2010 WL 3749281, at *2 (2d Cir. Sept. 28, 2010), amended by 2010 WL 4968961 (2d Cir. Dec. 8, 2010). The court then ordered the parties to address the application of Morrison and Norex II to Plaintiffs' RICO claims at oral argument.  (Docket Entry, Oct. 21, 2010.)  After hearing oral argument from the parties, the court ordered supplemental briefing on the issue.  (Docket Entry, Oct. 26, 2010; see also Defs.' Suppl. Mem. (Docket Entry # 95); Pls.' Suppl. Opp'n (Docket Entry # 97); Defs.' Suppl. Reply (Docket Entry # 99).)  The court now considers Defendants' motion and the parties' supplemental briefs.

4

### B.   Plaintiffs' Second Amended Complaint

Plaintiffs' Second Amended Complaint—a structureless morass of allegations, devoid of any sequential description of events—generally asserts that Defendants engaged in a global money-laundering scheme.  (2d Am. Compl. ¶¶ 1-5.)  Plaintiffs allege a representative scheme as follows: First, Colombian and Russian criminal organizations smuggle cocaine and heroin, respectively, into Europe, where they generate large cash proceeds, in Euros, from drug sales.  (Id. ¶¶ 31-32.)  Those criminal organizations then trade those Euros, located in Europe, for local currency in the criminal organizations' home countries, through a European black market "money broker."  (Id. ¶¶ 37-38.)  Next, illicit cigarette importers purchase those Euros from the money broker at a discount to the prevailing exchange rate.  (Id. ¶ 39.)  Those importers then use the Euros to purchase Defendants' cigarettes from U.S. and European wholesalers.  (Id.)  The wholesalers then purchase cigarettes from Defendants, and ship the cigarettes to the importers.  (Id.)

As for *Defendants'* involvement in this scheme—beyond their selling of cigarettes to U.S. and European wholesalers—Plaintiffs allege that Defendants "utilized certain companies" to handle the illicit transactions, who "maintained lists of 'direct customers of RJR' which included special handling instructions for shipments for [customers that] Defendants knew were involved in criminal activities."  (Id. ¶ 58.)  Plaintiffs further allege that Defendants traveled around the world "for the purpose of meeting and negotiating business agreements with individuals who [Defendants] knew, or should have known, were involved in the laundering of narcotics proceeds."  (Id. ¶ 63; see also id. ¶¶ 84, 115.)

Plaintiffs also allege some variations on this representative scheme.  In some instances, the illicit cigarette importers are the same Colombian and Russian criminal organizations

SPA-6

engaged in drug trafficking. (Id. ¶ 39.) In others, the money brokers themselves purchase

cigarettes from wholesalers. (Id. ¶ 59.) In another, Defendants initially ship their cigarettes into

Panama to "use the secrecy laws of the Republic of Panama" to shield the transactions. (Id.

¶¶ 66, 104-108.) Plaintiffs also allege that Defendants purchased former British tobacco

manufacturer, Brown & Williamson, for the purpose of expanding these schemes in Europe. (Id.

¶¶ 100-103.)

      In one scheme, Defendants' employees allegedly traveled to Venezuela, snuck across the

border to Colombia, sold cigarettes to Colombian criminal organizations for cash, snuck back

across the Venezuelan border, and wired the cash proceeds to Defendants from Venezuela. (Id. ¶

72.) Sometimes these employees would receive payments in Brady Bonds,[3] rather than cash,

which they would sell for U.S. dollars back in Venezuela. (Id. ¶ 74.)

      In another scheme—completely devoid of any connection to Europe—a non-party

corporation with the same address as one of the Defendants sold cigarettes in Iraq, via territories

controlled by the Kurdistan Workers' Party, a designated terrorist organization. (Id. ¶¶ 77, 80.)

Plaintiffs argue that this somehow harmed the European Community's interests. (Id.)

      Lastly, Plaintiffs assert that, "[o]n many occasions over the past decade," Defendants lied

to them regarding the exportation of their cigarettes. (Id. ¶¶ 85-87.) First, Plaintiffs allege that

Defendants lied to them about markings on their cigarettes that supposedly enabled Defendants

to identify illicit cigarette purchasers. (Id. ¶ 86.) And second, Plaintiffs complain that

Defendants undervalued the cost of their cigarettes when importing them into Europe. (Id. ¶¶

87-89.)

---

[3] Brady Bonds are tradeable securities issued by the United States and "backed by United States Treasury zero coupon bonds, which act as collateral or as a guarantee and give investors greater security." Comment, Jessica W. Miller, Solving the Latin America Sovereign Debt Crisis, 22 U. Pa. J. Int'l Econ. L. 677, 687 (2001).

Plaintiffs finish their Second Amended Complaint by listing seven "interests" the United States and this district have in Defendants' alleged conduct (id. ¶¶ 133(a)-(g)); thirty-six "injuries" suffered by Plaintiffs (id. ¶¶ 146(a)-(jj)); twenty-nine requests for relief (id. ¶¶153(a)-(o); 155(a)-(n)); and fourteen legal claims against Defendants (id. ¶¶ 157-257).

## II.    DISCUSSION

### A.    Extraterritoriality of Plaintiffs' RICO Claims

Defendants argue that, following Morrison and Norex II, Plaintiffs' RICO claims are impermissibly extraterritorial, and must be dismissed under Federal Rule of Civil Procedure 12(b)(6). (Defs.' Suppl. Mem. at 1-9.) Rule 12(b)(6) allows for dismissal of a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In evaluating a motion to dismiss under Rule 12(b)(6), a court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d Cir. 2008) (citation omitted). If the claim at issue does not state a "legally cognizable right of action," the court must dismiss that claim. Bell Atl. Corp. v. Twombly, 555 U.S. 544, 555 (2007). As discussed below, the court agrees that Plaintiffs' claims are impermissibly extraterritorial and must be dismissed under Rule 12(b)(6).

### 1.    Extraterritoriality of RICO

In measuring the territorial reach of a federal statute, Morrison commands that "when a statute gives no clear indication of an extraterritorial application, it has none." 130 S. Ct. at 2878. In Norex II, Second Circuit concluded that its prior precedent "holds that RICO is silent as to any extraterritorial application." 2010 WL 4968691, at *3 (citing N. S. Fin. Corp. v. Al-Turki, 100 F.3d 1046, 1051 (2d Cir. 1996)). Therefore, in light of Morrison, this silence prohibits any extraterritorial application of RICO. Id. at *3.

2.    The Focus of RICO

In determining whether a claim seeks an extraterritorial application of a federal statute, the court must look to the "focus" of that statute. See Morrison, 130 S. Ct. at 2883-84. This focus is not necessarily the "bad act," or the *actus reus*, prohibited by the statute. Id. at 2881. Rather, it is "the object[] of the statute's solicitude," the activities "the statute seeks to regulate [and] parties or prospective parties to those [activities] that the statute seeks protect." Id. (internal citations and quotation marks omitted).

In Morrison, for example, the Court engaged in a thorough analysis of § 10(b) of the Securities Exchange Act to determine its "focus." Id. at 2884. Section 10(b) makes it illegal for "any person . . . to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance." See id. at 2881 (quoting 15 U.S.C. § 78j(b)). Looking at the operative section of the statute, the Supreme Court noted that § 10(b) focused "not upon the place where the deception originated, but upon purchases and sales of securities." Id. The Court concluded that "[t]hose purchase-and-sale transactions are the objects of the statute's solicitude. It is those transactions that the statute seeks to regulate; it is parties or prospective parties to those transactions that the statute seeks protect." Id. (internal citations and quotation marks omitted). Accordingly, the Court determined that § 10(b) was limited in scope "to purchases and sales of securities *in the United States*." Id. (emphasis added). Because the sales of securities at issue in Morrison occurred outside the United States, the Court rejected the plaintiffs' argument that it merely sought enforcement of a domestic claim even though the deceptive conduct occurred in Florida. Id. at 2885-85.

While the Second Circuit has not addressed the "focus" of RICO, the statutory analysis in Morrison proves illuminating. The RICO statute contains four operative subsections.

Subsection (a) makes it "unlawful for any person who has received any income derived . . . from a pattern of racketeering activity . . . to use or invest . . . any part of such income [in] any enterprise." 18 U.S.C. § 1962(a).  Subsection (b) prohibits "any person through a pattern of racketeering activity . . . to acquire or maintain . . . any interest in or control of any enterprise." Id. § 1962(b).  Subsection (c) forbids "any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." Id. § 1962(c).  Lastly, subsection (d) outlaws conspiring "to violate any of the provisions of subsection (a), (b), or (c) of this section." Id. § 1962(d).

Each of the three primary subsections—(a), (b), and (c)—contains three elements: the "person," the "enterprise," and the "pattern of racketeering activity." See St. Germain v. Howard, 556 F.3d 261, 263 (5th Cir. 2009) ("Claims under RICO, 18 U.S.C. § 1962, have three common elements: (1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise.") (citation omitted).  With respect to these elements, the statute does not punish the predicate acts of racketeering activity—indeed, each predicate act is, itself, a separate crime—but only racketeering activity in connection with an "enterprise." See United States v. Neapolitan, 791 F.2d 489, 500 (7th Cir. 1986) ("The central role of the concept of enterprise under RICO cannot be overstated."); Randy D. Gordon, Crimes That Count Twice: A Reexamination of RICO's Nexus Requirements Under 18 U.S.C. §§ 1962(c) and 1964(c), 32 Vt. L. Rev. 171, 172 (2007) ("[E]ven a pervasive pattern of racketeering acts (also referred to as 'predicate' acts in cases and commentary) will not sustain a RICO claim if it is not tied to a RICO 'enterprise.'"); cf. Morrison, 130 S. Ct. at 2884 ("Section 10(b) does not punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of any security registered on a

SPA-10

national securities exchange or any security not so registered.'" (quoting 15 U.S.C. § 78j(b))).

RICO, therefore, seeks to regulate "enterprises" by protecting them from being victimized by or

conducted through racketeering activity. See Cedric Kushner Promotions, Ltd. v. King, 533 U.S.

158, 164 (2001) (concluding that the purpose of RICO is "both protect[ing] a legitimate

'enterprise' from those who would use unlawful acts to victimize it [and] protect[ing] the public

from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a

'vehicle' through which 'unlawful activity is committed'" (citing United States v. Turkette,

452 U.S. 576, 591 (1981) and Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 259

(1994))). Even the name of the statute suggests that it places its focus on the "enterprise"—

RICO is, after all, the Racketeer Influenced and Corrupt *Organizations* Act. See 18 U.S.C.

§ 1961, Short Title (emphasis added). Accordingly, it is the "enterprise" that is the object of the

statute's solicitude, and the "focus" of the statute. See Morrison, 130 S. Ct. at 2884.

      3.    Location of a RICO Enterprise

     Because the "focus" of RICO is the "enterprise," a RICO "enterprise" must be a

"domestic enterprise." Cf. id. at 2884 ("And it is in our view only transactions in securities listed

on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies.").

