# No. 11-2475-CV

## In the
## United States Court of Appeals
## for the Second Circuit

EUROPEAN COMMUNITY, acting on its own behalf and on behalf of the Member States it has the power to represent, KINGDOM OF BELGIUM, REPUBLIC OF FINLAND, FRENCH REPUBLIC, HELLENIC REPUBLIC, FEDERAL REPUBLIC OF GERMANY, ITALIAN REPUBLIC, GRAND DUCHY OF LUXEMBOURG, KINGDOM OF THE NETHERLANDS, PORTUGUESE REPUBLIC, KINGDOM OF SPAIN, individually, KINGDOM OF DENMARK, CZECH REPUBLIC, REPUBLIC OF LITHUANIA, REPUBLIC OF SLOVENIA, REPUBLIC OF MALTA, REPUBLIC OF HUNGARY, REPUBLIC OF IRELAND, REPUBLIC OF ESTONIA, REPUBLIC OF BULGARIA, REPUBLIC OF LATVIA, REPUBLIC OF POLAND, REPUBLIC OF AUSTRIA, KINGDOM OF SWEDEN, REPUBLIC OF CYPRUS, SLOVAK REPUBLIC, ROMANIA,

*Plaintiffs-Appellants,*

v.

RJR NABISCO, INC., R.J. REYNOLDS TOBACCO CO., R.J. REYNOLDS TOBACCO INTERNATIONAL, INC., RJR ACQUISITION CORP., FKA NABISCO GROUP HOLDINGS CORP., RJR NABISCO HOLDINGS CORP., R.J. REYNOLDS TOBACCO HOLDINGS, INC., NABISCO GROUP HOLDINGS CORP., R.J. REYNOLDS GLOBAL PRODUCTS, INC., REYNOLDS AMERICAN INC., R.J. REYNOLDS TOBACCO COMPANY, a North Carolina Corporation,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF NEITHER PARTY**

*(caption continued on inside cover)*

HAROLD HONGJU KOH

*Legal Adviser*
*Department of State*
*Washington, D.C. 20520*

TONY WEST

*Assistant Attorney General*

LORETTA E. LYNCH

*United States Attorney*

DOUGLAS N. LETTER
LEWIS S. YELIN, (202) 514-3425

*Attorneys, Appellate Staff*
*Civil Division, Room 7322*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C.  20530-0001*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION AND INTERESTS OF THE UNITED STATES. . . . . . . . . . 1

STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      I.     RICO Claims Are Territorial either if the Enterprise is Located or Operating within the United States or if the Pattern of Racketeering Activity Occurs within the United States.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      II.    The European Community is an "Agency or Instrumentality" of Its Member States within the Meaning of the Foreign Sovereign Immunities Act, and Thus a "Foreign State" within the Meaning of the Diversity Statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

CASES

JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd., 536 U.S. 88 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Armstrong v. Bush, 924 F.2d 282 (D.C. Cir. 1991). . . . . . . . . . . . . . . . . . . . 23

Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398 (1964). . . . . . . . . . . . . . 21

Boyle v. United States, 129 S. Ct. 2237 (2009). . . . . . . . . . . . . . . . . . . . . . 13, 19

European Community v. RJR Nabisco, Inc., 355 F.3d 123 (2d Cir. 2004). . . . . . 5

Filler v. Hanvit Bank, 378 F.3d 213 (2d Cir. 2004). . . . . . . . . . . . . . . . 9, 25, 27

H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989). . . . . . . . . . 11

Hertz Corp. v. Friend, 130 S. Ct. 1181 (2010). . . . . . . . . . . . . . . . . . . . . . . 6, 18

In re Air Crash Disaster Near Roselawn, Ind. on Oct. 31, 1994, 96 F.3d 932 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

In re Terrorist Attacks on September 11, 2001, 538 F.3d 71 (2d Cir. 2008). . . . 25

Matimak Trading Co. v. Khalily, 118 F.3d 76 (2d Cir. 1997). . . . . . . . . . . . 8, 21

Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010). . . 3, 5, 9, 10, 14, 15

Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826 (1989). . . . . . . . . . . . . 2

Norex Petroleum Ltd. v. Access Indus. Inc., 631 F.3d 29 (2d Cir. 2010). . . 3, 5, 6, 10, 9, 15, 16

*Norex Petroleum Ltd. v. Access Industries, Inc.*, 540 F. Supp. 2d 438 (S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Patrickson v. Dole Food Company*, 251 F.3d 795 (9th Cir. 2001). . . . . . . . . . . 24

*Peninsula Asset Management (Cayman) Ltd. v. Hankook Tire Co., Ltd.*, 476 F.3d 140 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29

*Religious Technology Center v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986). . . 20

*Samantar v. Yousuf*, 130 S. Ct. 2278 (2010).. . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Trane Co. v. O'Connor Securities*, 718 F.2d 26 (2d Cir. 1983). . . . . . . . . . . . . 20

*UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121 (2d Cir. 2010). . . . . . . 15

*United States v. Parness*, 503 F.2d 430 (2d Cir. 1974). . . . . . . . . . . . 13, 17, 18

*United States v. Pizzonia*, 577 F.3d 455 (2d Cir. 2009). . . . . . . . . . . . . . . . . 17

*United States v. Russotti*, 717 F.2d 27 (2d Cir. 1983).. . . . . . . . . . . . . . . 16, 17

*United States v. Turkette*, 452 U.S. 576 (1981).. . . . . . . . . . . . . . . . . . . . . 10, 11

*Zivotofsky v. Secretary of State*, 571 F.3d 1227 (D.C. Cir. 2009).. . . . . . . . . . . 21

**STATUTES**

1 U.S.C. § 1.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

18 U.S.C. § 1961

18 U.S.C. § 1961(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

18 U.S.C. § 1961(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 U.S.C. § 1961(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 U.S.C. § 1962. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 11