While there are no cases suggesting how a court may determine the geographic location of a

RICO enterprise, other cases have analogously discussed how to determine the geographic

location of a corporation. In Hertz Corp. v. Friend, 130 S. Ct. 1181 (2010), for example, the

Supreme Court adopted the "nerve center test" as the vehicle of choice in determining a

corporation's "principal place of business." In Hertz, the Supreme Court interpreted the

diversity jurisdiction statute to "conclude that [a corporation's] 'principal place of business' is

best read as referring to the place where a corporation's officers direct, control, and coordinate

the corporation's activities. It is the place that Courts of Appeals have called the corporation's

'nerve center.'" 130 S. Ct. at 1192 (citing Scot Typewriter Co. v. Underwood Corp., 170 F.

Supp. 862, 865 (S.D.N.Y. 1959)).

The nerve center test "identif[ies] the place where overall corporate policy originates or

the nerve center from which it radiates out to its constituent parts and from which its officers

direct, control and coordinate all activities without regard to locale, in the furtherance of the

corporate objectives." Royal Indem. Co. v. Wyckoff Heights Hosp., 953 F. Supp. 460, 462-63

(E.D.N.Y. 1996) (internal punctuation and citations omitted) (citing Scot Typewriter, 170 F.

Supp. at 865). In instances where the corporation at issue may not have a single center of

corporate policy, Hertz consoles the lower courts that "there will be hard cases," such as when

enterprises "may divide their command and coordinating functions among officers who work at

several different locations." 130 S. Ct. at 1194. Even then, the Court encourages using the nerve

center test, as it "points courts in a single direction. . . . [where they] do not have to try to weigh

corporate functions, assets, or revenues different in kind, one from the other." Id. Relative to

other tests that attempt to define corporate location, the nerve center test "provides a sensible test

that is relatively easier to apply, not a test that will, in all instances, automatically generate a

result." Id.

RICO enterprises, however, may not have a single center of corporate policy. Although

the "nerve center test" compels the court to determine a principal, i.e., single place of business

for a corporation, though there may be many, the test is still instructive in determining the

geographic location of "enterprise." The nerve center test's focus on the "brains," that is, where

the corporation's decision are made, as opposed to the "brawn," that is, how the corporation acts,

shows the Supreme Court's conception of the corporation's geographic location and where it

makes its decisions as twinned. Thus, although an enterprise may very well possess several "nerve centers," it is the "brains" not the "brawn" that dictate where the enterprise is located.

Indeed, the divide-and-command coordination structure mentioned in Hertz is the same type of organization contemplated by the Court in Boyle in regard to RICO enterprises. There, the court admitted that a RICO enterprise

> need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times.

Boyle v. United States, 129 S. Ct. 2237, 2245 (2009). Nonetheless, a RICO enterprise must have some semblance of "interpersonal relationships and a common interest," id. at 2244, and must "must function as a continuing unit," id. at 2245. Applying the nerve center test here, to determine an "enterprise's" location, similarly avoids the "weigh[ing of] corporate functions, assets, or revenues different in kind, one from the other." Hertz, 130 S. Ct. at 1194. An analysis of the territoriality of an "enterprise" in a RICO complaint, therefore, should focus on the decisions effectuating the relationships and common interest of its members, and how those decisions are made.

### 4. Territoriality of Plaintiffs' RICO Claims

The enterprise alleged in Plaintiffs' Complaint comprises of Defendants, "associated distributers, shippers, currency dealers, wholesalers, money brokers, and other participants." (2d Am. Compl. ¶ 158.) Plaintiffs assert that Defendants participated in the management of the enterprise through a pattern of racketeering activity, (Id. ¶ 171), and conspired with the other entities involved in the enterprise to violate RICO (id. ¶¶ 174-80). The Member States allege that they were harmed as a result of this conduct. (Id. ¶¶ 164-65; 169, 173, 180.)

Plaintiffs' accusations concerning the operation of the enterprise can be characterized as encompassing a series of steps governed by "interpersonal relationships."  See Boyle, 129 S. Ct. at 2245.  As discussed above, those steps are the "drug smuggling step" performed by the Colombian and Russian mob (2d Am. Compl. ¶¶ 31-32); the "currency swap step" between those mob organizations and European money brokers (id. ¶¶ 37-38); the "currency purchase step" between the money brokers and cigarette importers (id. ¶ 39); the "cigarette purchase step" performed by importers and wholesalers (id.); and the "cigarette shipping step" performed by wholesalers and Defendants (id.).

Nothing in Plaintiffs' Complaint even remotely suggests that Defendants had any hand in the planning, decisions, or "overall corporate policy" of the drug smuggling, currency swap, or currency purchase steps.  In fact, the Complaint very clearly and repeatedly articulates that the "overall corporate policy" regarding these steps originates with organized criminal organizations in Europe and South America.  (E.g., id. ¶¶ 32 (alleging that drugs are sold into Europe via the orders of criminal organizations in Europe and the Middle East); 37 (claiming that European money brokers have "developed methods to bypass the banking systems"); 38-41 (describing South American criminal organizations as "negotiating" contracts with money brokers and "contacting" individuals in Europe).)

Regarding the cigarette purchase and cigarette shipping step, Plaintiffs allege that Defendants "utilized certain companies to handle and sell their products [that Defendants] knew were involved in criminal activities," (id. ¶ 58), and that Defendants "negotiate[ed] business agreements with individuals who [Defendants] knew, or should have known, were involved in the laundering of narcotics proceeds" (id. ¶ 63).  Yet Plaintiffs do not allege how Defendants' involvement in these activities demonstrated how Defendants organized, orchestrated, planned,

or even participated in the remaining criminal steps. Indeed, the Complaint, when read as a whole, strongly suggests the money laundering cycle was directed by South American and European criminal organizations. It is those organizations that began the money laundering process by smuggling drugs; those organizations that swapped currency with money brokers in Europe; and those organizations that controlled the cigarette importers, and thereby completed the money laundering cycle. Defendants' appear to be nothing more than sellers of fungible goods in a complex series of transactions directed by South American and Russian gangs. If there was an "overall corporate policy" of the money laundering enterprise alleged in the Complaint, it issued from those criminal organizations located in South America and Russia— not Defendants in the United States. Because Plaintiffs RICO claims, Counts I through V, are extraterritorial, they do not state a "legally cognizable right of action," and the court must dismiss them under Federal Rule of Civil Procedure 12(b)(6). See Bell Atl. Corp. v. Twombly, 555 U.S. 544, 555 (2007).

**B.    Subject Matter Jurisdiction over Plaintiffs' Remaining Common Law Claims**

Aside from their RICO claims, Plaintiffs only remaining claims are predicated on state-law causes of action. As such, the court must assess whether it has subject matter jurisdiction, particularly diversity jurisdiction, over the remainder of this case. See Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001). To do so would require the court to address whether the European Community may bring claims on diversity grounds. If the European Community were not present, however, the court would undoubtedly possess subject matter jurisdiction over the remaining state law claims because the Member States are "foreign states" as contemplated by the diversity statute. See 28 U.S.C. § 1332(a)(4).

14

SPA-15

This very issue was raised at oral argument on October 26, 2010. (Oral Arg. Tr. (Docket Entry # 91) at 8-9.) There, the court expressed its concern about ruling on an issue of such solemnity unless it was absolutely necessary. (Id. at 12.) Both sides conceded that the potential jurisdictional defect could be circumvented if the European Community voluntarily withdrew from the action. (Id. at 9, 15.) Plaintiffs' counsel stated that he would be amenable to withdrawing the European Community from suit, if the court dismissed Plaintiffs' RICO claims, after consulting with his clients. (Id. at 15, 56.) Accordingly, the court reserves decision on Defendants' motion regarding the state-law causes of action to allow Plaintiffs' counsel time to inform the court whether the European Community intends to remain in this suit.

## III.  CONCLUSION

Defendants' Motion to Dismiss is GRANTED in part. The court directs Plaintiffs' counsel to inform the court within thirty days of this Memorandum and Order as to whether Plaintiff European Community intends to remain in this suit. The court reserves decision on the remainder of Defendants' motion pending Plaintiffs' counsel's response.

SO ORDERED.

s/Nicholas Garaufis,

Dated: Brooklyn, New York
      March 7 , 2011

NICHOLAS G. GARAUFIS
United States District Judge

15

SPA-16

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
The EUROPEAN COMMUNITY, *acting on its own*
*behalf and on behalf of the Member States it has*
*power to represent, and the* REPUBLIC OF
AUSTRIA, KINGDOM OF BELGIUM, REPUBLIC
OF BULGARIA, REPUBLIC OF CYPRUS, CZECH
REPUBLIC, KINGDOM OF DENMARK,
REPUBLIC OF ESTONIA, REPUBLIC OF
FINLAND, FRENCH REPUBLIC, FEDERAL
REPUBLIC OF GERMANY, HELLENIC
REPUBLIC, REPUBLIC OF HUNGARY,
REPUBLIC OF IRELAND, ITALIAN REPUBLIC,
REPUBLIC OF LATVIA, REPUBLIC OF
LITHUANIA, GRAND DUCHY OF
LUXEMBOURG, REPUBLIC OF MALTA,
KINGDOM OF THE NETHERLANDS, REPUBLIC
OF POLAND, PORTUGUESE REPUBLIC,
ROMANIA, SLOVAK REPUBLIC, REPUBLIC OF
SLOVENIA, KINGDOM OF SPAIN, and
KINGDOM OF SWEDEN, *individually*,

**MEMORANDUM & ORDER**

**02-CV-5771 (NGG) (VVP)**

Plaintiffs,

-against-

RJR NABISCO, INC., R.J. REYNOLDS TOBACCO
COMPANY, RJR ACQUISITION CORP., f/k/a
NABISCO GROUP HOLDINGS CORP., RJR
NABISCO HOLDINGS CORP., R.J. REYNOLDS
TOBACCO HOLDINGS, INC., R.J. REYNOLDS
GLOBAL PRODUCTS, INC., REYNOLDS
AMERICAN INC., and R.J. REYNOLDS
TOBACCO COMPANY,

Defendants.

-------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

The court considers Plaintiffs' motion for reconsideration of the court's Memorandum

and Order of March 8, 2011. (Pls.' Mot. (Docket Entry # 103-2).)  On March 8, 2011, the court

granted in part Defendants' motion to dismiss Plaintiffs' Second Amended Complaint (the

1

SPA-17

"Complaint"). (Mem. & Order (Docket Entry # 102).) Specifically, the court dismissed Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and reserved decision on the remainder of Defendants' motion. (Mem. & Order at 15.) On March 21, 2011, Plaintiffs filed a motion for reconsideration. (Pls.' Mot.) As directed by the court, Defendants filed their response on April 4, 2011. (Defs.' Mot. (Docket Entry # 104).) As set forth below, Plaintiffs' motion for reconsideration is denied.