    18 U.S.C. § 1962(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 18, 19

    18 U.S.C. § 1962(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 18, 19

    18 U.S.C. § 1962(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 18

    18 U.S.C. § 1962(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

18 U.S.C. § 1963. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1964

    18 U.S.C. § 1964(a), (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    18 U.S.C. § 1964(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 15

18 U.S.C. § 2332(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

18 U.S.C. § 2332a(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

18 U.S.C. § 2332b(g)(5)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

28 U.S.C. § 1332

    28 U.S.C. § 1332(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    28 U.S.C. § 1332(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

28 U.S.C. § 1603

    28 U.S.C. § 1603(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 21-23

    28 U.S.C. § 1603(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 23, 29

    28 U.S.C. § 1603(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

iv

Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922

    Pub. L. No. 91-452, § 1, 84 Stat. 922–23. . . . . . . . . . . . . . . . . . 10, 11

    Pub. L. No. 91-452, Title IX, § 904, 84 Stat. 922, 947. . . . . . . . . . . 13

## INTERNATIONAL AUTHORITIES

Case 149/79, *Commission of the European Communities v. Kingdom of Belgium*,
    1980 E.C.R. 3881. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Consolidated Version of the Treaty Establishing the European Community,
    Oct. 11, 1997, 1997 O.J. (C340) 173

    arts. 1–4, 1997 O.J. (C340) 181–182.. . . . . . . . . . . . . . . . . . . . . . 26

    art. 3, 1997 O.J. (C340) 181.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    art. 281, 1997 O.J. (C340) 293. . . . . . . . . . . . . . . . . . . . . . . . . . 23

    art. 313, 1997 O.J. (C340) 302. . . . . . . . . . . . . . . . . . . . . . . . . . 24

Consolidated Version of the Treaty on European Union, Art. I, ¶ 3, Mar. 30,
    2010, 2010 O.J. (C83) 16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

European Commission, EU Budget 2008 Financial Report (2009). . . . . . . 28

Opinion 1/94, *Competence to Conclude International Agreements Concerning Ser-*
    *vices and the Protection of Intellectual Property – Art. 228(6) of the EC*
    *Treaty*, 1994 E.C.R. I-5267. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## OTHER AUTHORITIES

Brief for the United States as Amicus Curiae, *Powerex Corp. v. Reliant Energy*
    *Servs., Inc.*, No. 05-85 (Sup. Ct. Mar. 2007). . . . . . . . . . . . . . . . . . 26

Brief for the United States as Amicus Curiae, *Scheidler v. Nat'l Org. for Women*, Nos. 01-1118, 01-1119 (Sup. Ct. July 2002). . . . . . . . . . . . . . . . . . . . . 20

Brief of the United States as Amicus Curiae in Support of Limited Rehearing En Banc, *Norex Petroleum Ltd. v. Access Indus.* No. 07-4553-cv (2d Cir. Nov. 22, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

―――――――――――

No. 11-2475-CV

―――――――――――

European Community, et al.,

Plaintiffs-Appellants,

v.

RJR Nabisco, Inc., et al.,

Defendants-Appellees.

―――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

―――――――――――

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF NEITHER PARTY

―――――――――――

**INTRODUCTION AND INTERESTS OF THE UNITED STATES**

The United States files this brief for two reasons. First, in dismissing this ac-
tion brought by the European Community (EC) and its member states against several
U.S. tobacco companies, the district court adopted too narrow a test for ascertaining
the territorial application of the Racketeer Influenced and Corrupt Organizations
Act (RICO). Second, the district court erred in concluding that the EC is not an

"organ" of its member states and thus not a "foreign state" for purposes of diversity jurisdiction.[1]  These errors are of serious concern to the United States.

RICO makes it unlawful to invest in an enterprise any income derived from a pattern of racketeering activity, to acquire control of an enterprise through a pattern of racketeering activity, to conduct an enterprise's affairs through a pattern of racketeering activity, or to conspire to do any of these things.  18 U.S.C. § 1962.  Violation of RICO is a criminal offense, subject to prosecution.  *Id.* § 1963.  The statute also authorizes the Attorney General to bring civil RICO suits for equitable relief.  *Id.* § 1964(a), (b).  And the statute permits a private party "injured in his business or property" by a RICO violation to bring an action for triple damages.  *Id.* § 1964(c).  The Government has a significant interest in the courts' interpretation of RICO in private suits insofar as decisions in those suits may affect the United States' ability to bring criminal prosecutions or civil enforcement actions under RICO.

In this case, the district court dismissed the EC's RICO claims because the court concluded that the RICO statute applies only to claims involving an enterprise

---

[1]  The status of the EC is discussed below.  In 2009, after this litigation began, the EC merged with the European Union.  Consolidated Version of the Treaty on European Union, Art. I, ¶ 3, Mar. 30, 2010, 2010 O.J. (C83) 16.  Because a district court must determine jurisdictional facts at the time the suit commenced (*Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989)), we refer throughout this brief to the EC.

2

whose "nerve center" is located within the United States.  In so ruling, the court unduly limited RICO's territorial application.  Under the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), and this Court's decision in *Norex Petroleum Ltd. v. Access Indus. Inc.*, 631 F.3d 29 (2d Cir. 2010), a RICO claim is territorial either if the RICO enterprise is located or operating within the United States, or if the plaintiff alleges a pattern of racketeering activity occurring within the United States.[2]  The district court erred in dismissing the EC's RICO claims insofar as the court relied on too narrow a territoriality standard.  However, because the United States is not a party to this long-running litigation and has not studied the voluminous district court record in depth, we express no views on the EC's RICO claims.

The district court's separate order dismissing the EC's state common law claims is also of serious concern to the United States.  Whether the EC is an "organ" of its member states within the meaning of the Foreign Sovereign Immunities Act, and so a "foreign state" within the meaning of the diversity jurisdiction statute, has implications for the United States' foreign relations and involves issues within the

---

[2] When a private party brings a RICO civil suit, the party must show that the alleged RICO violation directly caused harm to the party's business or property.  18 U.S.C. § 1964(c).  Because this requirement does not apply to RICO actions brought by the United States, we will not address whether a private party must assert an injury in the United States for a RICO claim to be territorial.