I.      **LEGAL STANDARD**

A motion for reconsideration will only be granted if the moving party can establish: "(1) that the court overlooked controlling decisions or data; (2) that there has been a change in controlling law; (3) that new evidence has become available; or (4) that reconsideration is necessary to correct a clear error or prevent manifest injustice." Hughes v. McWilliams, No. 04-CV-7030 (KMW), 2009 WL 2971757, at *1 (S.D.N.Y. Sept. 16, 2009) (citing Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)). "As a general matter, reconsideration is an exceptional remedy and will generally be denied . . . ." Gayle v. Harry's Nurses Registry, Inc., No. 07-CV-4672 (NGG) (MDG), 2010 WL 5477727, at *3 (E.D.N.Y. Dec. 30, 2010). Courts narrowly construe and strictly apply the rules governing motions for reconsideration in order to avoid "repetitive arguments on issues that have already been considered fully by the court." Caleb & Co. v. E.I. Du Pont De Nemours & Co., 624 F.Supp. 747, 748 (S.D.N.Y. 1985).

II.     **DISCUSSION**

The court assumes familiarity with the background of the case and its procedural history, as described in detail in the March 8, 2011 opinion. (Mem. & Order at 2-4.) Plaintiffs request reconsideration of three facets of that opinion. First, Plaintiffs move "to address the risk that pages 13-14 of the Decision will be misinterpreted by Defendants as containing findings of fact

2

SPA-18

that bind the Plaintiffs in this litigation." (Pls.' Mot. at 2.) Plaintiffs complain that the court "overlooked the principle that fact-finding is improper on a Rule 12(b)(6) motion directed at the pleadings." (Id. at 3) (capitalization removed). Second, Plaintiffs object to the opinion on the grounds that it "overlooked" some of their allegations. (Id. at 2-3.) And third, Plaintiffs request that the court allow them to amend their Complaint, and file what would be their *sixth* Complaint on the same underlying facts. (Id. at 4-5; see Mem. & Order at 2-4.) Notably, Plaintiffs "*do not* request reconsideration of the RICO claims' dismissal." (Pls.' Mot. at 1.)

### A.   Plaintiffs' Claims Regarding Impermissible Fact-Finding

As an initial matter, in its March 8, 2011 opinion, the court did not engage in findings of fact. The discussion referenced by Plaintiffs on pages 13 to 14 of its opinion was the court's best attempt to read Plaintiffs' convoluted, repetitive Complaint (see Mem. & Order at 2) while "accept[ing] as true all factual statements alleged in the complaint and draw[ing] all reasonable inferences in favor of [Plaintiffs]." See Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d Cir. 2008) (citation omitted) (describing the standard governing Federal Rule of Civil Procedure 12(b)(6)). To the extent the court construed aspects of Plaintiffs' Complaint as true, it did so because the standards governing motions to dismiss required the court to assume them to be true; the court did not *find* those allegations to be true. See id. Plaintiffs' counsel should know this distinction well: this is at least the third Complaint dismissed by the court in this case. As for Plaintiffs' concern that Defendants may "misinterpret" the court's opinion, Defendants' personal interpretations of the court's orders are not of concern to the court. The court's March 8, 2011 opinion has the force of law; Defendants' interpretation of that opinion—correct or incorrect—does not. Further, neither of these arguments point to any controlling decisions or data, change in the law, or new evidence

3

overlooked by the court, or any "clear error" that requires resolution to "prevent manifest injustice." See Hughes, 2009 WL 2971757, at *1. Plaintiffs' motion for reconsideration on these grounds is denied.

**B.    Plaintiffs' Claims Regarding "Overlooking" Allegations in Their Complaint**

Plaintiffs argue that the court "overlooked" several allegations in their Complaint showing that "Defendants direct the overall corporate policy of [the alleged] money laundering enterprise." (Pls.' Mot. at 2 (internal punctuation omitted).) As proof, Plaintiffs point to several paragraphs of their Complaint not referenced by the court in the March 8, 2011 decision. (Id.) But a court need not recite each and every paragraph of a complaint in deciding a motion to dismiss. The court rejects this "burdensome" approach of "making a determination [of sufficiency] with regard to each allegation within a [single] cause of action." Cf. Bernheim v. Litt, 79 F.3d 318, 326 (2d Cir. 1996) (concluding that "it would be burdensome to have the district court 'prune' a complaint at the pleading stage by making a determination with regard to each allegation within a cause of action that is legally cognizable when viewed in its totality"); see also In re Salomon Analyst Level 3 Litig., 373 F. Supp. 2d 248, 250 (S.D.N.Y. 2005) ("Although plaintiffs are correct that the December 2 Opinion did not specifically address the particular allegation they identify (in each case, merely two or three paragraphs in a nearly 200-paragraph complaint), neither of the allegations merits reconsideration under Local Rule 6.3 or alters the outcome of the motion to dismiss."). In any event, the "overlooked" paragraphs cited by Plaintiffs in their instant motion are either legal conclusions not entitled to deference, such as the allegation that Defendants "control, direct, [and] encourage," the alleged RICO enterprise (Pls.' Mot. at 2), or factual allegations that do not impact the court's conclusion that Defendants did not direct the alleged enterprise's "corporate policy," e.g., that Defendants "received" money

4

SPA-20

as a result of the alleged enterprise's activities (id.).  Plaintiffs' motion for reconsideration on these grounds is also denied.

**C.    Plaintiffs' Requests to Amend Their Complaint**

Plaintiffs also argue that this court overlooked their request to amend their Complaint. (Pls.' Mot. at 4-5.)  It did not.  Plaintiffs' have repeatedly couched their requests to amend their Complaint in the alternative.  (See, e.g., Pls.' Suppl. Opp'n (Docket Entry # 97) ("[I]f the Court should conclude otherwise [i.e., that Plaintiffs' RICO claims fail], at a minimum, the Plaintiffs should be given leave to amend the complaint to clarify and enhance the allegations of domestic conduct.").)  The court did not address these requests in its opinion, not because it "overlooked" them but because the predicates to Plaintiffs' requests to amend had not come to pass.  For example, in Plaintiffs' Supplemental Opposition, Plaintiffs requested to amend their Complaint *if* the court concluded Plaintiffs' allegations were insufficiently pleaded (see id.), or *if* the court concluded that the European Community did not fall under the diversity jurisdiction statute, 28 U.S.C. § 1332 (see id. at 23 n.25).  Because the opinion only addressed Plaintiffs' RICO claims, the court reserved decision on the remainder of Defendants' motion to dismiss, including Plaintiffs' request to amend their Complaint.  (Mem. & Order at 15.)  Therefore, because the court did not address Plaintiffs' requests to amend their Complaint in its opinion, the court cannot consider Plaintiffs' request here.  See Koehler v. Bank of Bermuda Ltd., No. 18-mc-302 (CSH), 2005 WL 1119371, at *1 (S.D.N.Y. May 10, 2005) ("It is implicit in [Local Rule 6.3] that a motion for reconsideration cannot assert new arguments or claims which were not before the court on the original motion and consequently cannot be said to have been considered.").  The court will address Plaintiffs' request to amend in the remainder of its decision on

5

SPA-21

Defendants' motion to dismiss.  Currently, however, Plaintiffs' request for "reconsideration" on

this ground is denied.

## III.    CONCLUSION

Plaintiffs' motion for reconsideration is DENIED.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      April 14, 2011

NICHOLAS G. GARAUFIS
United States District Judge

6

SPA-22

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

The EUROPEAN COMMUNITY, *acting on its own behalf and on behalf of the Member States it has power to represent, and the* REPUBLIC OF AUSTRIA, KINGDOM OF BELGIUM, REPUBLIC OF BULGARIA, REPUBLIC OF CYPRUS, CZECH REPUBLIC, KINGDOM OF DENMARK, REPUBLIC OF ESTONIA, REPUBLIC OF FINLAND, FRENCH REPUBLIC, FEDERAL REPUBLIC OF GERMANY, HELLENIC REPUBLIC, REPUBLIC OF HUNGARY, REPUBLIC OF IRELAND, ITALIAN REPUBLIC, REPUBLIC OF LATVIA, REPUBLIC OF LITHUANIA, GRAND DUCHY OF LUXEMBOURG, REPUBLIC OF MALTA, KINGDOM OF THE NETHERLANDS, REPUBLIC OF POLAND, PORTUGUESE REPUBLIC, ROMANIA, SLOVAK REPUBLIC, REPUBLIC OF SLOVENIA, KINGDOM OF SPAIN, and KINGDOM OF SWEDEN, *individually,*

       Plaintiffs,

  -against-

RJR NABISCO, INC., R.J. REYNOLDS TOBACCO COMPANY, RJR ACQUISITION CORP., f/k/a NABISCO GROUP HOLDINGS CORP., RJR NABISCO HOLDINGS CORP., R.J. REYNOLDS TOBACCO HOLDINGS, INC., R.J. REYNOLDS GLOBAL PRODUCTS, INC., REYNOLDS AMERICAN INC., and R.J. REYNOLDS TOBACCO COMPANY,

       Defendants.

------------------------------------------------------------X

**MEMORANDUM & ORDER**

**02-CV-5771 (NGG) (VVP)**

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ **MAY 1 3 2011** ★

**BROOKLYN OFFICE**

NICHOLAS G. GARAUFIS, United States District Judge.

  On March 8, 2011, the court granted in part Defendants' motion to dismiss Plaintiffs'

claims arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"),

18 U.S.C. § 1962, Plaintiffs' sole federal claims. (Mem. & Order (Docket Entry # 102).) The

SPA-23

court reserved decision on the remainder of Defendants' motion to dismiss.  (Id. at 15.)  For the

reasons set forth below, the court dismisses the remainder of this action for lack of subject matter

jurisdiction.

## I.      BACKGROUND

### A.      Procedural History

While the court assumes the parties' familiarity with the background of the case and its

procedural history, as described in detail in the March 8, 2011 opinion (Mem. & Order at 2-4), it

is important to highlight a few aspects of the litigation thus far.  Plaintiffs' Second Amended

Complaint (the "Complaint"), the operative complaint in the litigation, brought claims against

Defendants under several provisions of RICO and for nine common-law torts in relation to

Defendants' sales practices regarding their cigarettes.  (2d Am. Compl. (Docket Entry # 73).)

Defendants then moved to dismiss Plaintiffs' Complaint on several grounds, including the

argument that Plaintiffs' RICO claims were impermissibly extraterritorial.  (Defs.' Mem.

(Docket Entry # 84) at 38-41.)  While a decision on Defendants' motion was pending, the

Supreme Court decided Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010), which

bars the extraterritorial application of federal statutes that are silent on or unclear concerning

extraterritoriality.  Soon afterwards, the Second Circuit applied Morrison to civil RICO claims

and concluded that the RICO statute is silent on extraterritorial application.  Norex Petroleum

Ltd. v. Access Indus., Inc. (Norex II), No. 07-cv-4553, 2010 WL 3749281, at *2 (2d Cir. Sept.