3

State Department's expertise. The EC's legal successor, the European Union, is a close partner of the United States on a wide range of issues of joint and global concern, and the United States has an interest in decisions bearing on the European Union's status in U.S. courts. The district court's determination that the EC is not an "organ" of its member states resulted from an incorrect application of the factors this Court has identified as relevant to this issue. In light of the undeniably public purposes for which the EC was created, the EC is an "organ" of its member states and is, accordingly, a "foreign state" within the meaning of the diversity statute. The district court thus erred in dismissing the EC's common law claims for lack of diversity jurisdiction.

## STATEMENT

1. The EC's Second Amended Complaint alleges that defendants participated in an illegal enterprise to smuggle cigarettes and launder money in violation of RICO. JA 433–454 (Counts I–V); *see* 18 U.S.C. § 1962. The EC also asserts various state common-law tort claims. JA 454–477 (Counts VI–XIV).

Seven years ago, this Court affirmed the district court's dismissal of an earlier RICO complaint by the EC against defendants, concluding that the EC's claims were barred by the common law "revenue rule," which prohibits U.S. courts from adjudicating a foreign state's claims seeking direct or indirect enforcement of that state's tax

4

laws. *European Community v. RJR Nabisco, Inc.*, 355 F.3d 123, 131 (2d Cir. 2004), *rev'd and remanded for reconsideration by* 544 U.S. 1012 (2005), *judgment reinstated by* 424 F.3d 175 (2d Cir. 2005). The EC subsequently filed a second amended complaint, principally alleging that defendants participated in a money laundering scheme by selling cigarettes to criminal organizations in Europe and South America and accepting proceeds of criminal acts as payment. This scheme allegedly caused the EC and its member states financial losses, including diminished collection of customs duties and taxes; increased law enforcement costs; general harm to the EC economic system, common currency, and financial institutions; and commercial losses by state-owned tobacco companies. JA 408–23, 426–32 (¶¶ 146, 153, 155).

2.  Defendants filed a new motion to dismiss, arguing that the EC's claims are barred by the revenue rule and a related common law rule barring U.S. courts from enforcing foreign penal laws. Dist. Ct. Docket No. 84, at 7–21. While that motion was pending, the Supreme Court decided *Morrison*, which stated that, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." 130 S. Ct. at 2878. Thereafter, this Court applied *Morrison* in a RICO suit. *Norex*, 631 F.3d at 32–33. After noting its prior determination that "RICO is silent as to any extraterritorial application," this Court affirmed the dismissal of claims alleging a racketeering and money laundering scheme to seize control of the Russian oil industry, not-

5

withstanding the allegation of "some domestic conduct" within the United States in furtherance of that scheme. *Id.* at 32, 33 (quotation marks omitted).

The district court ordered supplemental briefing, and subsequently dismissed the EC's RICO claims as "impermissibly extraterritorial." SPA 7. Interpreting *Morrison*, the district court ruled that RICO's "focus" is regulating "'enterprises' by protecting them from being victimized by or conducted through racketeering activity." SPA 10. The district court next reasoned that, if the focus of RICO is on enterprises, and if the statute does not apply extraterritorially, then only domestic enterprises are covered by that statute. *Ibid.* And to determine the location of an enterprise, the district court adopted the "nerve center test" that the Supreme Court employed to determine a corporation's "principal place of business," within the meaning of the diversity statute. *Ibid.* (discussing *Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010)). Under that test, a corporation's "principal place of business" is "where a corporation's officers direct, control, and coordinate the corporation's activities." *Hertz*, 130 S. Ct. at 1192. Adapting that test to the RICO context, the district court concluded that "the territoriality of an 'enterprise' in a RICO complaint * * * should focus on the decisions effectuating the relationships and common interest of its members, and how those decisions are made." SPA 12.

Applying this framework to the EC's claims, the district court dismissed the EC's claims, holding that they are improperly extraterritorial because individuals located outside the United States made the decisions concerning the predicate crimes. SPA 14.

3.  The EC asserted state-common-law tort claims in addition to its RICO claims.  The district court declined to exercise discretionary supplemental jurisdiction over the EC's state-law claims.  SPA 50.  The court separately considered whether it had jurisdiction under the diversity statute, which provides for jurisdiction over civil actions brought by "a foreign state" against "citizens of a State or different States."  28 U.S.C. § 1332(a)(4).  The court determined that the EC is not a "foreign state" within the meaning of the diversity statute and dismissed the remainder of the suit for lack of subject matter jurisdiction.  SPA 22–23.

The diversity statute borrows its definition of "foreign state" from the Foreign Sovereign Immunities Act (FSIA).  *See* 28 U.S.C. §1332(a)(4).  Section 1603(a) of the FSIA provides that a "'foreign state' * * * includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state, as defined in subsection (b)." *Id.* § 1603(a).  As relevant here, "[a]n 'agency or instrumentality of a foreign state'" is any entity satisfying three requirements: it must be (1) "a separate legal person, corporate or otherwise"; (2) "an organ of a foreign state or political subdivision thereof";

7

and (3) "neither a citizen of a State of the United States * * * nor created under the laws of a third country."  *Id.* § 1603(b).

Because the FSIA's definition of "foreign state" specifies only what such a state "includes," the district court looked elsewhere to determine whether the EC qualifies as a "foreign state" in its own right.  Under this Court's precedent, courts look to the Executive Branch to determine whether the United States recognizes an entity as a foreign state.  *Matimak Trading Co. v. Khalily*, 118 F.3d 76 (2d Cir. 1997), *abrogated on other grounds by JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88 (2002).  The district court determined that the EC is not a foreign state because the Executive Branch has not recognized the EC as a foreign state.  SPA 29–31.  The district court separately determined that the EC does not constitute a foreign state under the standards articulated in the Restatement (Second) of the Foreign Relations Law of the United States.  SPA 32–33.  And the court rejected the alternative possibility that the EC is a political subdivision of a foreign state.  SPA 36.