28, 2010), amended by 2010 WL 4968961 (2d Cir. Dec. 8, 2010).  In light of these cases, the

court requested oral argument.  (Docket Entry Oct. 21, 2010.)

At oral argument, Defendants raised the possibility that if the court dismissed Plaintiffs'

RICO claims, it would lack subject matter jurisdiction over the remainder of the action because

2

Plaintiff European Community (the "European Community") is not a "foreign state" under the diversity statute, 28 U.S.C. § 1332(a)(4).  (Oral Arg. Tr. (Docket Entry # 91) at 7:25-9:10.)  Defendants noted, however, that the potential defect in subject matter jurisdiction could be cured if the European Community voluntarily withdrew from the lawsuit.  (Id. at 9:7-10.)  Plaintiffs disagreed with Defendants' contention that the European Community is not a "foreign state" under the diversity statute (id. at 19:25-20:4) but Plaintiffs' counsel stated that if it he were required to discuss dismissal with the European Community, he would do so (id. at 57:8-12).  The parties then submitted supplemental briefing on the issues raised at oral argument.  (Defs.' Suppl. Mem. (Docket Entry # 95); Pls.' Suppl. Opp'n (Docket Entry # 97); Defs.' Suppl. Reply (Docket Entry # 99).)

On March 8, 2011, the court dismissed Plaintiffs' RICO claims, their only federal claims.  (Mem. & Order at 15.)  Given the court's concerns over the subject matter jurisdiction issue, the court also directed Plaintiffs to inform it within thirty days whether the European Community intended to remain in the instant suit.  (Id.)  The court reserved decision on the remainder of Defendants' motion to dismiss.  (Id.)  On April 5, 2011, Plaintiffs filed a letter with the court stating that the European Community intended to remain as a party plaintiff.  (Docket Entry # 105.)  The court now considers the remainder of Defendants' motion to dismiss.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) allows defendants to challenge the court's subject matter jurisdiction by means of a motion to dismiss.  In reviewing a motion to dismiss under Rule 12(b)(1), courts must "accept as true all material factual allegations in the complaint," Shipping Fin. Serv. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) (citation omitted), but refrain from "drawing from the pleadings inferences favorable to the party asserting

[jurisdiction]," APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003) (citation omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).

## III.    DISCUSSION

It is axiomatic that federal courts are powerless to act unless they have subject matter jurisdiction over the cause of action. Because a federal claim no longer exists in this case, the only remaining jurisdictional hook for Plaintiffs' lawsuit is diversity jurisdiction. See 28 U.S.C. § 1332; Trans Union LLC v. Lindor, 393 F. App'x 786, 789-90 (2d Cir. 2010) (directing courts to address the issue of diversity jurisdiction after dismissing all federal claims).

### A.    Changes to the European Community

Regarding the European Community, great changes have been wrought to its status during the lengthy course of this litigation. The European Community was originally established in 1993 by the Maastricht Treaty, reforming its predecessor, the European Economic Community. See Treaty on European Union, art. G, Feb. 7, 1992, 1992 O.J. (C 191) 1 [hereinafter "Maastricht Treaty"]. In 2009, seven years after Plaintiffs filed their Original Complaint (see Compl. (Docket Entry #1)), the Lisbon Treaty incorporated the European Community, along with other European bodies, into the European Union. See Treaty of Lisbon Amending the Treaty on European Union and the Treaty Establishing the European Communities, Dec. 13, 2007, 2007 O.J. (C 306) 1 [hereinafter "Lisbon Treaty"]. The European Community thus ceases to function as an independent entity. Brian F. Havel & Gabriel S. Sanchez, Restoring Global Aviation's "Cosmopolitan Mentalité", 29 B.U. Int'l L.J. 1, 3 n.2 (2011) ("While some scholars have labored in the past to keep the European Union conceptually separate from the European Community, with the former referring to a geographic and political

4

territory and the latter designating a source of law and policy, the [Treaty of Lisbon] abolished this distinction by giving single legal personality to the EU." (internal citations omitted)).

Despite changes to the status of a party during litigation, the court must address the issue of diversity jurisdiction at the time of the filing of the complaint. Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830 (1989) ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."). It follows, then, that a change in a party's status during litigation cannot confer diversity jurisdiction on the court if it was lacking at the time the complaint was filed. See Adrian Family Partners I, L.P. v. ExxonMobil Corp., 79 F. App'x 489, 492 (2d Cir. 2003) (citing Anderson v. Watts, 138 U.S. 694, 702-03 (1891)) (concluding that the changed status in a party's residence during litigation cannot confer diversity jurisdiction on the court). This also applies in the corporate context: post-litigation changes to an entity's structure will not confer jurisdiction on the federal court where it was lacking at the time of filing. See Dole Food Co. v. Patrickson, 538 U.S. 468, 478 (2003) ("We think the plain text of [28 U.S.C. § 1603], because it is expressed in the present tense, requires that instrumentality status be determined at the time suit is filed."); Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 579-80 (2004) (holding that changes in the composition of a partnership during litigation did not confer jurisdiction on the lower courts). Therefore, although the European Community, as an entity, has since been subsumed into the European Union, the court must address whether the European *Community* met the strictures of the diversity statute at the time the Original Complaint was filed: October 30, 2002.

**B.    Diversity Jurisdiction**

The relevant provision of the diversity statute provides that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or

value of $75,000, exclusive of interest and costs, and is between . . . (4) a foreign state, defined in section 1603 (a) of this title, as plaintiff and citizens of a State or of different States." 28 U.S.C. § 1332(a).  Section 1603(a) of title 28 of the United States code, part of the Foreign Sovereign Immunities Act ("FSIA"), defines a "foreign state" as "includ[ing] a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)."[1]  Therefore, a "foreign state" under § 1332(a)(4) includes only a "foreign state," a "political subdivision of a foreign state," or an "agency or instrumentality of a foreign state." See Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek, 600 F.3d 171, 175 (2d Cir. 2010).

     1.    Recognition by the U.S. Department of State

     In making their arguments, both parties rely on Matimak Trading Co. v. Khalily, 118 F.3d 76 (2d Cir. 1997) for the proposition that an entity is a "foreign state" only if it is recognized as a "foreign state" by the United States government.  (Defs.' Suppl. Mem. at 12; Pls.' Suppl. Opp'n at 14; Defs.' Reply at 6-7.)  Indeed, this was the central thesis in Matimak: "deference [to the Executive] is consistent with (1) the purposes of alienage jurisdiction and (2) the well-established analysis for defining a 'foreign state' in related jurisdictional statutes and constitutional provisions."  118 F.3d at 82-83.  Or, in more pithy terms, a "state" isn't a "state" unless the President calls it a "state."  Under this rubric, the Matimak court concluded that "citizens" of Hong Kong were not entitled to alienage jurisdiction under any provision of 28 U.S.C. § 1332 because Hong Kong itself was not a "state," recognized as such by the United States government, and because Hong Kong citizens' ties to the United Kingdom were "too attenuated" to be ascribed.  Matimak, 118 F.3d at 86.

---

[1] The definition of an "agency or instrumentality of a foreign state as defined in subsection (b)" is discussed at Part III.B.4, infra.

The Supreme Court's decision in JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd., 536 U.S. 88, 92 (2002), however, narrowly abrogated Matimak. There, the Court concluded that even though the British Virgin Islands was not a governmentally recognized "state," its citizens were subject to alienage jurisdiction in diversity actions because those citizens' ties could be ascribed to the United Kingdom. Id. In doing so, the Court explicitly reserved opinion on whether "a foreign state must be diplomatically recognized by our own Government to qualify as such under the jurisdictional statute." Id.

Recently, in Samantar v. Yousuf, 130 S. Ct. 2278, 2286 (2010), the Court appears to have cast doubt on the requirement for diplomatic recognition of a "foreign state" under the FSIA. In Samantar, the Court noted that the State Department itself "sought and supported the elimination of its role with respect to claims against foreign states and their agencies or instrumentalities. . . . [but] understood the [FSIA] to leave intact the Department's role in official immunity cases." 130 S. Ct. at 2291 n.19 (citing Hearings on H.R. 11315 before the Subcommittee on Administrative Law and Governmental Relations of the House of Representatives Committee on the Judiciary, 94th Cong., 2d Sess., 34 (1976) (testimony of Monroe Leigh, Legal Adviser, Dept. of State) ("[I]t is our judgment . . . that the advantages of having a judicial determination greatly outweigh the advantage of being able to intervene in a lawsuit")). The Court did not, however, explicitly overrule Matimak, nor did it address the diplomatic recognition requirement in the context of alienage jurisdiction. Rather, it simply addressed whether the FSIA or common law principles of immunity applied to foreign officials apart from foreign states. Id. at 2282. Therefore, although Matimak is still technically controlling, because the current state of the law appears to be in flux, the court will address whether the European Community is a "foreign state" under the theories laid out in both Matimak and Samantar.

    2.    <u>A "Foreign State"</u>

        a.    The <u>Matimak</u> Factors

In <u>Matimak</u>, the Second Circuit concluded that Hong Kong was not a "foreign state" for purposes of alienage jurisdiction under § 1332(a)(4). 118 F.3d at 79-82. There, the court determined that the evidence "in the aggregate" compelled the conclusion that "the United States did not recognize Hong Kong as a sovereign and independent international entity." <u>Id.</u> at 82. The court distinguished between "de jure" and "de facto" recognition by the Executive. <u>See id.</u> at 80 ("The parties here agree that the United States has not formally recognized Hong Kong as a foreign state. . . . however, Matimak contends that Hong Kong has received 'de facto' recognition as a foreign state by the United States . . . ."); <u>see also</u> <u>Abu-Zeineh v. Fed. Labs., Inc.</u>, 975 F. Supp. 774, 776 (W.D. Pa. 1994) ("De jure recognition is formal recognition . . . . [while] de facto recognition . . . can be accorded a foreign state based upon an objective examination of the relations between the recognized entity and the recognizing state.").

An entity has received formal, de jure recognition of statehood if "the foreign state was recognized by the United States as 'a free and independent sovereign.'" <u>Matimak</u>, 118 F.3d at 80 (quoting <u>Iran Handicraft & Carpet Exp. Ctr. v. Marjan Int'l Corp.</u>, 655 F. Supp. 1275, 1278 (S.D.N.Y. 1987)). To that effect, the State Department periodically publishes a list of "Independent States in the World." Courts have looked to this list for similar guidance. <u>E.g.</u>, <u>United States v. Hasan</u>, 747 F. Supp. 2d 599, 633-34 (E.D. Va. 2010) (examining list to determining whether international law applied to accused Somalian pirate); <u>Doe v. Roman Catholic Diocese of Galveston-Houston</u>, 408 F. Supp. 2d 272, 281 n.2 (S.D. Tex. 2005) (consulting the list to determine whether the Holy See or Vatican City was the proper entity entitled to immunity). Analogously, some courts have looked to similar "fact sheets" to determine whether the United States has designated an entity as a foreign terrorist organization.