Turning to the FSIA's three criteria defining an agency or instrumentality of a foreign state, the district court determined that the EC satisfies the first and third criteria.  Under its organic treaty, the EC has legal personality separate from its member states.  SPA 36–37.  And because the EC is not created under the laws of any non-member state, the district court concluded that the EC had not been created

8

under the laws of a third country. SPA 49–50. As for the second criterion — that the entity be an "organ" of a foreign state — the district court recognized that an entity created by multiple states can qualify as an "organ." SPA 37–40. Nevertheless, considering the factors this Court identified in *Filler v. Hanvit Bank*, 378 F.3d 213 (2d Cir. 2004), the court concluded that the EC does not qualify as an "organ" of its member states, and so is not an "agency or instrumentality of a foreign state" within the meaning of the FSIA or the diversity statute. SPA 40–50. Thus, the district court held that it lacked diversity jurisdiction over a suit in which the EC is a plaintiff, and dismissed the EC's remaining claims. SPA 50. In dismissing the EC's complaint, the district court did not address defendants' arguments under the revenue rule.

## ARGUMENT

I.    **RICO Claims Are Territorial either if the Enterprise is Located or Operating within the United States or if the Pattern of Racketeering Activity Occurs within the United States.**

A. In *Norex*, this Court held that, under *Morrison*, RICO's silence on extraterritorial application means that it has none.[3] *Norex*, 631 F.3d at 32–33. In *Morrison*,

---

[3] As explained in greater detail in the Brief of the United States as Amicus Curiae in Support of Limited Rehearing En Banc, *Norex Petroleum Ltd. v. Access Indus.* No. 07-4553-cv (2d Cir. Nov. 22, 2010), the United States believes that RICO meets *Morrison*'s requirement of a "clear indication of an extraterritorial application" (130 S.

9

the Supreme Court instructed that, to determine whether domestic conduct is covered by a statute that does not apply extraterritorially, a court should consider the "focus" of the statute.  130 S. Ct. at 2883–84.

One focus of RICO is on "enterprises."  RICO makes it unlawful to invest in an enterprise any income derived from a pattern of racketeering activity (18 U.S.C. § 1962(a)), to acquire control of an enterprise through a pattern of racketeering activity (*id.* § 1962(b)), to conduct an enterprise's affairs through a pattern of racketeering activity (*id.* § 1962(c)), or to conspire to do any of these things (*id.* § 1962(d)).  A "major purpose" of Congress' enactment of RICO was "to address the infiltration of legitimate business by organized crime."  *United States v. Turkette*, 452 U.S. 576, 591 (1981); *see* Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 1, 84 Stat. 922–23 (finding that organized crime has used illicit gains "to infiltrate and corrupt legitimate business and labor unions").  But Congress was not concerned only with legitimate enterprises; it also sought to address the ill effects of criminal enterprises

---

Ct. at 2878), in part because some of RICO's predicate crimes can only be violated by extraterritorial conduct.  *See, e.g.*, 18 U.S.C. §§ 2332(a) (killing a United States national "while such national is outside the United States"), 2332a(b) (using certain weapons "outside of the United States"); *id.* §§ 1961(1), 2332b(g)(5)(B) (making these acts predicate crimes under RICO).  The United States nevertheless recognizes that this panel is bound by *Norex*'s holding that RICO does not apply extraterritorially in suits brought by private parties.  *Cf. Norex*, 631 F.3d at 33 (reserving question of "the extraterritorial application of RICO when enforced by the government").

on the U.S. economy. *Turkette*, 452 U.S. at 589–90; *see* Pub. L. No. 91-452, § 1 (finding that "organized crime in the United States" has engaged in "widespread activity that annually drains billions of dollars from America's economy by unlawful conduct").

Another focus of RICO is on "a pattern of racketeering." Because "Congress was concerned in RICO with long-term criminal conduct," RICO does not criminalize isolated or discrete acts. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 242 (1989). Its substantive provisions prohibit certain conduct, but only if the conduct is associated with a "pattern of racketeering activity," (18 U.S.C. § 1962), which "requires at least two acts of racketeering activity" (*Id.* § 1961(5)). The Supreme Court has explained that isolated or sporadic acts of racketeering are not enough to satisfy the pattern requirement. *Northwestern Bell*, 492 U.S. at 239; *see id.* at 237 (Section 1961(5) "does not so much define a pattern of racketeering activity as state a minimum necessary condition for such a pattern"). Consistent with Congress' focus on long-term criminal conduct, what RICO prohibits is a pattern of related criminal acts that amount to, or otherwise constitute a threat of, continuing racketeering activity. *Id.* at 239–40.

In light of RICO's focus on enterprises and patterns of racketeering, a RICO claim is territorial either if the enterprise is located or operating in the United States or if a pattern of racketeering activity occurs within the United States.

First, a party states a territorial RICO claim if the alleged enterprise — in which racketeering proceeds are invested, over which racketeering is used to acquire control, or through which racketeering is conducted — is located or operating in the United States, regardless of where the racketeering occurs. Permitting a party to pursue a RICO claim involving a domestic enterprise furthers Congress' purpose of preventing the infiltration of legitimate enterprises by criminal organizations and the operation of enterprises through racketeering.

The determination of an enterprise's location will vary depending on the nature of the enterprise. *See* 18 U.S.C. § 1961(4) (defining "enterprise" to include individuals, legal entities, and associations in fact). In the case of formal enterprises such as corporations, characteristics such as the entity's structure will likely be relevant. In the case of association-in-fact enterprises, a court will have to consider other characteristics, such as the location of the participants in the enterprise. Thus, determination of an enterprise's location will depend on case-specific considerations, and we will not propose a generally applicable test. However, in every case, in determining the location of the enterprise, courts should be guided by Congress' remedial pur-

12

pose in enacting RICO, and RICO's "obviously broad" conception of "enterprise." *Boyle v. United States*, 129 S. Ct. 2237, 2243 (2009); Pub. L. No. 91-452, Title IX, § 904, 84 Stat. 922, 947 ("The provisions of this title shall be liberally construed to effectuate its remedial purposes."). In light of these considerations, it is quite possible that a RICO enterprise will have multiple locations. In particular, it is possible that an association-in-fact enterprise may have a domestic presence even if some participants in the enterprise are outside of the United States.