E.g., Matar v. Dichter, 563 F.3d 9, 11 n.1 (2d Cir. 2009) (looking at the Foreign Terrorist

Organizations Fact Sheet to determine that Hamas is a terrorist organization); Hor v. Gonzales,

421 F.3d 497, 499 (7th Cir. 2005) (looking at the same sheet for the proposition that the Algerian

Groupe Islamique Armé is a foreign terrorist organization).  Here, the State Department's

"Independent States of the World" list dated November 13, 2002 does not list the European

Community as an independent state.  U.S. Dep't of State, Bureau of Intelligence and Research,

"Independent States in the World" (Nov. 13, 2002) (on file with Office of the Geographer and

Global Issues).  The European Community was therefore not afforded de jure recognition by the

United States as a "free and independent sovereign" at the time of the Original Complaint.

     Nonetheless, Plaintiffs appear to argue that the European Community was afforded de

facto recognition of sovereignty by the Executive.  (Pls.' Suppl. Opp'n at 13-14.)  In Matimak,

the court gave close scrutiny to federal policy acts and State Department communiqués in

determining that Hong Kong did not receive de facto recognition as a sovereign country.  118

F.3d at 81-82.  Specifically, the court noted that the United States Hong-Kong Policy Act

> provides that Hong Kong "will continue to enjoy a high degree of autonomy on
> all matters other than defense and foreign affairs," and emphasizes that only "with
> respect to economic and trade matters" shall the United States "continue to treat
> Hong Kong as a territory which is fully autonomous from the United Kingdom."

Id. at 82 (quoting 22 U.S.C. §§ 5701(1)(B), 5713(3) (West Supp. 1996)) (internal citations

omitted).  This, the court concluded, made "clear [that] the United States' dealings with Hong

Kong . . . did not regard Hong Kong as an independent sovereign entity."  Id.  The court also

gave credence to a State Department letter, stating that "[t]he State Department no longer urges

treatment of Hong Kong as a de facto foreign state and withdraws any reliance on this

contention."  Id. (alteration in original).

9

In support of their contention that the European Community has de facto recognition as a "foreign state" in the United States, Plaintiffs principally provide two pieces of evidence: a November 26, 2002 letter from the State Department to the European Police Office ("Europol") and a 1972 Executive Order.  (See Pls.' Suppl. Opp'n at 13-14; Halloran Decl. Ex. 3, Letter from U.S. Dep't of State to Europol (Nov. 26, 2002) (Docket Entry # 98-3) [hereinafter "Letter"].)  The State Department letter does not discuss whether the State Department considered the European Community as a "de facto foreign state." Cf. Matimak, 118 F.3d at 82.  Rather, the substance of the Letter simply analyzes several federal cases on the issue of whether Europol would be entitled to immunity under the FSIA for torts committed in its information-sharing agreement with the United States.[2]  Letter at 6-8.  Even then, the Letter adds a caveat that "while we are happy to discuss in general how our courts have addressed several issues which could be relevant . . . you should be aware that the courts are legally authorized to make these determinations and only they could make a binding decision regarding Europol." Id. at 6.

As for the Executive Order referenced by Plaintiffs, Executive Order 11,689 signed by President Richard M. Nixon, it similarly does not address whether the United States gave de facto recognition of sovereignty to the European Community.  Exec. Order No. 11,689, 37 Fed. Reg. 25,987 (Dec. 5, 1972).  Rather, pursuant to 22 U.S.C. § 288h, it simply extends "the same privileges and immunities . . . enjoyed by diplomatic missions accredited to the United States" to the Mission of the Commission of the European Communities to the United States. Id. But the extension of diplomatic privileges to an entity does not afford that entity a de facto recognition of its sovereignty.  Congress has authorized the President to grant diplomatic immunity to numerous entities, none of which could possibly be construed as sovereignty entities in their own right. See, e.g., 22 U.S.C. §§ 288f-2 (African Union Mission), 288f-3 (International Committee

---

[2] Further, what relationship Europol had to the European Community, if any, remains unclear.

of the Red Cross), 288j (International Development Law Institute). This evidence, in the aggregate, strongly suggests that the United States did not recognize the European Community as an independent sovereign nation, de jure or de facto. The European Community is therefore not a "foreign state" under the principles laid out in Matimak.

> b.    The Samantar Analysis

In Samantar, the Supreme Court concluded that the term "foreign state" in the FSIA generally "indicates a body politic that governs a particular territory." 130 S. Ct. at 2286. In interpreting the FSIA, the Court focused on the Act's "codification of international law at the time of [its] enactment" and found it useful to "examine the relevant common law and international practice when interpreting [the FSIA]." Id. at 2289. For written authority of "the relevant common law and international practice," the Court looked to the Restatement (Second) of Foreign Relations Law of the United States. Id. at 2286.

Section 4 of the Restatement defines "state" as "an entity that has a defined territory and population under the control of a government and that engages in foreign relations." Restatement (Second) of Foreign Relations Law of the United States ("Restatement") § 4; see also Samantar, 130 S. Ct. at 2286 (adopting the same definition). Comment c to § 4 specifically contemplates unions between several states. In that instance, the union is a "state" if "none of them retains an independent capacity to engage in foreign relations and to assume separate responsibility for its acts." Restatement § 4, cmt. c.

In contrast, § 5 of the Restatement defines "international organizations." There, an entity is an "international organization" if it is "(a) is created by an international agreement as defined in § 115 and (b) has a membership consisting primarily of states as defined in § 4." Section 115 defines "international agreement" as "an agreement between states or international organizations by which there is manifested an intention to create, change or define relationships under

international law." Restatement § 115(a). Comment b to § 5 further contemplates when "[a]

state may delegate a measure of power for certain purposes to an international organization. This

does not necessarily involve loss of status as a state under international law, even though the

organization may exercise functions which the states themselves cease to exercise." As an

example of an "international organization," comment b gives the European Economic

Community, the predecessor entity to the European Community. Restatement § 5, cmt. b; see

also Lisbon Treaty, 2007 O.J. (C 306) 1; Havel & Sanchez, supra, at 3 n.2 (2011) (describing the

European Community as a "source of law and policy" rather than a "geographic and political

territory").

        This framework strongly suggests that the European Community was an "international

organization" as opposed to a state. While it is true that the European Community was "an entity

that has a defined territory and population," i.e., the territory and population of its member states,

it is less clear whether it exercised the control of government over those territories, particularly

in the foreign relations arena. Despite its existence, the establishment of the European

Community did nothing to abrogate the powers of international sovereignty of its member states.

During the European Community's existence, member states were still able, independent of their

inclusion in the European Community, to receive ambassadors, sign treaties, and wage war. See

generally Note, A Community Within the Community: Prospects for Foreign Policy Integration

in the European Community, 103 Harv. L. Rev. 1066, 1066 (1990) (discussing the powers of

foreign relations of member states, and noting that "Member States have largely prevented the

Community from displacing national control over foreign relations"). Comment c to § 4 of the

Restatement is instructive in this regard: the union of multiple states is a state itself only if none

of the states "retains an independent capacity to engage in foreign relations and to assume separate responsibility for its acts." Restatement § 4, cmt. c.

The definition of "international organization," however, is a much better fit for the European Community. First, the European Community was created by an international agreement: the Maastricht Treaty. That Treaty, undoubtedly, was "between states" and "manifested an intention to create, change [and] define [the] relationships" between the member states. See Maastricht Treaty, 1992 O.J. (C 191) 1 (discussing this intention in the preamble). And second, the European Community's membership consisted entirely of states—all but one the Member States joined as Plaintiffs in this action.[3]  In addition, there is the inescapable fact that comment b to § 5 lists the European Community's predecessor entity, the European Economic Community, as an "international organization" even though it performs many of the governmental functions of a state "which the states themselves cease to exercise." See Restatement § 5, cmt. b.  Under the Restatement, therefore, the European Community is more properly construed as a "international organization" than a "state."

Plaintiffs point to two of this court's previous decisions, Morgan v. Council of Europe (Morgan I), 02-cv-891 (CBA) (LB) (E.D.N.Y. Jan. 3, 2003) (Docket Entry # 18), and Morgan v. United States (Morgan II), 04-cv-672 (CBA) (LB) (E.D.N.Y. Feb. 26, 2004) (Docket Entry # 4). In those cases, the plaintiff, a pro se litigant, filed claims against various international entities, including the Republic of Finland, the Council of Europe, the European Union, and the United Nations, regarding his alleged mistreatment at the hands of Finnish officials.  (See, e.g., Compl., Morgan v. Council of Europe, 02-cv-891 (E.D.N.Y. Mar. 5, 2002) (Docket Entry # 1).)  In Morgan I, the court adopted the Magistrate Judge's report and recommendation ("R&R") that the

_____

[3] The United Kingdom, a Member State of the European Community, is not a party plaintiff.  See Maastricht Treaty, 1992 O.J. (C 191) 1.

plaintiff's claims should be dismissed. Morgan I at 1. Among several reasons given for

recommending the dismissal of the plaintiff's claims, the Magistrate Judge's R&R's concluded

that "[t]he Republic of Finland and the Council of Europe are foreign states, 28 U.S.C. § 1603(a)

and (b), and are therefore entitled to immunity from the jurisdiction of the courts of the United

States." Aside from this single sentence, however, the R&R did not engage in any further

analysis of the issue. In Morgan II, a suit against the United States, the Republic of Finland, the

Council of Europe, the European Union, and the United Nations, the court stated, again in a

single sentence, "the defendants named herein are immune from suit for the reasons set forth in

the Court's prior orders." Morgan II at 3.

    To the extent the instant suit can be analogized to those decisions, the court does not find

them persuasive. First, both Morgan I and Morgan II were decided prior to 2010, without the

benefit of the Supreme Court's analysis in Samantar. Second, although the relevant portion of

the diversity statute incorporates the FSIA, Morgan I and II both dealt with the issue of immunity

rather than diversity jurisdiction. And third, the brief analyses in Morgan I and II did not engage

the statutory text as fully as is necessary in the instant case. Therefore, Plaintiffs' reference to

Morgan I and II do not convince the court that the European Community is a foreign state under

the FSIA.

    3.    A "Political Subdivision of a Foreign State"

    Although the European Community is not a "state" for purposes of the diversity statute,

the court may nonetheless obtain subject matter jurisdiction if the European Community can be

construed as "a political subdivision of a foreign state or an agency or instrumentality of a

foreign state." 28 U.S.C. § 1603. Like "foreign state," however, "political subdivision" seems to

inaccurately describe the European Community's relationship with the member states. "The

term 'political subdivisions' includes all governmental units beneath the central government,

14

including local governments," as well as departments or ministries of a state's government.  Garb
v. Republic of Poland, 440 F.3d 579, 596 n.21 (2d Cir. 2006).  The plain meaning of this
definition appears to exclude supranational, treaty-based organizations.  Here, the European
Community was not a governmental unit beneath a state's central government, nor can it be
construed as a department or ministry of a state's government.  Rather, as described in Garb v.
Republic of Poland, the most salient examples of "political subdivisions" from FSIA
jurisprudence are culture, trade, and financial organizations controlled by a single state's
government.  440 F.3d at 592 n.21 (giving, as examples of "political subdivisions," the Cuban
Ministry of Foreign Trade, the Russian Ministry of Culture, the Yemeni Ministry of Supply &
Trade, and an Italian public-financial entity).  The European Community was not an analogous
entity when this action was filed.