Second, a party states a territorial RICO claim if the party alleges a pattern of racketeering occurring within the United States. This Court has previously concluded that Congress intended RICO to cover patterns of racketeering in the United States, even where the racketeering involves a foreign enterprise. *United States v. Parness*, 503 F.2d 430 (2d Cir. 1974) (upholding conviction for acquiring a foreign enterprise through a pattern of racketeering activity in the United States). A contrary interpretation of RICO "would permit those whose actions ravage the American economy to escape prosecution simply by investing the proceeds of their ill-gotten gains in a foreign enterprise." *Id.* at 439.

Failing to recognize RICO claims based on a pattern of racketeering in the United States could also interfere with the United States' significant prosecutorial interests. A foreign-based terrorist organization, for example, might not qualify as an

enterprise located in the United States, yet it may launch domestic attacks against American citizens, amounting to a pattern of racketeering activity. Similarly, a foreign crime syndicate may engage in a pattern of racketeering by running money-laundering operations through United States banks, harming the United States financial system, though it may not qualify as a domestic enterprise.[4]

Our view that the territorial application of RICO may be based either on the location of the enterprise or the location of the pattern of racketeering is consistent with the Supreme Court's direction in *Morrison* to consider the focus of congressional concern when determining the scope of a statute's domestic application. *Morrison*, 130 S. Ct. at 2884. *Morrison* held that the focus of Section 10(b) of the Securities Exchange Act is on deceptive conduct associated with "transactions in securities listed on domestic exchanges, and domestic transactions in other securities to which § 10(b) applies." *Ibid.* For that reason, the Court held that the Exchange Act does not cover deception in connection with a transaction in a foreign securities exchange. *Id.* at 2284–86. RICO focuses on the use of enterprises as the prize, victim, or vehicle of a pattern of racketeering activity. Accordingly, it is appropriate to treat as a

---

[4] Under *Norex*, the pattern of racketeering activity must be domestic. However, that a RICO claim alleges both domestic predicate crimes and predicate crimes occurring outside the United States (*see, e.g.*, 18 U.S.C. § 2332(a)) does not disqualify the pattern of racketeering from being domestic.

domestic offense any racketeering activity directed at or conducted through a domestic enterprise.  But the statute is also focused on the ill effects of patterns of racketeering activity in the United States.  Because Congress enacted RICO in large part to permit the effective prosecution of structured criminal activity, it is also appropriate to treat as a domestic offense the commission of a pattern of domestic racketeering activity through any enterprise, domestic or foreign.

Our proposed standard is also consistent with this Court's decision in *Norex*. In *Norex*, the injury to the plaintiff's business or property occurred outside the United States.  631 F.3d at 31.  And the district court concluded that the alleged racketeering activity in the United States was "merely incidental" to the alleged fraud. *Norex Petroleum Ltd. v. Access Industries, Inc.*, 540 F. Supp. 2d 438, 444 (S.D.N.Y. 2007).  Therefore, *Norex* may be limited to cases in which the alleged racketeering activity did not cause injury to plaintiff's "business or property" in the United States, or in which the alleged racketeering activity was not the direct cause of plaintiff's alleged injury.  *See* 18 U.S.C. § 1964(c); *UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121, 136 (2d Cir. 2010).  Moreover, evaluating Norex's claims under RICO, this Court did not address the focus of the statute.  *See* 631 F.3d at 32–33; *but see Morrison*, 130 S. Ct. at 2284.  For example, the Court did not address whether the alleged

15

conduct constituted a pattern of racketeering in the United States. Instead, it characterized the acts alleged as having "slim contacts with the United States," and held that such conduct is insufficient to support a territorial application of RICO (though the Court did not explain how it derived the "slim contacts" test from the text or legislative history of RICO). 631 F.3d at 33. Thus, *Norex* does not foreclose the possibility that a valid territorial application of RICO may be based on a pattern of racketeering, at least if the pattern amounts to more than slim contacts with the United States.

B.  In applying *Norex* and *Morrison*, the district court concluded that: (1) the focus of RICO is exclusively on enterprises (SPA 8–10); (2) the statute only regulates domestic enterprises (SPA 10); and (3) an enterprise is domestic only if its "nerve center" is located in the United States (SPA 10–12). Each of these propositions is mistaken.

First, the district court's conclusion that RICO's focus is on enterprises alone is inconsistent with this Court's precedent. In *United States v. Russotti*, the defendants, seeking to avoid reprosecution under RICO, argued that because "the enterprise is the focal point of RICO," acquittal under one RICO prosecution "forecloses reprosecution for participation in the same enterprise, even though through a different pattern of racketeering activity." 717 F.2d 27, 32 (2d Cir. 1983). The govern-

16

ment urged this Court to define the RICO enterprise in terms of the specific pattern of racketeering activity charged. *Ibid.* This Court adopted neither position, holding instead that "it is neither the enterprise standing alone nor the pattern of racketeering activity by itself which RICO criminalizes. Rather, the *combination* of these two elements is the object of punishment under RICO." *Id.* at 33. Accordingly, this Court held that jeopardy attaches only if "both the enterprise and the pattern of activity alleged" are the same. *Ibid.; accord United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir. 2009).