### 4.    An "Agency or Instrumentality of a Foreign State"

To recap, 28 U.S.C. § 1603(a) defines a "foreign state" as "includ[ing] a political
subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in
subsection (b)."  Subsection (b) defines an "agency or instrumentality of a foreign state" as

> any entity—(1) which is a separate legal person, corporate or otherwise, and (2)
> which is an organ of a foreign state or political subdivision thereof, or a majority
> of whose shares or other ownership interest is owned by a foreign state or political
> subdivision thereof, and (3) which is neither a citizen of a State of the United
> States as defined in section 1332 (c) and (e) of this title, nor created under the
> laws of any third country.

28 U.S.C. § 1603(b).

### a.    A "Separate Legal Person"

The statute's "personhood" requirement "is intended to include a corporation,
association, foundation, or any other entity which, under the law of the foreign state where it was
created, can sue or be sued in its own name."  Samantar, 130 S. Ct. at 2287 n.9.  The court must

consider the "instrumentality status" of the disputed entity at the time the original complaint was filed in October 2002. See Dole Food, 538 U.S. at 478 ("We think the plain text of [§ 1603], because it is expressed in the present tense, requires that instrumentality status be determined at the time suit is filed."). Because the Amsterdam Treaty, the law in force when the European Community filed its Original Complaint in 2002, provided for the European Community's separate, legal personhood, the European Community is a separate legal person for the purposes of the FSIA. See Treaty of Amsterdam Amending the Treaty on European Union, The Treaties Establishing the European Communities And Related Acts art. 281, Nov. 10, 1997, 1997 O.J. (C 340) 3 [hereinafter "Treaty of Amsterdam"] ("The Community shall have legal personality."); see also Rafael Leal-Arcas, EU Legal Personality in Foreign Policy?, 24 B.U. Int'l L.J. 165, 197 (2006) (comparing the legal personality of the European Community to that of the European Union).

　　　　　b.　An "Organ of a Foreign State or Political Subdivision Thereof"

　　　　　　　i.　Singular or Plural?

　　Because the European Community arises out of an agreement among multiple states, the court must discern whether this clause of the FSIA is couched in the plural as well as the singular, that is, whether the FSIA applies only to "organs of a foreign state" or an "organ of foreign states." Put another way, whether the European Community can be an "organ of *a* foreign state" if it consisted of more than one foreign state. This occupies a central dispute in the parties' briefs. (Defs.' Suppl. Mem. at 15; Pls.' Suppl. Opp'n at 19.) And the great weight of authority suggests the answer is "yes."

　　As a general matter of statutory interpretation, "unless the context indicates otherwise[,] words importing the singular include and apply to several persons, parties, or things." 1 U.S.C. § 1. "'Context' here means the text of the Act of Congress surrounding the word at issue, or the

16

texts of other related congressional Acts . . . ."  Rowland v. Calif. Men's Colony, Unit II Men's Advisory Council, 506 U.S. 194, 199 (1993).  Therefore, unless the text of the act at issue suggests that its terms should be couched in the singular, the court will equate singular articles to their plural equivalents.  See Public Citizen, Inc. v. Mineta, 340 F.3d 39, 54 (2d Cir. 2003) (equating "a tire" under the TREAD Act to "tires").

In this vein, a number of courts have concluded that the term "a foreign state" under the FSIA also includes "foreign states" in the context of "share pooling": whether multiple foreign states who separately own shares in an entity may pool those shares to demonstrate that the entity is majority-owned by "a foreign state" for the purpose of asserting immunity under the FSIA. See 28 U.S.C. § 1603(b)(2) ("An 'agency or instrumentality of a foreign state' means any entity . . . a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof . . . .").

The leading case on the issue, LeDonne v. Gulf Air, Inc., 700 F. Supp. 1400, 1406 (E.D. Va. 1988), discussed whether Gulf Air, Inc., a corporation created by treaty among the Emirate of Abu Dhabi, the State of Bahrain, the State of Qatar and the Sultanate of Oman, fell under the FSIA even though Gulf Air was "owned equally by four foreign states, not one [of] which has a majority of [] shares."  The court explicitly rejected this argument as an "unnecessary literalism that runs counter to [the FISA's] purpose and ignores the well-established international practice of states acting jointly through treaty-created entities for public or sovereign purposes." Id.

The Fifth Circuit has adopted the position advanced in LeDonne.  In Linton v. Airbus Industrie, 30 F.3d 592 (5th Cir. 1994), that court considered whether Germany's interest in Airbus could be pooled with other foreign countries' to show that Airbus was majority-owned by "a foreign state," and therefore immune to suit under the FSIA.  While the court dismissed the

appeal on procedural grounds, it explicitly rejected the district court's "comment[] that 'pooling' appears to be foreclosed by the use of the state ('singular') in the FSIA . . . [and] should be examined in light of the rules of statutory construction and in light of the cases in which the pooling issue has been considered." Id. at 598 n.29.  The Linton court then noted a number of opinions to have considered the issue, all of which rejected the singularity theory in favor of pooling.  Id. (collecting cases).

Similarly, in In re EAL Corp., No. 93-cv- 578 (SLR), 1994 WL 828320 (D. Del. Aug. 3, 1994), the court addressed whether the European Organisation for the Safety of Air Navigation ("Eurocontrol"), the entity responsible for air traffic control in Europe and created by the International Convention Relating to Cooperation for the Safety of Air Navigation, qualified as the agency or instrumentality of "a foreign state" under the FSIA.  The court concluded that, although Eurocontrol was the child of fifteen different European nations, its responsibilities regarding a primarily sovereign activity—regulating air space—"would be frustrated if Eurocontrol were not accorded the status of an 'agency or instrumentality of a foreign state.'" Id. at *5.

The court agrees with this line of reasoning that an entity established by multiple foreign states can, in principle, be an "organ of a foreign state" under the FSIA.  This parallels a plain reading of the statute under venerable principles of statutory interpretation that include the plural with the singular.  See 1 U.S.C. § 1; In re Aircrash Disaster Near Roselawn, Ind. on Oct. 31, 1994, 909 F. Supp. 1083, 1093 (N.D. Ill. 1995) ("[W]e find that 1 U.S.C. § 1 permits reading § 1603(b)(2) as referring to majority ownership by 'foreign states' rather than simply 'a foreign state.'  Moreover, we find that the wooden reading urged by the plaintiffs would most assuredly frustrate the FSIA's objective of providing a comprehensive jurisdictional scheme in cases

18

involving foreign states." (internal quotation marks omitted)).  Therefore, although the European

Community was established by multiple foreign states, this does not automatically disqualify it

from being characterized as "an organ of a foreign state" under § 1603(b).

> ii.  The Character of the European Community as an "Organ of a
>      Foreign State"

In determining whether an entity is the "organ of a foreign state," the Second Circuit has

counseled district courts to apply the Filler factors.  See In re Terrorist Attacks on Sept. 11, 2011,

538 F.3d 71, 85 (2008) (citing Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir. 2009)),

abrogated on other grounds by Samantar, 130 S. Ct. at 2278.  The Filler factors ask the court to

weigh:

> (1) [W]hether the foreign state created the entity for a national purpose;
> (2) whether the foreign state actively supervises the entity; (3) whether the foreign
> state requires the hiring of public employees and pays their salaries; (4) whether
> the entity holds exclusive rights to some right in the [foreign] country; and
> (5) how the entity is treated under foreign state law.

Filler, 378 F.3d at 217.  "Filler invites district courts to engage in a balancing process, without

particular emphasis on any given factor and without requiring that every factor weigh in favor of,

or against, the entity . . . ."  Terrorist Attacks, 538 F.3d at 85 (quoting Murphy v. Korea Asset

Mgmt. Corp., 421 F. Supp. 2d 627, 641 (S.D.N.Y. 2005)).

*National purpose.*  Under Filler, the "national purpose" factor asks whether the entity

"was created for a quintessential government purpose," such as the preservation of countries'

financial industries.  Murphy, 421 F. Supp. 2d at 642.  In fact, this was precisely the purpose of

the Member States in creating the European Community: to "establish[] a common market and

an economic and monetary union . . . to promote throughout the Community a harmonious,

balanced and sustainable development of economic activities, . . . and economic and social

19

cohesion and solidarity among Member States." Treaty of Amsterdam art. 2, 1997 O.J. (C 340) 3.

*Supervision.* The "supervision" factor looks to whether the foreign states regulate the entity or direct the entity's appointments or official acts. See Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., 476 F.3d 140, 143 (2d Cir. 2007) (concluding that the Republic of Korea supervised Financial Supervisory Service of the Republic of Korea because it appointed its governor and auditor, controlled its actions through another agency, and regulated its inspection fees); Murphy, 421 F. Supp. 2d at 643 (concluding the same in regards to the Korea Asset Management Corporation because the Republic of Korea had the power to appoint its auditor, through which it exercised control over its decision making); U.S. Fidelity & Guar. Co. v. Braspetro Oil Services Co., No. 97-cv-6124 (JGK), 1999 WL 307666 (S.D.N.Y. May 17, 1999) (concluding that the defendant was an organ of Brazil where the President of Brazil appointed its directors, approved its charter, and could inspect its financial reports).

To determine whether the Member States "actively supervised" the European Community, it is important to engage in a brief review of the Community's composition. Prior to the Lisbon Treaty in 2009, the European Community consisted of five basic institutions: the Council of the European Communities (the "Council"), the European Parliament (the "Parliament"), the Commission of the European Communities (the "Commission"), the Court of Justice of the European Communities (the "Court of Justice"), and the European Court of Auditors (the "Court of Auditors").[4] Amsterdam Treaty, art. 7. The Council was a legislative body consisting of one representative from each Member State. Id., art. 203. The Parliament, also a legislative body, consisted of representatives directly elected by the citizens of the Member States. Id., art. 190(1). The Commission served the European Community's executive

---

[4] Some of these bodies still exist as part of the framework of the European Union. See Lisbon Treaty.

function, consisting of a "cabinet" of individuals from each Member State, and a President nominated by the Council and approved by Parliament. Id., art. 214.  The Court of Justice consisted of twenty-seven judges, again, one from each Member State, nominated by that State and confirmed by the other States. See id., art. 221 (establishing a court of fifteen judges); Treaty of Nice Amending the Treaty on European Union, the Treaties Establishing the European Communities and Certain Related Acts [hereinafter "Nice Treaty"], art. 2 ¶ 27, Mar. 10, 2001, 2001 O.J. (C 80) 1 (amending the Amsterdam Treaty and establishing the one-judge-per-Member-State rule).  The Court of Auditors similarly consisted of twenty-seven members, one from each state, appointed by the Council.  Amsterdam Treaty, art. 247; Nice Treaty, art. 2 ¶ 36.