Second, the district court was equally mistaken in determining that RICO covers only domestic enterprises. Again, there is Circuit precedent to the contrary. In *Parness*, defendants were convicted of obtaining control of a foreign enterprise through a pattern of racketeering activity occurring in the United States. The defendants argued that a foreign corporation is not an "enterprise" within the meaning of the RICO statute. *Parness*, 503 F.2d at 439. Noting that the text of the statute refers broadly to "any" enterprise, and that RICO's legislative history demonstrated Congress' intent "to deal generally with the influences of organized crime on the American economy and not merely with its infiltration into domestic enterprises," this

Court held that Congress intended to prohibit the acquisition of foreign enterprises through a pattern of racketeering activity in the United States.[5] *Ibid.*

Third, the district court's adoption of the "nerve center" test for determining the location of an enterprise is in sharp tension with the Supreme Court's direction in *Morrison* to consider a statute's focus. The Supreme Court developed the "nerve center" test to determine a corporation's principal place of business for purposes of the diversity statute. *Hertz*, 130 S. Ct. at 1192–94; *see* 28 U.S.C. § 1332(c)(1). A corporation's nerve center is usually located in a single place, and the text of the diversity statute, its legislative history, and the desirability of an administratively simple jurisdictional test favored an interpretation of the statute requiring the identification of a single place for the determination of a corporation's citizenship. *Hertz*, 130 S. Ct. at 1192–94.

By contrast, the "enterprise" with which RICO is concerned is significantly broader than a formal corporation with an identifiable "nerve center." For example, in *Boyle*, the Supreme Court held that an association-in-fact enterprise can qualify as

---

[5] Although *Parness* involved 18 U.S.C. § 1962(b), its rationale applies equally to claims under Sections 1962(a) and (c). *Parness* was decided before *Morrison* and *Norex*. *Parness* nevertheless remains valid Circuit precedent. Under the territoriality standard we propose, and consistent with *Morrison* and *Norex*, a private party could assert a claim analogous to the charge in *Parness* because the pattern of racketeering occurred entirely within the United States. *See Parness*, 503 F.2d at 433–35, 438.

a RICO "enterprise" even without formal structural attributes. *Boyle*, 129 S. Ct. at 2245. An association-in-fact enterprise "need not have a hierarchical structure or a 'chain of command'; decisions may be made on an *ad hoc* basis and by any number of methods — by majority vote, consensus, a show of strength, etc." *Ibid*. *Boyle* makes clear that a RICO enterprise need not have a "nerve center," and, for that reason, it makes no sense to use the location of an enterprise's "nerve center" as the sole test for determining whether the enterprise's activity is subject to RICO.[6]

In sum, by focusing exclusively on domestic enterprises, and by focusing on a characteristic of formal corporations, the district court ignored critical aspects of RICO's regulatory concern. Because the focus of RICO is on both the enterprise and the pattern of racketeering activity, the district court erred in focusing only on the enterprise. Because RICO employs an "obviously broad" conception of "enterprise," *Boyle*, 129 S. Ct. at 2243, the district court erred in focusing on formal features not shared by all enterprises. And because Congress was concerned not only with the corruption of domestic enterprises but with the effect of patterns of racketeering in the United States, the district court erred in limiting RICO's applica-

---

[6] Moreover, under 18 U.S.C. § 1962(a) and (b), the enterprise does not direct the unlawful racketeering activity. Thus, as the EC argues, it makes no sense to focus on the enterprise's "nerve center" in considering RICO's application under these provisions. *See* EC Br. 52–53.

tion to domestic enterprises alone.  An appropriate test of territoriality must take these central features of RICO into account.[7]

## II. The European Community is an "Agency or Instrumentality" of Its Member States within the Meaning of the Foreign Sovereign Immunities Act, and Thus a "Foreign State" within the Meaning of the Diversity Statute.

The district court dismissed the EC's common law claims because it determined that the EC is not a "foreign state" within the meaning of the FSIA and the diversity jurisdiction statute.  While the district court correctly determined that the EC is not recognized by the United States as a foreign state in its own right, the court erred in holding that the EC is not an agency or instrumentality of its member states.  Because the FSIA defines "foreign state" to include such agencies or instrumentalities, the EC qualifies as a "foreign state" for purposes of the diversity statute.  Accord-

---

[7] As noted, we will not opine on whether the EC's RICO claims are territorial under the standard we propose.  In our view, though, the EC's complaint has a separate flaw insofar as it seeks equitable relief under RICO.  JA 426–29 (¶¶ 153, 154).  Only the Attorney General may obtain equitable relief in a civil RICO suit.  *Religious Technology Center v. Wollersheim*, 796 F.2d 1076, 1080–89 (9th Cir. 1986); *see Trane Co. v. O'Connor Securities*, 718 F.2d 26, 28–29 (2d Cir. 1983) (expressing doubt about the availability of private party injunctive relief under RICO); *see generally* Brief for the United States as Amicus Curiae, *Scheidler v. Nat'l Org. for Women*, 6–15, Nos. 01-1118, 01-1119 (Sup. Ct. July 2002).  Accordingly, the Court should affirm the district court's dismissal of the EC's equitable claims under RICO, regardless of its disposition of the EC's RICO damages claims.

ingly, the district court should not have dismissed the EC's state common law claims for lack of diversity jurisdiction.

A.  The district court correctly concluded that the EC is not a "foreign state" in its own right.  The FSIA does not define "foreign state" except to say that the term includes political subdivisions and agencies or instrumentalities.  28 U.S.C. § 1603(a).  That is not surprising, because the Constitution gives the President the exclusive authority to recognize foreign states and their governments.  *See, e.g., Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964) ("Political recognition [of a foreign government] is exclusively a function of the Executive."); *Zivotofsky v. Secretary of State*, 571 F.3d 1227, 1231 (D.C. Cir. 2009) (holding that the Constitution gives the President exclusive power to recognize foreign sovereigns), *cert. granted* 131 S. Ct. 2897 (2011).  For this reason this Court looks to the Executive Branch to determine a foreign person's citizenship for purposes of alienage jurisdiction.  *Matimak Trading Co.*, 118 F.3d at 80–81.  The district court here thus correctly concluded that, because the President has not recognized the EC as a foreign state, the EC does not qualify as a foreign state in the basic sense of that term.