This structure demonstrates that the Member States did not actively supervise the European Community as a whole.  While it is true that the Member States individually nominated representatives to serve as Commission officials, judges on the Court of Justice, and auditors on the Court of Auditors, this power was not unlimited: the other Member States needed to consent to the appointment.  See Amsterdam Treaty, arts. 214, 221, 247.  In other instances, the Member States had absolutely no control over the appointment of officials.  Representatives of Parliament were elected by direct elections of the Member States' citizenry, not appointed by the Member States' governments. Id., art. 190(1).  And the President was elected by Council members, not appointed by the Member States, individually or collectively. Id., art. 214.  Indeed, the only Community institution that gave the Member States an unfettered appointment right was the Council, which consisted of the Member States themselves. Id., art. 203.  This is unlike the "supervision" of the appointment process in other cases where the foreign state or an executive of a foreign state wielded an unchecked appointment power.  See Peninsula Asset

Mgmt., 476 F.3d at 140; Murphy, 421 F. Supp. 2d at 643; Braspetro Oil Services Co., 1999 WL

307666, at *9.

Further, aside from the Council, each one of the European Community's public

institutions was independent of control by the Member States, individually or collectively.

Although the Member States nominated representatives to the Commission, the Amsterdam

Treaty specifically established that

> [t]he Members of the Commission shall, in the general interest of the Community,
> be completely independent in the performance of their duties. In the performance
> of these duties, they shall neither seek nor take instructions from any government
> or from any other body. They shall refrain from any action incompatible with
> their duties. Each Member State undertakes to respect this principle and not to
> seek to influence the Members of the Commission in the performance of their
> tasks.

Amsterdam Treaty, art. 213(2). The Amsterdam Treaty similarly makes independent the judges

and auditors of the Courts of Justice and Auditors. See id. arts. 222 ("The Judges and

Advocates-General shall be chosen from persons whose independence is beyond doubt . . . .");

248 ("The Court of Auditors and the national audit bodies of the Member States shall cooperate

in a spirit of trust while maintaining their independence."). Nor, by virtue of the representatives'

direct election, could the Member States control Parliament. Indeed, the only institution

susceptible to any control by the Member States was the Council. Id., art. 203. This, however, is

not enough to conclude that the Member States controlled the European Community any more

than, say, U.S. states control the workings of the federal government. See Ernest A. Young,

Protecting Member State Autonomy in the European Union: Some Cautionary Tales from

American Federalism, 77 N.Y.U. L. Rev. 1612, 1696 (2002) (stating that just as "the State of

Texas has no more influence at the Federal Communications Commission, for example, than

does AT&T (and in fact, probably less)," the Member States lack power to control regulatory

activity in the European Community).  Consequently, the Member States do not meet the "supervision" factor under Filler.

    *Hiring of public employees and payment of their salaries.*  Filler does not provide any guidance as to how the court should determine whether the employees of the putative "organ" are "public employees."  Rather, Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect, 89 F.3d 650 (9th Cir. 1996), was the first case to rely on the "public employee" analysis in the FSIA context.  There, the court tersely concluded that the employees of a Mexican oil refinery were "public employees" because they were "subject to the rights and obligations of public servants."  Id. at 654.  Implicit in Corporacion Mexicana's conclusion that the employees of the oil refinery were "public employees" was the recognition that it was the law of the foreign state—there, Mexico—that determined whether the employees held "the rights and obligations of public servants."  See id.; Glencore, Ltd. v. Chase Manhattan Bank, N.A., No. 92-cv-6214 (JFK), 1998 WL 74294, at *3 (S.D.N.Y. Feb. 20, 1998) (concluding that employees of Indian bank were public employees where Supreme Court of India concluded that they were public employees).

    The European Court of Justice has long held that "public service" means "a series of posts which involve direct or indirect participation in the exercise of powers conferred by public law and duties designed to safeguard the general interests of the state or of other public authorities."  See Case 149/79, Comm'n of the European Cmtys. v. Kingdom of Belgium, 1980 E.C.R. 3881, ¶ 10; see also Case C-4/91, Bleis v. Ministère de l'Education Nationale, 1991 E.C.R. 5627, ¶ 6 ("[E]mployment in the public service . . . must be understood as meaning a series of posts which involve direct or indirect participation in the exercise of powers conferred by public law and duties designed to safeguard the general interests of the State or of other public authorities . . . .").  Under this rubric, it may initially seem that the employees of the

European Community, i.e., its President, cabinet members, auditors, judges, members of

Parliament, and Council representatives, are "public employees." Each occupies a post which

involves the exercise of the powers conferred on them by the various treaties regulating the

European Community. See, e.g., Amsterdam Treaty, arts. 190, 203, 214. And each position is

designed to further "the general interests" of the European Community. See, e.g., id., arts.

213(2), 234, 247(4). But the "public employee" question under Filler asks whether the

individuals were public employees of the *foreign states*, not the *entity*. Indeed, the cases to

substantively address the "public employee" inquiry under Filler determined that the employees

in question were public employees of the foreign state at issue, not the alleged organ. See

Glencore, 1998 WL 74294, at *3 (concluding that Indian bank employees were "public

employees" under the FSIA where Supreme Court of India determined they were specifically

employees of the Republic of India); Vivas v. Boeing Co., Nos. 06-cv-3566, 06-cv-3567, 06-cv-

3568, 06-cv-6807, 07-cv-0683, 2007 WL 2409742, at *5 (N.D. Ill. Aug. 21, 2007) (concluding

that state-operated-airline pilots were public employees because they were required to be

members of the Peruvian Air Force and were paid by the state treasury).

  Here, although the employees of the European Community may have met the definition

of "public employees" of the Community itself, they were not public employees of the Member

States. Indeed, the "powers conferred by public law" given to these employees was not the

public law of the Member States but the public law of the European Community; the legislators,

judges, and executives of the European Community held no power to legislate, judge, or execute

the laws of their home countries. Further, the powers vested in these employees were intended to

be exercised so as to "safeguard the general interests" of the European Community, not the

employees' home countries. As discussed above, the Amsterdam Treaty specifically called for

these officers' independence—independence from their home countries' governments. See

Amsterdam Treaty, arts. 213, 222, 248. In addition, it appears that although the Member States

paid into the European Community's general fund, it was the Community itself that paid—and

set—its employees' salaries. See id. arts. 210, 247(8); see also Vivas, 2007 WL 2409742, at *5

(entity was an organ of the foreign state where employees were paid directly from the state

treasury). Consequently, the employees of the European Community were not public employees

of the Member States under Filler.

    *Exclusive Rights.* Filler also asks whether the putative organ possesses "exclusive rights

to some right in the [foreign] country." 378 F.3d at 217. Other courts examining the "exclusive

rights" factor have given it broad meaning. Terrorist Attacks, 538 F.3d at 86 (Saudi High

Commission for Relief to Bosnia and Herzegovina held an "exclusive right" where it was the

"sole authority" to collect and distribute charity in Bosnia); Peninsula Asset Mgmt., 476 F.3d at

143 (Financial Supervisory Service of the Republic of Korea held an "exclusive right" where it

was had the sole authority to receive monthly business reports from the entities it oversaw);

Kelly v. Syria Shell Petroleum Development B.V., 213 F.3d 841, 848 (5th Cir. 2000) (Al Furat

Petroleum Company had "the exclusive right to explore and develop Syria's identified petroleum

reserves, which are the property of the Syrian government.").

    The Amsterdam Treaty obliquely refers to the European Community's "exclusive rights":

> In areas which do not fall within its exclusive competence, the Community shall
> take action, in accordance with the principle of subsidiarity, only if and insofar as
> the objectives of the proposed action cannot be sufficiently achieved by the
> Member States and can therefore, by reason of the scale or effects of the proposed
> action, be better achieved by the Community.

Amsterdam Treaty, art. 5. Precisely what this means, or how the European Community's

"exclusive competences" interacted with the "principle of subsidiarity," has long been unclear.

See George A. Bermann, Taking Subsidiarity Seriously: Federalism in the European Community

& The United States, 94 Colum. L. Rev. 331, 348-66 (1994) (discussing the "exclusive right"

versus "subsidiarity" conflict in the context of principles of federalism). Nonetheless, it appears

that—at the time Plaintiffs filed their Complaint—the European Community possessed two

"exclusive rights" in regard to the Member States. One, as set forth in Article 106(1) of the

Amsterdam Treaty, the European Central Bank had "the exclusive right to authorise the issue of

banknotes within the Community."[5] And two, Article 133(1) calls for a "common commercial

policy . . . based on uniform principles, particularly in regard to changes in tariff rates, the

conclusion of tariff and trade agreements, the achievement of uniformity in measures of

liberalisation, export policy and measures to protect trade such as those to be taken in the event

of dumping or subsidies." The European Court of Justice has concluded that this language

means that the "[European] Community has exclusive competence, pursuant to Article 113 of the

[Amsterdam] Treaty, to conclude the Multilateral Agreements on Trade in Goods." See Opinion

1/94, Competence of the Community to Conclude International Agreements Concerning Services

& the Protection Of Intellectual Property - Article 228(6) of the EC Treaty, 1994 E.C.R. I-5267,

¶ 34. Therefore, the European Community possessed some "exclusive rights" relative to the

Member States under Filler.