On appeal, the EC seeks a remand to have the district court consider whether the EC is a "foreign state" under what the EC describes as the Supreme Court's "def-

inition" of that term in *Samantar v. Yousuf*, 130 S. Ct. 2278 (2010). EC Br. 44–47. A remand on that issue is unnecessary. In *Samantar*, the Supreme Court held that the FSIA does not govern the immunity of individual foreign officials. *Samantar*, 130 S. Ct. at 2282. The Court held that Congress codified standards for foreign state immunity in the FSIA, but left foreign official immunity determinations to the State Department. *Id.* at 2291. In reaching that conclusion, the Supreme Court considered whether foreign officials come within the FSIA's definition of "foreign state." *Id.* at 2286. The Court observed that "[t]he term 'foreign state' on its face indicates a body politic that governs a particular territory." *Ibid.* But Congress gave the term a "broader meaning, by mandating the inclusion of the state's political subdivisions, agencies, and instrumentalities." *Ibid.* (citing 28 U.S.C. § 1603(a)). The Court concluded, however, that Congress did not intend to include individual foreign officials even within this "broader meaning" of "foreign state." *Id.* at 2286–89.

The EC argues that it qualifies as a "foreign state" under what it characterizes as the Supreme Court's "definition" of that term as "'a body politic that governs a particular territory.'" EC Br. 45 (quoting *Samantar*, 130 S. Ct. at 2286). But *Samantar* nowhere addresses which branch of the United States Government determines which body politic governs what particular foreign territory. In light of the FSIA's

silence on that question, courts cannot properly conclude that Congress intended to diminish the President's constitutional authority to recognize foreign states or assign that authority to the courts.[8]  *See Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) ("When Congress decides purposefully to enact legislation restricting or regulating presidential action, it must make its intent clear.").

B.  Although the President has not recognized the EC as a foreign state, the FSIA defines the term "foreign state" to include "an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  To qualify as an agency or instrumentality of a foreign state, an entity must be a separate legal person, an organ of a foreign state, and not created under the laws of a third country.  *Id.* § 1603(b).  The district court concluded that the EC has independent legal status and is not created under the laws of a third country (*i.e.*, under the laws of a non-member state).  SPA 36–37, 49–50.

These conclusions are correct.  At the time it brought suit, the EC had separate legal personality.  Consolidated Version of the Treaty Establishing the European Community (EC Treaty), art. 281, Oct. 11, 1997, 1997 O.J. (C340) 293 ("The Community shall have legal personality.").  And because each member state ratified within

---

[8] For the same reason, the district court erred when it separately considered whether the EC constitutes a "foreign state" under criteria contained in the Restatement (Second) of the Foreign Relations Law of the United States.  *See* SPA 28, 32–35.

23

its own legal system the treaty creating the EC, the EC was created under the laws of the member states.  EC Treaty, art. 313, 1997 O.J. (C340) 302; *see In re Air Crash Disaster Near Roselawn, Ind. on Oct. 31, 1994*, 96 F.3d 932, 938 (7th Cir. 1996) (an entity created under the laws of a member state to an international agreement is not created under the laws of a third country).

Considering the EC's status as an organ of its member states, the district court correctly concluded that an entity can qualify as an "organ" under the FSIA if it is an organ of multiple states.[9]  SPA 37.  As used in the FSIA, an "organ of a foreign state" is an entity created by the state to carry out a public function.  *See, e.g., Patrickson v. Dole Food Company*, 251 F.3d 795, 807 (9th Cir. 2001), *aff'd on other grounds* 538 U.S.

---

[9] Although the FSIA refers to an organ of a "foreign state" and not "foreign *states*," in the absence of other indications in the statute that Congress intended to limit organs to entities created only by one state, the statute's use of the singular is not dispositive.  *See* 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise[,] words importing the singular include and apply to several persons, parties, or things.").  Nothing in the text or legislative history of the FSIA suggests that Congress intended to disqualify as organs entities created by multiple foreign states.

This conclusion is consistent with the courts' treatment of commercial entities created by multiple foreign states.  If it is not an "organ" of a foreign state, an entity can still qualify as "an agency or instrumentality of a foreign state" if it is an entity "a majority of whose shares or other ownership interest is owned by a foreign state."  28 U.S.C. § 1603(b)(2).  As the district court noted, a number of courts have concluded that a commercial entity owned by multiple states satisfies the majority-ownership requirement.  SPA 38–39 (citing cases); *see also In re Air Crash Disaster*, 96 F.3d at 938–39.

24

468 (2003).  A foreign state acting alone can create an entity to carry out a public function, such as management of the state's natural resources or the provision of basic needs such as water or electricity to remote parts of the country.  Similarly, when foreign states jointly create an entity to carry out a public function, in some circumstances that entity can qualify as an "organ" under the FSIA.

Having concluded that the multi-national character of the EC is not a bar to the EC's status as an organ, the district court next considered whether the EC qualifies as an organ under this Court's *Filler* decision.  *Filler* identified five factors as "relevant" to consideration of whether an entity is an organ of a foreign state:

1.    "whether the foreign state created the entity for a national purpose";

2.    "whether the foreign state actively supervises the entity";

3.    "whether the foreign state requires the hiring of public employees and pays their salaries";

4.    "whether the entity holds exclusive rights to some right in the [foreign] country"; and

5.    "how the entity is treated under foreign state law."

*Filler*, 378 F.3d at 217.  Considering these factors, the district court determined that the EC is not an organ of its member states.  SPA 40–49.  However, that conclusion resulted from a flawed application of the *Filler* factors.  *Cf. In re Terrorist Attacks on*

*September 11, 2001*, 538 F.3d 71, 85 (2d Cir. 2008) (*Filler* invites a flexible balancing

of factors), *abrogated in part on other grounds by Samantar*, 130 S. Ct. at 2286–89.