     *Treatment Under Foreign State Law.* The court also considers how the entity is treated

under the law of the foreign states; specifically, whether the entity is considered an "organ" of

the government by the foreign states. See Peninsula Asset Mgmt., 476 F.3d at 143 (concluding

---

[5] It is true that, despite this provision, the United Kingdom, Denmark, and Sweden continued to issue their own currency. Both the United Kingdom and Denmark "opted-out" of their inclusion in the "Eurozone." Maastricht Treaty, Protocol on Denmark; id., Protocol on Certain Provisions Relating to the United Kingdom of Great Britain and Northern Ireland. And Sweden, while having no similar opt-out provision, rejected the Euro by plebiscite. See Sweden Says No to Euro, BBC News (Sept. 15, 2003), http://news.bbc.co.uk/2/hi/europe/ 3108292.stm. Nonetheless, the "exclusive right" inquiry under Filler asks whether the putative organ has a *legal* rather than a *de facto* exclusive right. See Bd. of Regents of Univ. of Tex. Sys. v. Nippon Tel. & Tel. Corp., 478 F.3d 274, 280 (5th Cir. 2007) (concluding that putative organ of Japan did not hold exclusive rights to telephone service in Japan where it possessed a de facto monopoly it inherited from its government-controlled predecessor and was tasked with increasing telephone service competition).

that Korean entity met "foreign state law" factor where Korean government informed the State Department and the court that it considered the entity an "organ" of the government); Nippon Tel. & Tel., 478 F.3d at 280 (concluding that Japanese entity did not meet "foreign state law" factor where it was not considered an organ of Japan under Japanese law); Ocean Line Holdings, 578 F. Supp. 2d at 625 (concluding that entity, a subsidiary to a private corporation, was not an organ of China even though it was considered an "Enterprise Owned by the Whole People" under Chinese law). The court cannot find, nor do the parties cite to any law of any Member State that construed the European Community as an "organ" of the Member States, individually or collectively. If anything, secondary authorities strongly suggest that the European Community was "a truly supranational body with a reasonably autonomous institutional existence of its own" rather than "an intergovernmental body, requiring the consent of each Member State before common action can be taken." See Young, supra, at 162 n.32 (quoting Peter L. Lindseth, Democratic Legitimacy and the Administrative Character of Supranationalism: The Example of the European Community, 99 Colum. L. Rev. 628, 652 (1999)). And much unlike an "organ" of the Member States, the European Community "impinged upon"—rather than advanced—"the autonomy of individual member states." See Jacqueline Bhabha, Belonging In Europe: Citizenship and Post-national Rights, 11 Int'l Soc. Sci. J. 11 (1999). This concept of a supranational, autonomous, and independent entity "ha[d] been most visibly championed by the constitutional courts of certain member states of the Community and their friends." Larry Catá Backer, The Extra-National State: American Confederate Federalism and the European Union, 7 Colum. J. Eur. L. 173, 194 (2001). As one example, the Constitutional Court of Spain specifically disclaimed "ownership" over the European Community. See id. at 205-06 (quoting Treaty on European Union, Case No. 1236/92, Spanish

Constitutional Court (Plenary Session) (July 1, 1992)); see also id. at 204-05 (citing similar examples from the constitutional courts of Germany, Italy, and, to some degree, the United Kingdom). Therefore, the Member States did not consider the European Community to be their "organ."

Weighing the _Filler factors_. As discussed above, the European Community was certainly created for a "national purpose" and did possess some, albeit limited, exclusive rights. Nonetheless, the Member States did not actively supervise the European Community, did not require the hiring of employees that could be deemed public employees of the Member States, and rejected notions of the European Community as an "organ" of themselves under their own laws. These factors all point to the inescapable conclusion that the European Community really is a supranational body, truly independent of the governments of the Member States. It was not a subsidiary of the Member States, nor was it controlled by them in any meaningful fashion. Weighing these factors qualitatively and quantitatively, the court concludes that the European Community is not an "organ or instrumentality" of the Member States.

c.    "Not Created Under the Laws of Any Third Country"

Because the European Community existed by virtue of the establishing treaties signed by the Member States, the issue arises as to whether the European Community was "created under the laws of a third country." 28 U.S.C. § 1603(b). Where multinational, treaty-based organizations are concerned, courts have concluded that the entity at issue is not created under the laws of a third country if "the instrumentality is created or established . . . under the laws of the owner nations, [as opposed to] under the laws of any other, third countries." See, e.g., LeDonne, 700 F. Supp. at 1406; see also Gardner Stone Hunter, 896 F. Supp. at 131 n.7; Sequa Corp. v. Aetna Cas. & Sur. Co., No. 89-cv-234 (JRR), 1990 WL 212756, at *5 (D. Del. Jan. 18, 1990) (concluding that court lacked subject matter jurisdiction over entity where entity, created

28

by multinational treaty, was partially established by Bahrain, which had no ownership interest in entity). Here, the only countries' laws establishing the European Community are those of its Member States. See Maastricht Treaty. Therefore, the European Community was not created under the laws of a third country under 28 U.S.C. § 1603(b).

Consequently, the European Community is neither a "foreign state," a "political subdivision of a foreign state," nor an "agency or instrumentality of a foreign state" as required under 28 U.S.C. § 1332(a)(4). The court therefore lacks subject matter jurisdiction over the instant action. See 28 U.S.C. § 1332(a).

**C.     Supplemental Jurisdiction**

The court further declines to exercise supplemental jurisdiction over Plaintiffs' action. "Supplemental jurisdiction allows federal courts to hear and decide state-law claims along with federal-law claims when they 'are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.'" Wis. Dep't of Corrs. v. Schacht, 524 U.S. 381, 387 (1998) (quoting 28 U.S.C. § 1367(a)). This exercise is discretionary. Id. Where "the district court has dismissed all claims over which it has original jurisdiction," the supplemental jurisdiction statute counsels the court to decline jurisdiction. 28 U.S.C. § 1367(c)(3); see also Cataldi v. United Water N.Y., 363 F. App'x 769, 769 (2d Cir. 2010) (affirming order of district court declining to exercise supplemental jurisdiction where court dismissed plaintiff's federal claims and lacked diversity jurisdiction over the remainder). Here, the court dismissed Plaintiffs' only federal claims in its March 8, 2011 opinion; only Plaintiffs' state law claims remain. (See Mem. & Order.) As discussed above, the court lacks subject matter jurisdiction over Plaintiffs' lawsuit. Therefore, as counseled by 28 U.S.C. § 1367(c)(3), the court will decline to exercise supplemental jurisdiction over the remainder of Plaintiffs' case.

**D.    Plaintiffs' Request to Amend Their Complaint**

Plaintiffs have also requested leave to amend their Second Amended Complaint.  (Pls.'
Opp'n at 33 n.24.)  Notwithstanding that this would be Plaintiffs' *sixth* complaint in the decade
of litigation between the parties, the court denies Plaintiffs leave to amend.  "Although Rule
15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given
when justice so requires,' it is within the sound discretion of the district court to grant or deny
leave to amend."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007).  "A
district court has discretion to deny leave for good reason, including futility, bad faith, undue
delay, or undue prejudice to the opposing party."  Id.  Here, Plaintiffs requested leave to amend
in the event the court concluded that their federal claims were impermissibly extraterritorial.
(Pls.' Opp'n at 33 n.24.)  Plaintiffs suggested that they possessed additional facts that could have
aided the court's determination that the enterprise alleged in the Complaint was a domestic
enterprise.  (Id.)  Plaintiffs complain that they did not include such allegations in their Second
Amended Complaint because "this Court had repeatedly requested brevity in the pleadings."
(Pls.' Mot. for Reconsideration (Docket Entry # 103) at 5.)[6]

But brevity and sufficiency are not mutually exclusive.  Nothing prevented Plaintiffs
from including in their Complaint the facts most salient to tie Plaintiffs' alleged harms to
Defendants' conduct, or to prove that Defendants' were involved in an illegal, domestic
enterprise.  Rather than doing that, Plaintiffs spent the vast majority of their 143-page, 273-
paragraph alleging facts and harms that, even taken at face value, had absolutely nothing to do
with Defendants.  The court commented on the Complaint's disorganization in its previous
opinion.  (Mem. & Order at 5.)  Surely Plaintiffs had the wherewithal and the opportunity to file

---

[6] The court strains to take this excuse seriously given that Plaintiffs' Complaint measures 143 pages and 273
paragraphs.

30

a reasonably concise and legally sufficient complaint, as the court expected them to do the previous *five times*. The court will not now grant Plaintiffs leave to amend their Complaint.

## IV.    CONCLUSION

Defendants' Motion to Dismiss is GRANTED in part. Plaintiffs' request for leave to amend their Complaint is DENIED. The action is DISMISSED for lack of subject matter jurisdiction.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
     May 12, 2011

_____
NICHOLAS G. GARAUFIS
United States District Judge

31

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
The EUROPERAN COMMUNITY, *acting on its own*
*behalf and on behalf of the Member States it has*
*power to represent, and the* REPUBLIC OF
AUSTRIA, KINGDOM OF BELGIUM, REPUBLIC
OF BULGARIA, REPUBLIC OF CYPRUS, CZECH
REPUBLIC, KINGDOM OF DENMARK,
REPUBLIC OF ESTONIA, REPUBLIC OF
FINLAND, FRENCH REPUBLIC, FEDERAL
REPUBLIC OF GERMANY, HELLENIC
REPUBLIC, REPUBLIC OF HUNGARY,
REPUBLIC OF IRELAND, ITALIAN REPUBLIC,
REPUBLIC OF LATVIA, REPUBLIC OF
LITHUANIA, GRAND DUCHY OF
LUXEMBOURG, REPUBLIC OF MALTA,
KINGDOM OF THE NETHERLANDS, REPUBLIC
OF POLAND, PORTUGUESE REPUBLIC,
ROMANIA, SLOVAK REPUBLIC, REPUBLIC OF
SLOVENIA, KINGDOM OF SPAIN, and
KINGDOM OF SWEDEN, *individually,*

JUDGMENT
02-CV- 5771 (NGG)



                    Plaintiffs,

     -against-

RJR NABISCO, INC., R.J. REYNOLDS TOBACCO
COMPANY, RJR ACQUISITION CORP., f/k/a
NABISCO GROUP HOLDINGS CORP., RJR
NABISCO HOLDINGS CORP., R.J. REYNOLDS
TOBACCO HOLDINGS, INC., R.J. REYNOLDS
GLOBAL PRODUCTS, INC., REYNOLDS
AMERICAN INC., and R.J. REYNOLDS
TOBACCO COMPANY,

                    Defendants.

-------------------------------------------------------------X

     A Memorandum and Order of Honorable Nicholas G. Garaufis, United States

District Judge, having been filed on May 13, 2011, granting defendants' motion to dismiss in

part; denying plaintiffs' request for leave to amend their Complaint; and dismissing the action

for lack of subject matter jurisdiction; it is

Page 2

JUDGMENT
02-CV- 5771 (NGG)

    ORDERED and ADJUDGED that plaintiff take nothing of the defendants; that

defendants' motion to dismiss is granted in part; that plaintiffs' request for leave to amend

their Compliant is denied; and that the action is dismissed for lack of subject matter

jurisdiction.


Dated:  Brooklyn, New York
        May 13, 2011

                                              ROBERT C. HEINEMANN
                                              Clerk of Court

STATE OF NEW YORK    )
                           )        ss.:        **AFFIDAVIT OF**
COUNTY OF NEW YORK   )                     **CM/ECF SERVICE**


I, Natasha S. Johnson, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age.

**On September 27, 2011**

deponent served the within:  **Brief and Special Appendix for Plaintiffs-Appellants**

     **upon:**


**Jones Day**
**222 East 42nd Street**
**New York, New York  10017**
**(212) 326-3939**

*Attorneys for Defendants-Appellees*


via the CM/ECF Case Filing System. All counsel of record in this case are registered CM/ECF users. Filing and service were performed by direction of counsel.


**Sworn to before me on September 27, 2011**


_____

     **MARIA MAISONET**
Notary Public State of New York
No. 01MA6204360
Qualified in Bronx County
Commission Expires Apr. 20, 2013          **Job #  237093**