The district court recognized that the member states formed the EC for quin-

tessential national purposes: to establish a common market and monetary union, and

to coordinate economic activities and policies throughout the member states.  SPA

40–41; *see* EC Treaty, arts. 1–4, 1997 O.J. (C340) 181–182.  For the reasons given by

the EC, that determination is correct.  EC Br. 29–30.  The United States has consis-

tently taken the view that the public purpose factor is the most important consider-

ation in determining an entity's organ status.  Brief for the United States as Amicus

Curiae, *Powerex Corp. v. Reliant Energy Servs., Inc.*, at 6, 21–22, No. 05-85 (Sup. Ct.

Mar. 2007).  The district court paid little attention to this factor, other than to ac-

knowledge that the EC satisfies it.

The remaining *Filler* factors support the conclusion that the EC is an organ of

its member states, especially when considered in reference to the public purposes for

which the EC was created. The treaty establishing the EC delegates from the member

states to the EC the authority to exercise specified sovereign powers.  *See, e.g.,* EC

Treaty, art. 3, 1997 O.J. (C340) 181.  The district court believed that this implies that

the member states do not actively supervise the EC.  SPA 41–44.  However, this

Court has held a state's exercise of significant control over an entity supports organ

26

status.  *See, e.g., Peninsula Asset Management (Cayman) Ltd. v. Hankook Tire Co., Ltd.,* 476 F.3d 140, 143 (2d Cir. 2007) (finding active supervision of entity by state through "(1) appointing its governor and auditor; (2) acting through a related agency * * *; *and* (3) regulating the inspection fees that [the entity] can collect").  The member states have extensive and ultimate control over the EC, defining its areas of authority and limiting its power to act outside those areas.  EC Treaty, art. 5, 1997 O.J. (C340) 182 ("The Community shall act within the limits of the powers conferred upon it by this Treaty and of the objectives assigned to it therein. * * * Any action by the Community shall not go beyond what is necessary to achieve the objectives of this Treaty."); *see also* EC Br. 31–33.  That is sufficient to qualify as active supervision under *Peninsula Asset Management.*

The district court recognized that EC officials are "public employees" in that they exercise "'powers conferred by public law and duties designed to safeguard the general interests of the state or of other public authorities.'" SPA 44 (quoting Case 149/79, *Commission of the European Communities v. Kingdom of Belgium*, 1980 E.C.R. 3881, ¶ 10).  The district court thought that the third *Filler* factor did not support the EC's organ status because EC officials are not public employees of the EC's member states.  SPA 45.  But the third *Filler* factor asks whether the state "requires the hiring

27

of public employees and pays their salaries," not whether the state itself is the employer. *Filler*, 378 F.3d at 217. As the district court recognized, the treaty establishing the EC itself required the creation of certain positions, to be filled by public officials. SPA 45 (citing treaty provisions). And the EC member states funded much of the EC's operations, including the pay of EC employees. In 2000, for example, the EC member states contributed 78.4% of the EC's revenue, and administrative expenses accounted for 5.5% of the 2000 EC budget. *See* European Commission, EU Budget 2008 Financial Report, 82, 88 (2009), *available at* http://ec.europa.eu /budget/library/biblio/publications/2008/fin_report/fin_report_08_en.pdf; *see id.* at 43 (explaining that "administration" includes "salaries and pensions of the staff").

The EC satisfies the fourth *Filler* factor, as the district court concluded, because the EC member states delegated to the EC exclusive authority over certain sovereign functions. SPA 47. The EC, for example, "has exclusive competence * * * to conclude the Multilateral Agreements on Trade and Goods." Opinion 1/94, *Competence to Conclude International Agreements Concerning Services and the Protection of Intellectual Property – Art. 228(6) of the EC Treaty*, 1994 E.C.R. I-5267, ¶ 34.

Finally, the district court erred in concluding that there was no evidence that any of the member states considered the EC to be their "organ." SPA 47–49. In *Pen-*

28

*insula Asset Management*, this Court determined that the fifth *Filler* factor was satisfied because "the Korean government informed the State Department and the district court that it treats [the Financial Supervisory Service of the Republic of Korea] as a government entity." 476 F.3d at 143. Here, every member of the EC but one is a plaintiff in this suit. Through their briefing, these member states informed the district court that they consider the EC to be a governmental entity. EC Br. 6. Because the State Department accepts the EC member states' representation, that representation should be conclusive.

In sum, the factors this Court considers when evaluating an entity's status as an organ of a foreign state compel the conclusion that the EC is an organ of its member states, especially when considered in reference to the clear governmental purposes the EC was established to further. Because the EC is an organ of its member states, and because it satisfies the other requirements under 28 U.S.C. § 1603(b), the EC is an "agency or instrumentality" of its member states. Accordingly, the EC is a "foreign state" within the meaning of the FSIA, and the district court erred in concluding that it lacked subject matter jurisdiction over the EC's state law claims under the diversity statute.

## CONCLUSION

For the foregoing reasons, the Court should evaluate the district court's dismissal orders under the standards identified in this brief.

Respectfully submitted,

HAROLD HONGJU KOH
*Legal Adviser*
*Department of State*
*Washington, D.C. 20520*

TONY WEST
*Assistant Attorney General*

LORETTA E. LYNCH
*United States Attorney*

DOUGLAS N. LETTER
LEWIS S. YELIN, (202) 514-3425
*Attorneys, Appellate Staff*
*Civil Division, Room 7322*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C.  20530-0001*

October 2011

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29(c) and (d), I certify that this brief uses proportionately spaced font and contains 6,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced typeface using WordPerfect X5, in 14 point Goudy Old Style.

s/ Lewis S. Yelin
Lewis S. Yelin, (202) 514-3425
*Attorney for the United States*

October 4, 2011

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of October, 2011, I caused the foregoing Brief for the United States as Amicus Curiae in Support of Neither Party to be filed with the Court through the Court's CM/ECF system and by sending (on October 5, 2011) six paper copies by overnight delivery, and to be served on all counsel of record through the Court's CM-ECF system.

s/ Lewis S. Yelin
*Attorney for the United States*