# 11-2475-cv

## United States Court of Appeals

### for the

## Second Circuit

EUROPEAN COMMUNITY, acting on its own behalf and on behalf of the
Member States it has power to represent, KINGDOM OF BELGIUM,
REPUBLIC OF FINLAND, FRENCH REPUBLIC, HELLENIC REPUBLIC,
FEDERAL REPUBLIC OF GERMANY, ITALIAN REPUBLIC, GRAND
DUCHY OF LUXEMBOURG, KINGDOM OF THE NETHERLANDS,
PORTUGUESE REPUBLIC, KINGDOM OF SPAIN, Individually, KINGDOM
OF DENMARK, CZECH REPUBLIC, REPUBLIC OF LITHUANIA,
REPUBLIC OF SLOVENIA, REPUBLIC OF MALTA,
*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## CORRECTED BRIEF OF DEFENDANTS-APPELLEES

Mark R. Seiden
David M. Cooper
JONES DAY
222 East 41st Street
New York, New York 10017
(212) 326-3939

Gregory G. Katsas
JONES DAY
51 Louisiana Ave, N.W.
Washington, D.C. 20001
(202) 879-3939

*Attorneys for Defendants-Appellees*

REPUBLIC OF HUNGARY, REPUBLIC OF IRELAND, REPUBLIC OF ESTONIA, REPUBLIC OF BULGARIA, REPUBLIC OF LATVIA, REPUBLIC OF POLAND, REPUBLIC OF AUSTRIA, KINGDOM OF SWEDEN, REPUBLIC OF CYPRUS, SLOVAK REPUBLIC, ROMANIA,

*Plaintiffs-Appellants*,

v.

RJR NABISCO, INC., R.J. REYNOLDS TOBACCO COMPANY, R.J. REYNOLDS TOBACCO INTERNATIONAL, INC., RJR ACQUISITION CORP., FKA NABISCO GROUP HOLDINGS CORP., RJR NABISCO HOLDINGS CORP., R.J. REYNOLDS TOBACCO HOLDINGS, INC., NABISCO GROUP HOLDINGS CORP., R.J. REYNOLDS GLOBAL PRODUCTS, INC., REYNOLDS AMERICAN INC., R.J. REYNOLDS TOBACCO COMPANY, a North Carolina Corporation,

*Defendants-Appellees*.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Appellees declare as follows:

R.J. Reynolds Tobacco Company, a North Carolina corporation, states that it is the successor by merger to R.J. Reynolds Tobacco Company, a New Jersey corporation.  The existing R.J. Reynolds Tobacco Company is a wholly-owned subsidiary of R.J. Reynolds Tobacco Holdings, Inc., f/k/a RJR Nabisco, Inc.  R.J. Reynolds Tobacco Holdings, Inc. is a wholly-owned subsidiary of Reynolds American Inc., a publicly held corporation.

R.J. Reynolds Global Products, Inc., is an indirect, wholly-owned subsidiary of Reynolds American Inc., a publicly held corporation.

RJR Acquisition Corp., f/k/a Nabisco Group Holdings Corp., f/k/a RJR Nabisco Holdings Corp., merged into R.J. Reynolds Tobacco Holdings, Inc., f/k/a RJR Nabisco, Inc.

R.J. Reynolds Tobacco International, Inc. is not a defendant in the Second Amended Complaint in this case.

Brown & Williamson Tobacco Corp. (now known as Brown & Williamson Holdings, Inc.) and Invesco Ltd. hold more than 10% of the stock of Reynolds American Inc.  British American Tobacco p.l.c. indirectly holds more than 10% of the stock of Reynolds American Inc. through Brown & Williamson Holdings, Inc.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..................................................i

TABLE OF AUTHORITIES ..............................................................iii

COUNTERSTATEMENT OF ISSUES ...................................................1

COUNTERSTATEMENT OF FACTS ...................................................1

SUMMARY OF ARGUMENT ...........................................................7

ARGUMENT ...................................................................................9

    I.    PLAINTIFFS' RICO CLAIMS ARE IMPERMISSIBLY EXTRATERRITORIAL ...............................................................9

        A.    Plaintiffs Fail To Allege Any Domestic Injury ......................11

        B.    Plaintiffs Fail To Allege Any Domestic Enterprise................18

        C.    Plaintiffs Fail To Allege Sufficient Domestic Contacts .........28

        D.    The District Court Correctly Denied Leave To Amend .........30

    II.    THERE IS NO DIVERSITY JURISDICTION OVER THE REMAINING COMMON-LAW CLAIMS ......................................32

        A.    The EC Is Not Itself A "Foreign State" Under Section 1332(a)(4)..............................................................................33

        B.    The EC Is Not a "Citizen or Subject" of a Foreign State Under Section 1332(a)(2) ......................................................36

        C.    The EC Is Not an "Agency or Instrumentality" of a Foreign State Under Section 1332(a)(4)..................................39

            1.    An international organization cannot be an "organ of a foreign state."..........................................................40

            2.    The EC does not satisfy the factors required to be considered an "organ of a foreign state." .....................39

    III.    THE DISTRICT COURT CORRECTLY DISMISSED THE SUPPOSED FEDERAL COMMON-LAW CLAIMS....................54

CONCLUSION ...............................................................................56

# TABLE OF AUTHORITIES

**Page**

CASES

*Anza v. Ideal Steal Corp.*,
  547 U.S. 451 456-62 (2006) ..............................................................32

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009)......................................................................17

*Autocephalous Greek-Orthodox Church v. Goldberg & Feldman Fine Arts, Inc.*,
  917 F.2d 278 (7th Cir. 1990) ............................................................37

*Banco Nacional de Cuba v. Sabbatino*,
  376 U.S. 398 (1964)..........................................................................33

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................17

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988)..........................................................................54

*Boyle v. United States*,
  129 S. Ct. 2237 (2009)......................................................................24

*Broadbent v. Org. of Am. States*,
  481 F. Supp. 907 (D.D.C. 1978), *aff'd on other grounds*, 628 F. 2d 27
  (D.C. Cir. 1980) ...............................................................................47

*by JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*,
  536 U.S. 88 (2002)...............................................................33, 37, 39

*Cedeno v. Intech Group, Inc.*,
  733 F. Supp. 2d 471 (S.D.N.Y. 2010) (Rakoff, J.), *appeal docketed*, No.
  10-3861 (2d Cir. Sept. 27, 2010) ....................................................20

*Clark v. Martinez*,
  543 U.S. 371 (2005).....................................................................15, 23

*Cohn v. Rosenfeld*,
  733 F.2d 625 (9th Cir. 1984) ............................................................37

-iii-

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962)..................................................................................21

*Costa v. ENEL*,
    [1964] E.C.R. 585 ...................................................................................35

*Discon, Inc. v. Nynex Corp.*,
    93 F.3d 1055 (2d Cir. 1996) ....................................................................27

*EAL (Del.) Corp. v. Eur. Org. for the Safety of Air Navigation
    (Eurocontrol)*,
    1994 U.S. Dist. LEXIS 20528 (D. Del. 1994)...................................48

*EEOC v. Arabian American Oil Co.*,
    499 U.S. 244 (1991)..................................................................................12

*European Community v. RJR Nabisco, Inc.* (*EC I*), 150 F. Supp. 2d 456
    (E.D.N.Y. 2001)..........................................................................................2

*European Community v. RJR Nabisco, Inc.* (*EC II Appeal*), 355 F.3d 123 (2d
    Cir. 2004) ...........................................................................................2, 4

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004)..................................................................................12

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)..................................................................................46

*Filler v. Hanvit Bank*,
    378 F.3d 213 (2d Cir. 2004) ..........................................................6, 49, 51

*Gonzales v. Oregon*,
    546 U.S. 243 (2006)..................................................................................46

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)..................................................................................41

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989)..................................................................................22

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Heilweil v. Mount Sinai Hosp.*,
32 F.3d 718 (2d Cir. 1994) ................................................39

*Herrick Co. v. SCS Commc'ns, Inc.*,
251 F.3d 315 (2d Cir. 2001) ..............................................32

*Hertz Corp. v. Friend*,
130 S. Ct. 1181 (2010) ................................................24, 25

*Ideal Steel Supply Corp. v. Anza*,
652 F.3d 310 (2d Cir. 2011) ..............................................27

*In re Air Crash Disaster Near Roselawn*,
96 F.3d 932 (7th Cir. 1996) ..............................................48

*In re Hashim*,
188 B.R. 633 (Bankr. D. Ariz. 1995)......................................47

*In re Le-Nature's, Inc.*,
MDL No. 2021, 2011 WL 2112533 (W.D. Pa. May 26, 2011) .........19

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 05-MD-1720, 2010 WL 3420517 (E.D.N.Y. Aug. 27, 2010) .....49

*Int'l Ass'n of Machinists & Aerospace Workers v. OPEC*,
477 F. Supp. 553 (C.D. Cal. 1979), *aff'd*, 649 F.2d 1354 (9th Cir. 1981) .........47

*Int'l Refugee Org. v. Republic S.S. Corp.*,
92 F. Supp. 674 (D. Md. 1950), *rev'd on other grounds*,
189 F.2d 858 (4th Cir. 1951) .........................................36, 38, 39, 44

*Krisel v. Duran*,
386 F.2d 179 (2d Cir. 1967) (per curiam) ..............................36

*Land Oberoesterreich v. Gude*,
109 F.2d 635 (2d Cir. 1940) ..............................................33

*Leasco Data Processing Equipment Corp. v. Maxwell*,
468 F.2d 1326 (2d Cir. 1972) ............................................21

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*LeDonne v. Gulf Air, Inc.*,
  700 F. Supp. 1400 (E.D. Va. 1988) .............................................................48, 49

*Mangattu v. M/V Ibn Hayyan*,
  35 F.3d 205 (5th Cir. 1994) ................................................................48

*Matimak Trading Co. v. Khalily*,
  118 F.3d 76 (2d Cir. 1997) ................................................................33

*McCarthy v. Dun & Bradstreet Corp.*,
  482 F.3d 184 (2d Cir. 2007) ................................................................30

*Minnesota v. N. Sec. Co.*,
  194 U.S. 48 (1904)................................................................36

*Morrison v. National Australia Bank Ltd.*,
  130 S. Ct. 2869 (2010)................................................................passim

*Murphy v. Korea Asset Mgmt. Corp.*,
  421 F. Supp. 2d 627 (S.D.N.Y. 2005), *aff'd*, 190 Fed. App'x 43 (2d Cir.
  2006) ................................................................51, 52

*Norex Petroleum Ltd. v. Access Indus. Inc.*,
  631 F.3d 29 (2d Cir. 2010) ................................................................passim

*Norex Petroleum Ltd. v. Access Industries, Inc.*,
  540 F. Supp. 2d 438 (S.D.N.Y. 2007), *aff'd*, 631 F.3d 29 (2d Cir. 2010) ..passim

*NOW v. Scheidler*,
  510 U.S. 249 (1994)................................................................23

*Ouaknine v. MacFarlane*,
  897 F.2d 75 (2d Cir. 1990) ................................................................27

*Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*,
  476 F.3d 140 (2d Cir. 2007) ................................................................51, 52

*Permanent Mission of India to United Nations v. City of New York*,
  551 U.S. 193 (2007)................................................................34, 43

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Pfizer, Inc. v. Gov't of India*,
  434 U.S. 308 (1978)..........................................................................33

*Prewitt Enters., Inc. v. OPEC*,
  353 F.3d 916 (11th Cir. 2003) ...........................................................47

*Republic of Colombia v. Diageo North America, Inc.*,
  531 F. Supp. 2d 365 (E.D.N.Y. 2007) ...............................................32

*Rios v. Marshall*,
  530 F. Supp. 351 (S.D.N.Y. 1981) .....................................................49

*Samantar v. Yousuf*,
  130 S. Ct. 2278 (2010)................................................................passim

*Stiftung v. Plains Mktg., L.P.*,
  603 F.3d 295 (5th Cir. 2010) .............................................................37

*Toy Mfrs. of Am., Inc. v. Consumer Prods. Safety Comm'n*,
  630 F.2d 70 (2d Cir. 1980) ................................................................42

*United States v. Neapolitan*,
  791 F.2d 489 (7th Cir. 1986) .............................................................19

*United States v. Parness*,
  503 F.2d 430 (2d Cir. 1974) ..............................................................21

*United States v. Sisal Sales Corp.*,
  274 U.S. 268 (1927)...........................................................................21

*Van Gend & Loos v. Nederlandse Administratie Der Belastingen*,
  [1963] E.C.R. 1 .................................................................................35

*Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*,
  164 F.3d 123 (2d Cir. 1999) ..............................................................55

**STATUTES**

1 U.S.C. § 1 ..................................................................................42, 45

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

18 U.S.C. § 1961(1) ............................................................................20

18 U.S.C. § 1961(4) ...............................................................18, 19, 23

18 U.S.C. § 1962...........................................................................passim

18 U.S.C. § 1962(a) .....................................................19, 23, 26, 27

18 U.S.C. § 1964(c) ......................................................................passim

22 U.S.C. § 228 ...................................................................................45

22 U.S.C. § 288a *et seq.*...................................................................41

22 U.S.C. §§ 288f-3 ............................................................................46

28 U.S.C. § 1332 ......................................................................5, 7, 32

28 U.S.C. § 1332(a)(2)...........................................................32, 36, 37

28 U.S.C. § 1603(a) ....................................................................32, 39

28 U.S.C. § 1603(b)(2)........................................................................41

28 U.S.C. § 1608(b)(3)........................................................................42

28 U.S.C. § 1611(a) ............................................................................46

22 U.S.C.A. § 288 nn. (West 2004 & Supp. 2010) ...................................46

Pub. L. No. 79-291, §2(b), 59 Stat. 669 (Dec. 29, 1945) (codified at 22
    U.S.C. § 288a)............................................................................44

Pub. L. No. 89-353, 80 Stat. 5 (Feb. 19, 1966) (codified at 22 U.S.C. § 288f-
    1) ...............................................................................................45

Pub. L. No. 92-499, 86 Stat. 815 (Oct. 18, 1972) (codified at 22 U.S.C. §
    288h) .........................................................................................45

Pub. L. No. 93-161, 87 Stat. 635 (Nov. 27, 1973) (codified at 22 U.S.C. §
    288f-2)........................................................................................45

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Pub. L. No. 107-278, 116 Stat. 1939 (codified at 22 U.S.C. § 288f-5) ...................47

Securities Exchange Act of 1934, § 10(b) ...............................................9, 11, 19, 22

**OTHER AUTHORITIES**

Federal Rule of Appellate Procedure 29 .....................................................................1

Federal Rule of Appellate Procedure 32(a)(5) ...........................................................1

Federal Rule of Appellate Procedure 32(a)(6) ...........................................................1

Federal Rule of Appellate Procedure 32(a)(7)(B) ......................................................1

*Germany: Federal Constitutional Court Decision Concerning the Maastricht Treaty*, 33 I.L.M. 388 (1994) ............................................................53

H.R. Rep. No. 1487, 94th Cong., 2d Sess. 8 (1976) ................................................43

Lawrence Preuss, *The International Organizations Immunities Act*, 40 Am. J. Int'l L. 332, 333 (1946) ....................................................................................44

Merriam-Webster's Collegiate Dictionary (10th ed. 1997) ......................................41

Restatement (Second) of Foreign Relations Law of the United States ............passim

Webster's Third New International Dictionary (1976) ..........................................41

## COUNTERSTATEMENT OF ISSUES

1.     Whether the district court correctly dismissed Plaintiffs' civil RICO claims—which allege no domestic injury, no domestic enterprise, and no substantial domestic contacts—as impermissibly extraterritorial.

2.     Whether the district court correctly held that the European Community—an international organization—is not a foreign state, a citizen or subject of a foreign state, or an agency or instrumentality of a foreign state for purposes of diversity jurisdiction.

## COUNTERSTATEMENT OF FACTS

This is the third action brought by the European Community ("EC"), and the second action brought by certain of its Member States, against R.J. Reynolds Tobacco Company ("RJR") and various affiliated corporations.  These actions seek recovery for an array of harms allegedly caused in Europe by foreign criminal activities, including narcotics trafficking and the illegal distribution of cigarettes. The operative complaint in this appeal is the sixth filed by Plaintiffs in these cases. The district court dismissed the RICO claims as impermissibly extraterritorial, and it dismissed the common-law claims for lack of diversity jurisdiction.

**1.**     In November 2000, the EC filed suit against three large cigarette manufacturers—RJR, Philip Morris Companies, Inc., and Japan Tobacco, Inc.— and several of their related corporate affiliates.  The EC asserted RICO and

common-law claims based on an alleged scheme of cigarette smuggling and money laundering in Europe.  In dismissing those claims, the district court held that the EC had suffered no injury because, under the governing treaties, any revenue that it lost from the alleged scheme would have to be made up by contributions from its Member States.  *See European Cmty. v. RJR Nabisco, Inc.* (*EC I*), 150 F. Supp. 2d 456, 501-02 (E.D.N.Y. 2001).

**2.**  In August 2001, the EC and certain of its Member States filed a second action based on essentially the same allegations.  The Plaintiffs once again alleged that major tobacco companies were "actively involved in smuggling contraband cigarettes into the EC" and that, "in the process of smuggling cigarettes, Defendants engaged the business and services of narcotics traffickers and money launderers."  *European Cmty. v. Japan Tobacco, Inc*. (*EC II*), 186 F. Supp. 2d 231, 233 (E.D.N.Y. 2002).  The district court dismissed *EC II* in its entirety.  It held that the smuggling claims involved attempts to enforce foreign tax laws, and thus were barred by the revenue rule.  *See id.* at 236-42.  It further held that the money-laundering claims were inextricably intertwined with those smuggling claims.  *See id.* at 242-45.  This Court affirmed the dismissal.  *European Cmty. v. RJR Nabisco, Inc*., 355 F.3d 123 (2d Cir. 2004) (Sotomayor, J.), *vacated*, 544 U.S. 1012 (2005), *adhered to on remand*, 424 F.3d 175 (2d Cir. 2005).

**3.** In October 2002, while the *EC II* appeal was still pending, Plaintiffs filed a third action based on substantially similar allegations. JA 35. Amended and second amended complaints were filed in April 2004 and November 2009. JA 184, 333. Although stripped of express references to "smuggling," the complaint still repeatedly alleges that Defendants engaged in the "illegal distribution" of cigarettes in Europe. JA 409 (¶ 146(b)); *see also* JA 361 (¶ 43) ("criminal distribution channels"); JA 393 (¶ 112) ("sales into illegal channels"). The complaint further alleges that, as part of that illegal distribution scheme, Defendants engaged in money laundering by selling cigarettes in exchange for the proceeds of narcotics trafficking and other criminal activities. JA 363, 367-68, 370, 374-75 (¶¶ 47, 53, 59, 69, 70).

According to the latest complaint—which the district court accurately described as "a structureless morass of allegations, devoid of any sequential description of events," Special Appendix ("SPA")-5—the alleged money-laundering scheme had several steps. First, foreign drug traffickers, located in Afghanistan, Colombia, the Middle East, and Russia, smuggled illegal narcotics into Europe and sold them there for Euros. JA 355-56 (¶¶ 31-32). Second, the drug traffickers traded those Euros for other foreign currencies, in transactions with black-market money brokers located in Europe. JA 358-59 (¶ 38). Third, the money brokers sold the Euros to European cigarette importers. JA 359 (¶ 39).

3

Fourth, the European importers used those funds to purchase cigarettes from cigarette wholesalers. *Id.* Fifth, the wholesalers in turn purchased cigarettes from Defendants, and shipped the cigarettes to the importers for retail sale in Europe. JA 361 (¶ 43). According to the complaint, the cigarette wholesalers with whom Defendants conducted business were located in foreign countries such Colombia, Croatia, Panama, and Venezuela, and in other locales in the Caribbean. JA 368 (¶ 54); JA 371 (¶ 63); JA 372 (¶ 66); JA 375-76 (¶ 71); JA 377-78 (¶ 74); JA 390-92 (¶¶ 105-07). The complaint further alleges that Defendants unlawfully sold cigarettes in Iraq, in territory controlled by a foreign terrorist organization. JA 378-82 (¶¶ 75-83).

Based on this alleged conduct, the complaint asserts claims under RICO and the common law. The RICO claims allege an enterprise consisting of an "association-in-fact of individuals and corporations," including Defendants, drug traffickers, and "associated distributors, shippers, currency dealers, wholesalers, money brokers, and other participants" in the alleged scheme described above. JA 433-34 (¶ 158). The RICO claims allege a pattern of racketeering consisting of predicate acts of money laundering, mail fraud, wire fraud, Travel Act violations, and providing material support to terrorists. JA 434-44 (¶¶ 159-60). Plaintiffs seek to recover for various alleged sovereign injuries such as lost tax revenues, increased law-enforcement costs, border violations, disruption of legitimate trade

4

and markets, harm to financial institutions, infrastructure, and currency, and harm to the general population in Europe.  JA 413-23 (¶ 146(h) to (jj)).  Plaintiffs also allege competitive injuries to the Member States, as an undifferentiated group, in the form of reduced cigarette sales and profits in Europe.  JA 409-12 (¶ 146(a) to (g)); *see also* JA 343-44 (¶ 6).

**4.**  The district court dismissed the second amended complaint.  First, it held that Plaintiffs' RICO claims were "impermissibly extraterritorial."  SPA-7.  The court explained that, under *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), and *Norex Petroleum Ltd. v. Access Indus. Inc.*, 631 F.3d 29 (2d Cir. 2010), RICO does not apply extraterritorially.  SPA-7.  Moreover, it concluded that, because RICO is focused on enterprises, there must be a domestic enterprise to state a territorial RICO claim.  SPA-8-10.  Adopting a "nerve center" test to determine where an enterprise is located, the court held that that determination "should focus on decisions effectuating the common interest of its members."  SPA-10-12.  Applying that test, the court held that the enterprise alleged here was not domestic because it allegedly was directed by South American and European criminal organizations, not by any party in the United States.  SPA-12-14.

In a later order, the court dismissed the remaining common-law claims for lack of diversity jurisdiction.  The court concluded that the presence of the EC as a plaintiff destroyed the complete diversity required under 28 U.S.C. § 1332.  Under

that statute, the EC could satisfy diversity only if it were a "foreign state," an "agency or instrumentality of a foreign state," or a "citizen or subject of a foreign state."  The district court held that the EC was not a "foreign state" because it had not been recognized as such by the United States, SPA-27-32, and because, under the common law, as reflected in the Restatement (Second) of Foreign Relations Law, the EC was an international organization as opposed to a foreign state, SPA-32-35.  The district court further held that the EC was not an "agency or instrumentality of a foreign state" under the factors identified in *Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004), because Member States do not supervise the EC, do not employ EC officials or employees, and do not treat the EC as their own organ.  SPA-40-49.

Finally, the district court denied Plaintiffs' motion to amend the second amended complaint.  In so doing, it noted that "Plaintiffs spent the vast majority of their 143-page, 273-paragraph [complaint] alleging facts and harms that, even taken at face value, had absolutely nothing to do with Defendants."  SPA-51.  It further explained that nothing had prevented Plaintiffs, in their six previous complaints, from alleging facts that would state territorial and otherwise valid claims.  *Id.*

## SUMMARY OF ARGUMENT

**I.**  The district court correctly dismissed the RICO claims as impermissibly extraterritorial.   The claims alleged here are extraterritorial for at least three different reasons, considered either individually or in combination:  First, Plaintiffs allege no domestic injury in the United States, as required under the provision authorizing private civil RICO claims, 18 U.S.C. § 1964(c).  Second, as the district court correctly concluded, Plaintiffs allege no domestic RICO enterprise, as required to state a substantive RICO violation under 18 U.S.C. § 1962.  Third, the domestic contacts alleged here are no more substantial than those held insufficient to state a claim in *Norex*.

**II.**  The district court correctly concluded that it had no diversity jurisdiction over the common-law claims, because the presence of the EC destroys the complete diversity required under 28 U.S.C. § 1332.   Under that provision, diversity jurisdiction would apply only if the EC were a foreign state, a citizen or subject of a foreign state, or an agency or instrumentality of a foreign state.  As an international organization, the EC is none of these.  In particular, the EC is not a foreign state for two reasons: because the United States has not recognized it as such and because, under the Restatement (Second) of Foreign Relations Law, which the Supreme Court has cited approvingly in this context, international organizations like the EC are not foreign states.  Furthermore, the EC is not a

citizen or subject of a foreign state because, under ordinary usage as well as settled precedent, a state is not a citizen or subject of itself, and an international organization is not a citizen or subject of its member states. Finally, an international organization is not an agency or instrumentality of its member states: the text and legislative history of the Foreign Sovereign Immunities Act strongly suggest that an agency or instrumentality must be the organ of a single foreign state; international organizations did not have immunity as foreign states under prior law codified by the FSIA; and a contrary rule would eviscerate the elaborate statutory scheme affording limited immunities to international organizations, as set forth in the International Organization Immunities Act and related statutes. In any event, as the district court correctly concluded, the EC does not satisfy the test for determining whether an entity is an organ of a foreign state, and therefore an agency or instrumentality of a foreign state.

**III.** The district court correctly dismissed Plaintiffs' claims under federal common law. Following a choice-of-law inquiry by the district court, Plaintiffs themselves stipulated that their common-law claims arise, if at all, under the common law of New York State.

# ARGUMENT

## I.    PLAINTIFFS' RICO CLAIMS ARE IMPERMISSIBLY EXTRATERRITORIAL

The territoriality questions presented in this appeal are governed by *Morrison* and *Norex*.  In *Morrison*, the Supreme Court emphatically reaffirmed the presumption against extraterritoriality:  "When a statute gives no clear indication of an extraterritorial application, it has none."  130 S. Ct. at 2878.  The Supreme Court held that Section 10(b) of the Securities Exchange Act of 1934, which prohibits deceptive conduct "in connection with the purchase or sale of any security," applies only domestically because the Exchange Act contains no "affirmative indication" that Section 10(b) applies extraterritorially.  *See* 130 S. Ct. at 2881-83.  In determining what qualifies as a valid territorial application, the Court looked to the statutory "focus" of the specific provision at issue—Section 10(b), which governs "purchases and sale of securities"—to hold that Section 10(b) applies only to purchases or sales "made in the United States."  *See id.* at 2883-86.  The Court rejected the "conduct test" (whether "wrongful conduct occurred in the United States") and the "effects test" (whether such conduct "had a substantial effect in the United States") previously used by this Court to determine the territorial coverage of federal statutes such as Section 10(b) and RICO.  *See id.* at 2878-81.  Similarly, the Court rejected a "'significant and material conduct' test" that the Solicitor General had proposed as an alternative.  *See id.* at 2886-88.

9

In *Norex*, this Court applied *Morrison* to determine the territorial coverage of RICO. This Court held that "'RICO is silent as to any extraterritorial application,'" and therefore has none. 631 F.3d at 32-33. The Court specifically rejected an argument that the extension of RICO's substantive provisions to "any enterprise" (18 U.S.C. § 1962) establishes extraterritorial application. *See* 631 F.3d at 33. The Court also rejected an argument "that because a number of RICO's predicate acts possess extraterritorial reach, RICO itself possesses an extraterritorial reach." *Id.* Finally, the Court held that the "slim contacts with the United States" alleged in that case, although sufficient to establish a domestic pattern of racketeering under Section 1962, did not establish a domestic civil RICO claim under Section 1964(c). *See id.*

The specific RICO provision at issue in this case is the same one at issue in *Norex* and the one under which Plaintiffs brought suit, 18 U.S.C. § 1964(c). That provision states that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court." Because Section 1964(c) is obviously focused on redressing harm, claims under that provision require a domestic *injury*. Moreover, because Section 1962 in turn is obviously focused on enterprises, violations of that provision require a domestic *enterprise*. Finally, even apart from these two clear rules, "slim contacts with the United States" cannot support a territorial RICO

10

claim under *Norex*.  In this case, Plaintiffs' RICO claims fail for any of three independent reasons: first, Plaintiffs have alleged no domestic *injury*; second, plaintiffs have alleged no domestic *enterprise*; and third, plaintiffs have alleged no more domestic contacts than were alleged in *Norex*.  Although any one of these failures is sufficient to support an affirmance, the combination of all of them makes this an easy case.

## A.    Plaintiffs Fail To Allege Any Domestic Injury

**1.**  Section 1964(c) affords a private right of action to "any person injured in his business or property by reason of a violation" of Section 1962.  Because nothing in RICO affirmatively indicates that Section 1964(c) applies extraterritorially, it does not.  *See Morrison*, 130 S. Ct. at 2881-83; *Norex*, 631 F.3d at 32-33.  Moreover, the focus of Section 1964(c) is on redressing injuries.  Thus, just as Section 10(b) of the Exchange Act "does not punish deceptive conduct, but only deceptive conduct in connection with the purchase or sale of [certain securities]," *Morrison*, 130 S. Ct. at 2884, Section 1964(c) does not create a private cause of action for any RICO violation, but only for RICO violations that cause the plaintiff an injury.  Indeed, the *only* focus of Section 1964(c), above and beyond RICO violations independently prohibited by Section 1962, is on any resulting *injury*.  Applying the presumption against extraterritoriality, Section 1964(c) must therefore be limited to domestic injuries.  *See id.* at 2884-85.

11

The Supreme Court has recognized the need for a domestic injury in several other contexts.  For example, in *EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991), the Court held that Title VII does not apply "extraterritorially to regulate the employment practices of United States employers who employ United States citizens abroad."  *Id.* at 246.  Because the "focus" of Title VII is on employment discrimination itself, what matters for extraterritoriality purposes is the place of any discrimination, not the nationality of the plaintiff of the place where he was hired.  *See Morrison*, 130 S. Ct. at 2884.  Similarly, in the antitrust context, there must be a domestic injury even though the Sherman Act does have some extraterritorial application.  *See, e.g.*, *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 165 (2004) (antitrust laws apply to "foreign anticompetitive conduct" if, but only if, such conduct causes "domestic antitrust injury").  Because domestic injury is a requirement even for a statute with some extraterritorial application, it is *a fortiori* also required for a statute—like 18 U.S.C. § 1964(c)— that requires an injury and has no extraterritorial application.

*Norex* confirms a domestic-injury requirement under Section 1964(c), as no other territoriality criterion could explain this Court's decision.  On its facts, *Norex* involved allegations that a domestic pattern of racketeering harmed the plaintiff in Russia.  The *Norex* complaint identified eight groupings of defendants, five of which allegedly were controlled by United States citizens.  JA 1412-13 (¶¶ 19-20)

12

("Access/Renova defendants" all U.S. citizens); JA 1415 (¶ 37) (U.S. citizen managed and operated "Crown Group" of defendants); JA 1416 (¶¶ 42-43) (U.S. citizens were officers of "BP defendants"); JA 1417-18 (¶¶ 49-50, 56) (U.S. citizens operated and managed "TNK defendants"); JA 1415, 1418 (¶¶ 37, 57-61) (U.S. citizen was one of three in control of "Slush Fund defendants"). The complaint alleged at least one RICO enterprise made up entirely of United States companies and individuals. JA 1412-13, 1452 (¶¶ 17-20, 241). The complaint alleged "numerous [predicate] offenses in the United States . . . including mail and wire fraud, money laundering, Hobbs Act violations, Travel Act violations and bribery." *Norex Petroleum Ltd. v. Access Industries, Inc.*, 540 F. Supp. 2d 438, 440 (S.D.N.Y. 2007), *aff'd*, 631 F.3d 29 (2d Cir. 2010); *see* JA 1456-64 (¶¶ 261-321). In addition, the complaint alleged that the defendants "operated and directed" those acts "from this district, specifically through U.S. citizens, residents, and companies." JA 1408 (¶ 2). The complaint further alleged various adverse domestic effects from the racketeering activity, including harm to the United States from the defendants' allegedly unlawful dealings with Cuba and Iraq. JA 1422-23, 1449 (¶¶ 84-89, 226). But despite all of these alleged domestic defendants, enterprises, conduct, predicate acts, control, and effects, the *Norex* complaint alleged only extraterritorial injuries: that Norex "was deprived of its majority ownership stake in Yugraneft [a Russian oil company] and of certain quantities of

oil owed to it by Yugraneft and other Russian oil entities." 540 F. Supp. 2d at 440. Accordingly, on the facts as alleged, the absence of any alleged domestic injury is the only consideration that could possibly explain the district court's dismissal of the RICO claims in *Norex*, and this Court's affirmance of that dismissal.

The arguments made on appeal reinforce that conclusion. In supplemental briefing after *Morrison*, Norex argued that, because racketeering activity is a "focus" of RICO, Section 1964(c) is domestically applied if the underlying *pattern* of racketeering involves domestic conduct. JA 1490-93. In contrast, the defendants argued that, because injury is a "focus" of Section 1964(c), that provision is domestically applied only if there is a domestic *injury* to the plaintiff. JA 1507-10. This Court agreed with the defendants, and it held that the "slim contacts with the United States alleged by *Norex*"—even though they involved a domestic enterprise and a domestic pattern of racketeering—were "insufficient to support" a RICO claim. 631 F.3d at 33. Based on the facts alleged and the arguments made, the clear implication is that, absent any domestic *injury*, other domestic contacts cannot establish a valid domestic claim.

Finally, the Court removed any possible doubt on this point in amending its opinion on rehearing. The United States supported *en banc* review based on a stated concern that the *Norex* decision had given overly narrow territorial coverage to Section 1962. In response, this Court denied *en banc* review, but amended its

14

opinion to emphasize that its extraterritoriality ruling rested on Section 1964(c). The Court stated: "Because Norex brought a private lawsuit pursuant to 18 U.S.C. § 1964(c), we have no occasion to address—and express no opinion on—the extraterritorial application of RICO when enforced by the government pursuant to Sections 1962, 1963 or 1964(a) and (b)." 631 F.3d at 33. But because the substantive elements of Section 1962 are *the same* regardless of whether that provision is enforced by private parties under Section 1964(c), or by the government under Section 1963, Section 1964(a), or Section 1964(b), Section 1962 must bear the same meaning in both contexts. *See*, *e.g.*, *Clark v. Martinez*, 543 U.S. 371, 386 (2005) (judges cannot "give the same statutory text different meanings in different cases"). Accordingly, the only relevant difference between private and government enforcement is the *injury* requirement that appears only in Section 1964(c). As clarified on rehearing, *Norex* rests squarely on that element.

Neither Plaintiffs nor the United States offer any counter to these arguments. Despite recognizing in their Jurisdictional Statement that "this is a civil action under . . . 18 U.S.C. § 1964(c)," Plaintiffs entirely ignore that provision in their argument about extraterritoriality. And because there is no injury requirement for criminal prosecutions under Section 1963 or for civil enforcement actions by the government under Section 1964(a) and (b), the United States expressly declines to address "whether a private party must assert an injury in the United States for a

15

RICO claim to be territorial." *See* Brief for the United States as Amicus Curiae in Support of Neither Party ("U.S. Br.") at 3 n.2. Thus, whatever the merits of the parties' disputed contentions about the extent to which Section 1962 requires a domestic enterprise or domestic contacts, which we address below, there can be no serious dispute that Section 1964(c) requires a domestic injury. As we now explain, that rule alone should be dispositive.

**2.** The Complaint does not allege that Plaintiffs suffered any injuries within the United States. Most of the injuries involve sovereign harms that Plaintiffs allegedly suffered within their respective borders: lost tax revenues, increased law-enforcement costs, border violations, disruption of European trade and markets, harm to European financial institutions, infrastructure, and currency, and harm to the general population in Europe. JA 413-23 (¶ 146(h) to (jj)). As is obvious from the sovereign nature of the injuries, and the fact that Plaintiffs are all European entities, none of these injuries is alleged to have occurred in the United States. Indeed, at various points, the Complaint makes explicit that these sovereign injuries allegedly occurred "within THE EUROPEAN COMMUNITY." JA 413 (¶ 146(h)); *see also*, *e.g.*, *id.* (¶ 146(i)) (alleging damage to "the legitimate economy of THE EUROPEAN COMMUNITY and the MEMBER STATES"); *id.* (¶ 146(j)) (alleging "damage [to] THE EUROPEAN COMMUNITY'S financial system").

16

The complaint also alleges competitive injuries in the form of lost cigarette sales and profits. JA 409-13 (¶ 146(a) to (g)). But in describing Plaintiffs' competitive activities, the Complaint states only that unspecified Member States, at unspecified times "now or . . . in the past," "have held a constitutional monopoly" on cigarette sales, have operated cigarette manufacturing facilities "within their borders," and have sold cigarettes "within their borders." JA 343-44 (¶ 6). Even those allegations appear to be artfully drafted, as judicially noticeable materials—including the EC's own regulatory decisions approving tobacco-company mergers in Europe—reveal that the former European cigarette monopolies were dismantled decades ago and that, even in European markets, government-run cigarette companies for years have had at most negligible market share. JA 482-87, 502, 536, 570, 581, 595-600. To be sure, the Complaint does make passing reference to unspecified sales at unspecified times by unspecified Member States in non-EC markets "including . . . the United States." JA 409 (¶ 146(a)). But particularly against this backdrop, these bare allegations are neither sufficiently detailed nor sufficiently plausible to state a claim of lost cigarette sales or profits in United States markets. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561-66 (2007). After all, Plaintiffs include 26 individual sovereign nations, and it is hardly unreasonable to expect them to state *which nations*—if any—*ever* sold cigarettes in the United States.

17

Moreover, the Complaint does not tie any possible domestic competitive injuries to the alleged RICO violations.  As explained above, those alleged violations involve the sale of cigarettes destined for Europe or Iraq, in exchange for drug proceeds, in such foreign jurisdictions as the Caribbean, JA 368, 371 (¶¶ 54, 63), Colombia, JA 377 (¶ 74), Croatia, JA 391-92 (¶ 107), Panama, JA 372, 390-91 (¶¶ 66, 105-06), and Venezuela, JA 375-76 (¶ 71).  Plaintiffs nowhere allege that any of this alleged money laundering involved cigarettes destined for sale in the United States, or that Defendants obtained any unfair competitive advantage regarding the sale of cigarettes in the United States.  In short, the Complaint does not allege any mechanism at all, much less a plausible one, by which the alleged foreign money-laundering activities could have impacted any domestic cigarette market, much less harmed Plaintiffs in those markets.

Because Plaintiffs allege no domestic injury, the district court correctly dismissed their claims as impermissibly extraterritorial.

### B.    Plaintiffs Fail To Allege Any Domestic Enterprise

**1.**  To state a RICO claim, Plaintiffs must allege not only an injury under Section 1964(c), but a substantive violation of Section 1962.  That provision, in turn, requires an "enterprise," which RICO defines to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

18

RICO contains no "affirmative indication" that either Section 1962 in general, or Section 1961(4) in particular, should have any extraterritorial application; accordingly, they have none. *See Morrison*, 130 S. Ct. at 2883; *Norex*, 631 F.3d at 32-33.

Moreover, as the district court correctly concluded, the "focus" of Section 1962 is on the enterprise. Each substantive prohibition of Section 1962 requires an "enterprise" as an essential element.[1] Thus, just as Section 10(b) "does not punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of any security," *Morrison*, 130 S. Ct. at 2884, so too Section 1962 "does not punish the predicate acts of racketeering activity—indeed, each predicate act is, itself, a separate crime—but only racketeering activity in connection with an 'enterprise.'" SPA-9; *see also United States v. Neapolitan*, 791 F.2d 489, 500 (7th Cir. 1986) ("The central role of the concept of enterprise under RICO cannot be overstated."); *In re Le-Nature's, Inc.*, MDL No. 2021, 2011 WL 2112533, at *3 (W.D. Pa. May 26, 2011) ("RICO 'focuses,' in the context of a territorial analysis,

---

[1] *See* 18 U.S.C. § 1962(a) ("It shall be unlawful for any person who has received any income derived . . . from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income . . . in acquisition of any interest in, or the establishment or operation of, any *enterprise* . . . ."); *id.* § 1962(b) ("It shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain . . . any interest in or control of any *enterprise* . . . ."); *id.* § 1962(c) ("It shall be unlawful for any person employed by or associated with any *enterprise* . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity") (all emphases added).

19

on domestic rather than foreign enterprise."); *Cedeno v. Intech Group, Inc.*, 733 F. Supp. 2d 471, 473 (S.D.N.Y. 2010) (Rakoff, J.) ("nowhere does the statute evidence any concern with foreign enterprises, let alone a concern sufficiently clear to overcome the presumption against extraterritoriality"), *appeal docketed*, No. 10-3861 (2d Cir. Sept. 27, 2010).  Section 1962 focuses on enterprises, and covers only domestic ones.  *See Morrison*, 130 S. Ct. at 2884.

In response, the United States contends that, because Section 1962 assertedly focuses on *both* "enterprises" and a "pattern of racketeering activity," a Section 1962 violation "is territorial *either* if the enterprise is located in the United States *or* if a pattern of racketeering activity occurs within the United States."  U.S. Br. at 10-12; *see also id.* at 16-17.  But although a "pattern of racketeering activity" is also an element for any violation of Section 1962, it cannot fairly be described as a "focus" of Section 1962 because, as the district court noted, each RICO "pattern"—indeed each predicate act that makes up the "pattern"—is independently unlawful.  *See*  18 U.S.C. § 1961(1) (defining "racketeering activity"); *id.* § 1961(5) (defining "pattern").  Moreover, the government's contention cannot be reconciled with *Norex*, which affirmed the dismissal of RICO claims as extraterritorial despite well-pled allegations "that Defendants committed numerous [predicate] offenses in the United States."  540 F. Supp. 2d at 440.

20

Plaintiffs and the United States further contend that a domestic-enterprise requirement is inconsistent with *United States v. Parness*, 503 F.2d 430 (2d Cir. 1974). Appellants' Br. at 50; U.S. Br. at 17-18. But *Parness* long predated both *Morrison* and *Norex*, and cannot be reconciled with those cases. *Parness* did not start with the premise that Section 1962 cannot be applied extraterritorially, and then determine the focus of that provision to establish the necessary domestic link. Instead, it effectively adopted a presumption *in favor* of extraterritoriality, rejecting the idea that RICO "sought to protect only American institutions" because "[t]here is no indication that the statute was meant to have such a limited remedial scope." 503 F.2d at 439. Moreover, *Parness* relied on two cases—*United States v. Sisal Sales Corp.*, 274 U.S. 268, 276 (1927), and C*ontinental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 704-06 (1962)—that *Morrison* distinguished as applicable *only* where a statute *does* apply extraterritorially. *Morrison*, 130 S. Ct. at 2886 n.11. Another case that *Parness* relied upon, *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972), employed the very "conduct" test that *Morrison* rejected so emphatically. *See* 130 S. Ct. at 2878-79 (describing *Leasco*'s use of "conduct" test); *id.* at 2881 (rejecting "conduct" and "effects" tests in favor of presumption against extraterritoriality).

Finally, Plaintiffs advance three further, insubstantial arguments against a domestic-enterprise requirement. First, they contend that Congress, in enacting

21

RICO, "'had organized crime as its focus.'"  Appellants' Br. at 48 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 248 (1989)).  But the very case that Plaintiffs cite held that RICO is "not limited in application to organized crime." *H.J. Inc.*, 492 U.S. at 248.  Because "organized crime" is not even an element of Section 1962, it cannot possibly drive the extraterritoriality analysis.  Second, Plaintiffs contend that, because some RICO "predicate acts" apply extraterritorially, so too does Section 1962.  Appellants' Br. at 48-49.  In *Norex*, however, this Court rejected an identical argument: "*Morrison* similarly forecloses Norex's argument that because a number of RICO's predicate acts possess an extraterritorial reach, RICO itself possesses an extraterritorial reach."  631 F.3d at 33.  Finally, Plaintiffs contend that the words "any enterprise" extend RICO to non-domestic enterprises.  Appellants' Br. at 50-51.  But similar language in Section 10(b), which applies to "any" deception in connection with the purchase or sale of "any" security, *see Morrison*, 130 S. Ct. at 2881, did not overcome the presumption against extraterritoriality.  And *Norex*, specifically citing that language, held that "*Morrison* forecloses" the very argument that Plaintiffs seek to advance.  *See* 631 F.3d at 33.

    **2.**  In determining what qualifies as a domestic enterprise, the district court applied a "nerve center" test keyed to the place where the enterprise's decisions and policies originate.  SPA-10-11.  This approach focuses on the source of any

connection between the "enterprise" and the "pattern of racketeering activity." It is therefore a perfect fit for Section 1962(c), in which the "enterprise" is "the vehicle through which the unlawful pattern of racketeering activity is committed." *NOW v. Scheidler*, 510 U.S. 249, 259 (1994). Moreover, as the district court explained, a nerve-center test is surely much simpler than any alternative requiring courts to weigh by jurisdiction the enterprise's functions, assets, or revenues. SPA-11.

Plaintiffs criticize the nerve-center test as supposedly a bad fit for Sections 1962(a) and (b), under which the "enterprise" is generally the "victim" of the "pattern of racketeering activity." Appellants' Br. at 52-53. But Plaintiffs propose no alternative test for distinguishing domestic from non-domestic enterprises. Moreover, despite Plaintiffs' suggestion to the contrary, the term "enterprise"— which RICO defines in a single provision that governs all of Section 1962, *see* 18 U.S.C. § 1961(4)—cannot mean one thing for "vehicle" claims under Section 1962(c), and another for "victim" claims under Section 1962(a) or (b). *See Clark*, 543 U.S. at 386.

The government does propose an alternative test, but it is untenable. According to the government, a domestic "enterprise" is sufficient to establish a territorial violation of Section 1962, and an enterprise is "domestic" so long as it is "located or operating in the United States." U.S. Br. at 12. That approach would resurrect the very "conduct" test that *Morrison* rejected so decisively. Moreover,

23

despite the government's suggestion that an "administratively simple" test has no significant benefit in this context (*id.* at 18), the Supreme Court found "no more damning indictment of the 'conduct' and 'effects' tests" than their indeterminacy. *See Morrison*, 130 S. Ct. at 2879. And despite the government's related suggestion that a territoriality test should be "obviously broad" in light of RICO (U.S. Br. at 18), the Supreme Court rejected the *narrower* "significant and material conduct" test previously proposed by the government, on the ground that its *overbreadth* would make the United States a "Shangri-La" for prospective plaintiffs worldwide. *See Morrison*, 130 S. Ct. at 2886. Finally, the government's assertion that "a RICO enterprise need not have a 'nerve center'" (US Br. at 19) is overstated. As the district court explained (SPA-19), even an association-in-fact enterprise "must have a structure," *Boyle v. United States*, 129 S. Ct. 2237, 2244 (2009), and even corporations "may divide their command and coordinating functions," *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1194 (2010). Moreover, the relevant question is not, as the government erroneously suggests, whether the nerve-center test is more easily applied to corporations than to association-in-fact enterprises. Rather, the question is whether there is any better criterion for determining the location of enterprises. For the reasons given, there is not.

3. Applying the nerve-center test, the district court concluded that the "enterprise" alleged by Plaintiffs was not domestic. As explained above, that

24

"enterprise" allegedly consisted of an "association-in-fact of individuals and corporations" including Defendants, drug traffickers, "distributors, shippers, currency dealers, wholesalers, money brokers, and other participants" in the alleged money-laundering scheme.    JA 433 (¶ 158).    As the district court explained, nothing in the Complaint "even remotely suggests that Defendants had any hand in the planning, decisions, or 'overall corporate policy' of the drug smuggling, currency swap, or currency purchase steps" of the overall alleged scheme, and the complaint itself makes various allegations to the contrary.  SPA-13.  Moreover, "the Complaint, when read as a whole, strongly suggests the money laundering cycle was directed by South American and European criminal organizations."  SPA-14.  Thus, according to the Complaint, Defendants "appear to be nothing more than sellers of fungible goods in a complex series of transactions directed by South American and Russian gangs."  *Id.*

Plaintiffs barely muster any response on these points.  They make a perfunctory assertion that Defendants supposedly "orchestrated the scheme from the United States," Appellants' Br. at 49, but the cited paragraphs in the Complaint allege only that Defendants sold cigarettes to "criminal customers," JA 364 (¶ 49), or "received criminal proceeds in payment for cigarettes," JA 389 (¶ 101); *see also* JA 390 (¶ 105).  That point only confirms the district court's analysis: these allegations, even if true, do not suggest that Defendants "organized, orchestrated,

25

planned, or even participated in" the many "remaining criminal steps" of the alleged money-laundering scheme, much less that they planned or directed the far-flung alleged enterprise.  SPA-14.

Instead, Plaintiffs attempt to re-define the alleged "enterprise" as the Brown & Williamson Tobacco Company, and to re-define the alleged RICO violation as the acquisition of that company by RJR, allegedly in violation of Sections 1964(a) and 1964(b).  Appellants' Br. at 49-50, 53-54.  However, the complaint nowhere alleges that Brown & Williamson is itself a RICO enterprise.  Rather, just as for the Section 1964(c) claim, the claims under Section 1964(a) and 1964(b) identify the enterprise as an "association-in-fact" enterprise including the "RJR DEFENDANTS, along with their coconspirators in the money-laundering schemes, including associated distributors, shippers, currency dealers, wholesalers, money brokers, and other participants in the schemes."  JA 433 (¶ 158) (alleged "enterprise" for § 1962(a) claim); *see also* JA 447-48 (¶¶ 166-69) (allegations under § 1962(b)).  Moreover, the Complaint does not allege that Defendants used proceeds of racketeering activity to acquire Brown & Williamson or acquired Brown & Williamson through a pattern of racketeering activity.  Instead, it alleges only that Defendants made the acquisition "for the purpose of expanding upon their illegal cigarette sales and money-laundering activities," and that they have continued to engage in these activities through Brown & Williamson.  JA 389-90

26

(¶¶ 102-03).   Similarly, that is the only theory in Plaintiffs' brief about their supposed harm from the Brown & Williamson acquisition.  *See* Appellants' Br. at 53-54 ("The RJR Defendants created a new domestic company—Reynolds American—into which they merged the newly-acquired domestic business of B&W, and branched out into new money laundering activities through the overarching RJR Money-Laundering Enterprise.").  But this theory plainly does not state a claim under Section 1962(a) and 1962(b).  As this Court has long held, those provisions require a "use or investment injury" (for claims under Section 1962(a)), or an "acquisition or maintenance" injury (for claims under Section 1962(b)), that is "distinct from the injury resulting from the predicate acts." *Discon, Inc. v. Nynex Corp.*, 93 F.3d 1055, 1062-63 (2d Cir. 1996); *see Ouaknine v. MacFarlane*, 897 F.2d 75, 83 (2d Cir. 1990).   And as it more recently confirmed, "injury from [the defendant's] continuation" of its racketeering activity presents a claim under Section 1962(c), *not* a claim under Section 1962(a) or Section 1962(b).  *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 320 (2d Cir. 2011).

The district court correctly concluded that Plaintiffs' RICO Claims must be dismissed for failure to allege a domestic enterprise.

### C.    Plaintiffs Fail To Allege Sufficient Domestic Contacts

Plaintiffs argue that a RICO claim is domestic under *Norex* so long as it has more than "slim contacts" with the United States.  Appellants' Br. at 47.  Plaintiffs further argue that they satisfy this purported "slim contacts" test.  *Id.* at 48-52.  These contentions are both mistaken.

As a legal matter, Plaintiffs err in contending that *Norex* adopted what they describe as a "'slim contacts' test" (*id.* at 47).  As explained above, we believe that *Morrison* and *Norex* together impose domestic-injury and domestic-enterprise requirements for private civil RICO claims.  But in any event, *Norex* did not even remotely suggest that anything more than "slim contacts" with the United States would suffice to state a claim.  Rather, *Norex* stated simply that the "slim contacts" alleged in that case were "insufficient" to state a claim.  631 F.3d at 33.  Moreover, the proposed "slim contacts test" is flatly inconsistent with *Morrison*, which rejected not only the "conduct" and "effects" tests previously used by this Court to determine the territorial scope of federal statutes, *see* 130 S. Ct. at 2877-81, but also a "significant and material conduct" test proposed by the Solicitor General as an alternative, *see id* at 2886-87.  *See also id.* at 2884 ("[T]he presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case."); *Norex*, 611

F.3d at 33 ("simply alleging that some domestic conduct occurred cannot support a claim of domestic application" of Section 1964(c)).

Whatever the exact test, this case involves fewer alleged domestic contacts than did *Norex*. To begin with, the *Norex* complaint alleged that the defendants in that case "operated and directed" the entire illegal scheme from within the United States. JA 1408 (¶ 2), quoted in 540 F. Supp. 2d at 443. There is no such allegation here. Moreover, the *Norex* complaint alleged domestic acts of money laundering. JA 1461-62 (¶¶ 304-310). Here, the three specific allegations of money laundering all involve alleged transactions in Panama or Croatia, JA 390-92 (¶¶ 105-07), and even the allegations of money laundering that do not purport to describe specific transactions all refer to transactions outside of the United States, *see* JA 368, 371 (¶¶ 54, 63) (alleging unspecified money-laundering transactions in Caribbean); JA 372 (¶ 66) (unspecified transactions in Panama); JA 375-76 (¶ 71) (unspecified transactions in Venezuela); JA 377-78(¶ 74) (unspecified transactions in Colombia). Plaintiffs here also allege various domestic acts of mail fraud, wire fraud, and Travel Act violations in order to further the alleged scheme, JA 442-43, but the *Norex* complaint made substantially similar allegations, JA 1458-61, 1463. Moreover, apart from Defendants, this case involves almost entirely foreign actors: Plaintiffs themselves are all European entities, JA 341-44 (¶¶ 5-6); the drug dealers who require money-laundering services allegedly are located in Colombia,

Afghanistan, the Middle East, and Russia, JA 355-56 (¶¶ 31-32); the currency brokers who trade directly with the drug dealers allegedly are located in Europe, JA 358-59 (¶ 38); and, as explained above, the intermediaries who allegedly purchase Defendants' products with drug proceeds allegedly are located in foreign countries such as Colombia, Croatia, Panama, Venezuela, or elsewhere in the Caribbean.  As in *Norex*, this case "primarily involves foreign actors and foreign acts."  *Norex*, 631 F.3d at 31.  Moreover, in *Norex*, at least one alleged enterprise was made up entirely of United States companies and individuals.  JA 1412-13, 1452 (¶¶ 17-20, 241).  Here, by contrast, the only alleged enterprise consists primarily of foreign actors.  JA 433 (¶ 158).  Because this case involves no more domestic contacts than *Norex*, application of Section 1964(c) in this case would, as in *Norex*, be impermissibly extraterritorial.

## D.    The District Court Correctly Denied Leave To Amend

In this case and its predecessors, Plaintiffs have filed no fewer than six complaints over the course of a decade—one in *EC I*, two in *EC II*, and three in this case.  The district court acted well within its discretion in denying Plaintiffs permission to file a *seventh* complaint.  *See, e.g.*, *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (holding that denial of leave to amend is reviewed for abuse of discretion).

30

Plaintiffs argue that intervening legal changes excuse their failure to state a domestic RICO claim.  Appellants' Br. at 55-56.  But under the "conduct" and "effects" tests that governed prior to *Morrison*, Plaintiffs had every opportunity and incentive to include all relevant allegations of domestic contacts, particularly given the vagueness of those tests (*see Morrison*, 130 S. Ct. at 2879).  Moreover, two years before the latest complaint in this case was filed, the district court in *Norex*, applying pre-*Morrison* standards, had dismissed as extraterritorial a complaint alleging at least as many domestic contacts as are alleged here.  *See Norex*, 540 F. Supp. 2d 438.  Moreover, Defendants repeatedly had moved to dismiss the prior complaints based on extraterritoriality.  *See EC I* Defs.' Mem. at 32-38 (E.D.N.Y. No. 00-6617, Docket Entry #201); *EC II* Defs.' Mem. at 46-50 (E.D.N.Y. No. 01-5188, Docket Entry #39).  For all of these reasons, Plaintiffs can hardly claim surprise at the need to allege all domestic contacts in support of their RICO claims.

In any event, even Plaintiffs' proposed amendments would not state a domestic RICO claim under Section 1964(c).  Those amendments would simply elaborate on the alleged sale to two Panamanian companies of cigarettes destined for Europe, JA 390-91 (¶¶ 105-06), and would make new allegations that Defendants sold to Russian narcotics traffickers cigarettes that the traffickers then "smuggled into the European Union."  Appellants' Br. at 58.  These proposed new

allegations still do not involve any domestic injury or enterprise, are not materially different from those already contained in numerous prior complaints, and fail to distinguish the allegations held insufficient to state a claim in *Norex*.[2]

## II. THERE IS NO DIVERSITY JURISDICTION OVER THE REMAINING COMMON-LAW CLAIMS

The federal diversity statute, 28 U.S.C. § 1332, requires complete diversity such that each plaintiff is capable of suing each defendant. *See, e.g.*, *Herrick Co. v. SCS Commc'ns, Inc.*, 251 F.3d 315, 322 (2d Cir. 2001). In this case, complete diversity is lacking because the EC does not fit within any of the categories enumerated in Section 1332(a). As relevant here, Section 1332(a)(4) creates jurisdiction only where a plaintiff is a "foreign state" as defined by the Foreign Sovereign Immunities Act ("FSIA"). In pertinent part, the FSIA defines "foreign state" to include an "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). In addition, Section 1332(a)(2) creates jurisdiction if the plaintiff is a "citizen[] or subject[] of a foreign state." Thus, as Plaintiffs and the United States acknowledge, there is diversity jurisdiction in this case only if the EC is (1) a

---

[2] The RICO claims suffer from many fatal flaws even apart from their impermissible extraterritoriality. Under this Court's decision in *EC II*, the claims for sovereign injuries are barred by the revenue and penal-law rules. *See Republic of Colombia v. Diageo North America, Inc.*, 531 F. Supp. 2d 365, 383-401 (E.D.N.Y. 2007) (Garaufis, J.). Moreover, the claims for competitive injuries fail to satisfy RICO's proximate-cause requirement. *See*, *e.g.*, *Anza v. Ideal Steal Corp.*, 547 U.S. 451 456-62 (2006). Finally, as the United States correctly points out, the claims for equitable relief fail because "[o]nly the Attorney General may obtain equitable relief in a civil RICO suit." U.S. Br. at 20 n.7.

foreign state; (2) a citizen or subject of a foreign state; or (3) an agency or instrumentality of a foreign state.  As an international organization, the EC is none of these.

### A.    The EC Is Not Itself A "Foreign State" Under Section 1332(a)(4)

The question whether an entity is itself a "foreign state" depends on whether the entity has been "formally recognized" as such "by the executive branch of the United States government."  *Matimak Trading Co. v. Khalily*, 118 F.3d 76, 79 (2d Cir. 1997) (internal quotations and citation omitted), *abrogated on other grounds by JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88 (2002); *see*, *e.g.*, *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 319-20 (1978) ("only governments recognized by the United States and at peace with us are entitled to access to our courts"); *Land Oberoesterreich v. Gude*, 109 F.2d 635, 637 (2d Cir. 1940) (for diversity purposes, a foreign state "must first achieve recognition by our government").  This settled rule reflects the fact that recognition of foreign sovereigns "is exclusively a function of the Executive."  *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410-11 (1964).  The Executive Branch has recognized each of the Member States as a foreign state, but it has never so recognized either the EC or the European Union.  The United States agrees that the district court "correctly concluded that, because the President has not recognized the EC as a foreign state, the EC does not qualify as a foreign state."  U.S. Br. at 21.

33

The Restatement (Second) of Foreign Relations Law of the United States reinforces this conclusion.  Because the FSIA was enacted as a "'codification of international law,'" *Samantar v. Yousuf*, 130 S. Ct. 2278, 2289 (2010) (quoting *Permanent Mission of India to United Nations v. City of New York*, 551 U.S. 193, 199 (2007)), courts construing the FSIA should "examine[] the relevant common law and international practice" at the time of its 1976 enactment.  *Id.* at 2289-90.  The Restatement, promulgated in 1964, is highly instructive for that purpose.  *See, e.g.*, *id.* at 2286, 2290; *Permanent Mission of India*, 551 U.S. at 199.

The Restatement draws a fundamental distinction between foreign states and international organizations.  Under the Restatement, an entity constituted as a union of states may itself become a state only if none of the constituent states "retains an independent capacity to engage in foreign relations and to assume separate responsibility for its acts."  Restatement § 4, cmt. c.  In contrast, the Restatement defines an "international organization" as an organization that is "created by an international agreement" and that has "a membership consisting primarily of states."  *Id.* § 5.  Under these definitions, the EC is plainly an international organization rather than a state.  Indeed, the Restatement lists the EC's predecessor entity, the European Economic Community ("EEC"), as an "international organization" even though the EEC performed many sovereign functions "which the states themselves cease to exercise."  *See id.* § 5, cmt. b.

34

Plaintiffs argue that the district court "overlooked controlling law" to the effect that an international organization is a state if it exercises any "sovereign rights."  Appellants' Br. at 43-44.  That is incorrect.  Plaintiffs' authorities on this point are European decisions establishing only that the EC, like the EEC before it, exercises some sovereign rights.  *See Van Gend & Loos v. Nederlandse Administratie Der Belastingen*, [1963] E.C.R. 1, 12; *Opinion 1/91 of 14.12.1991*, [1991] E.C.R. I-6079 at ¶ 21; Case 6/64, *Costa v. ENEL*, [1964] E.C.R. 585, 593. The cases do not distinguish either the EEC or the Restatement, much less address any question of foreign sovereign immunity under United States or international law.

Plaintiffs also contend that *Samantar* changed the relevant definition by describing a "foreign state" as a "body politic that governs a particular territory." Appellants' Br. at 44-45. But *Samantar* did not purport to create a new definition of a "foreign state"; rather, paraphrasing and then quoting from the Restatement, it stated only that the term "indicates" a "body politic."  *See* 130 S. Ct. at 2286 ("The term 'foreign state' on its face indicates a body politic that governs a particular territory.  *See, e.g.*, Restatement § 4 (defining 'state' as 'an entity that has a defined territory and population under the control of a government and that engages in foreign relations.')").  Moreover, as the United States explains, even if the "body politic" language from *Samantar* were a new and complete definition,

35

that would not change the fact that only the Executive Branch may decide whether it has been met.  *See* U.S. Br. at 22-23.

### B.    The EC Is Not a "Citizen or Subject" of a Foreign State Under Section 1332(a)(2)

Plaintiffs argue that the EC should be considered a "citizen[] or subject[] of a foreign state" under 28 U.S.C. § 1332(a)(2), *see* Appellants' Br. at 39-43, but there is no support for such a strange interpretation of that term.

No court has ever suggested that anything like the EC qualifies as a citizen or subject of a foreign state.  To the contrary, courts have long held that states are not, for diversity purposes, citizens or subjects of themselves.  *See, e.g.*, *Minnesota v. N. Sec. Co.*, 194 U.S. 48, 63 (1904) ("the circuit court could not take cognizance of the case as one presenting a controversy between citizens of different states, for the state of Minnesota is not a citizen"); *Krisel v. Duran*, 386 F.2d 179, 181 (2d Cir. 1967) (per curiam) ("state" is not "a citizen for the purpose of diversity jurisdiction").  Moreover, an international organization is not a "citizen" or "subject" of its member states.  *See Int'l Refugee Org. v. Republic S.S. Corp.*, 92 F. Supp. 674, 676-77 (D. Md. 1950) (holding that International Refugee Organization ("IRO"), an "agency of the United Nations," is not a citizen or subject "of any foreign state or of the United States"), *rev'd on other grounds*, 189 F.2d 858 (4th Cir. 1951).

36

Plaintiffs cite no contrary authority. They assert that "Section 1332(a)(2) applies to foreign legal entities of all kinds," Appellants' Br. at 41, but all of their cases involve non-governmental, juridical entities created under the laws of one single nation. *See*, *e.g.*, *Cohn v. Rosenfeld*, 733 F.2d 625, 628-29 (9th Cir. 1984) (unincorporated entity resembling a "business trust"); *Autocephalous Greek-Orthodox Church v. Goldberg & Feldman Fine Arts, Inc.*, 917 F.2d 278, 285 (7th Cir. 1990) (Cypriot church); *Stiftung v. Plains Mktg., L.P.*, 603 F.3d 295, 299 (5th Cir. 2010) (Liechtenstein "stiftung" similar to a business trust). These entities have no resemblance to an international organization that is *made up of* several foreign states, rather than the *subject of* a single foreign state.

Plaintiffs also point to *JPMorgan Chase Bank*, *see* Appellants' Br. at 43, but that case says nothing about whether an international organization can qualify as a "citizen or subject." The entity at issue in *JPMorgan* was a corporation, which obviously is a "citizen or subject" at least of the country under whose laws it is incorporated. *See JPMorgan*, 536 U.S. at 92. The question in *JPMorgan* was whether a corporation incorporated under the laws of the British Virgin Islands—an overseas territory of the United Kingdom—was also a "citizen or subject" of the United Kingdom itself. *See id.* at 92-97. That question has no relevance here.

Plaintiffs also suggest that the district court had held the EC to be a "citizen or subject of a foreign state" in *EC I.* Appellants' Br. at 42. That is mistaken. In

37

*EC I*, the presence of Japan Tobacco Inc. as a defendant destroyed the complete diversity required under Section 1332(a)(2): regardless of whether or not the EC was a "citizen or subject of a foreign state," Japan Tobacco was not the "citizen of a State." For that reason, the district court held that diversity jurisdiction was lacking. *See EC I*, 150 F. Supp. 2d at 502. That holding has no bearing on the question whether the presence of the EC as a plaintiff likewise destroys complete diversity. As explained above, the latter question turns on whether the EC is a "citizen or subject of a foreign state" for diversity purposes, and nothing in *EC I* even remotely addresses that question.

Plaintiffs also claim support from the EC Treaty, *see* Appellants' Br. at 42-43, but that treaty is irrelevant to the diversity issue. To begin with, the treaty merely affords the EC, within the Member States, the same "legal capacity accorded to legal persons under their laws." Treaty Establishing the European Community, Nov. 10, 1997, 1997 O.J. (C 340) 3, art. 282 [hereinafter EC Treaty]. This legal capacity within the Member States says nothing about whether the EC is a "citizen or subject" of those States. *See IRO*, 92 F. Supp. at 676 (IRO is not "citizen or subject" of its member states, even though the UN charter provided that the IRO "shall enjoy in the territory of each of its members such legal capacity as may be necessary for the exercise of its functions and the fulfilment of its purposes") (internal quotation marks omitted). Moreover, the EC Treaty states that

38

individuals in the Member States are citizens of the EC, *see id.*, art. 17, and it would be strange for an entity with citizens to be a citizen itself. Finally, whatever it determines as a matter of European or international law, the EC Treaty plainly has no relevance in determining the meaning of a "citizen or subject" under the federal diversity statute. *See JPMorgan*, 536 U.S. at 2060-61.

Finally, Plaintiffs seek a remand because the district court did not expressly address this issue in its opinion. *See* Appellants' Br. at 40. That is entirely understandable, given its insubstantial nature and the relative lack of attention given to it by Plaintiffs in the district court. In any event, there is no need for a remand because the issue is a legal one that has been fully briefed in this Court. *See, e.g.*, *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 724 (2d Cir. 1994) ("On appeal the issue has been fully briefed. We could remand to the district court for it to decide this issue in the first instance, but we see no reason to do so because . . . the issue to be decided is solely one of law, which we may decide ourselves.").

## C. The EC Is Not an "Agency or Instrumentality" of a Foreign State Under Section 1332(a)(4)

Section 1603(a) provides that a "foreign state," as the term is generally used in the FSIA, "includes a political subdivision of a foreign state, or an agency or instrumentality of a foreign state as defined in subsection (b)." Section 1603(b), in turn, provides the following definition of an "agency or instrumentality":

(b)  An "agency of instrumentality" of a foreign state means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States * * * nor created under the laws of any third country.

In this case, it is undisputed that the EC is a separate legal person, as required by Section 1603(b)(1), and is neither a United States citizen nor created under the laws of any third country, as required by Section 1603(b)(3).  It is also undisputed that the EC is not a corporation with "shares" or any other "ownership interest," and so cannot qualify as an "agency or instrumentality" under the second prong of Section 1603(a)(2)  Accordingly, the dispositive question is whether the EC is "an organ of a foreign state" under the first prong of that provision.  For several reasons, it is not.

### 1.    An international organization cannot be an "organ of a foreign state."

As used in Section 1603, the phrase "organ of a foreign state" does not include an international organization consisting of member states.  That conclusion follows from the text of the FSIA, from its legislative history, and from common law at the time of its enactment.  Moreover, a contrary interpretation would

40

effectively nullify the International Organization Immunities Act ("IOIA"), 22 U.S.C. § 288a *et seq*., and numerous related statutes.

The text of the FSIA cuts against any contention that an international organization is an "organ of a foreign state."  In the context of government, the word "organ" denotes "a governmental instrumentality operating as part of a larger organization."  Webster's Third New International Dictionary 1589 (1976); *see also* Merriam-Webster's Collegiate Dictionary 819 (10th ed. 1997) ("a subordinate group or organization that performs specialized functions").  In short, the "organ" is smaller—not larger—than the "foreign state" of which it is a part.  Underscoring this point, the operative text refers to an "organ" of a foreign state "or political subdivision thereof."  28 U.S.C. § 1603(b)(2).  That phrase does not naturally denote international organizations.  Moreover, Section 1603 repeatedly refers to entities related to "a foreign state" in the singular—it speaks of "a political subdivision of *a* foreign state," of "an agency or instrumentality of *a* foreign state," of "an organ of *a* foreign state," and of an entity majority-"owned by *a* foreign state" (emphases added).  None of those phrases naturally refers to a subdivision, agency, organ, or corporation of *several* foreign states, and the phrase "political subdivision of a foreign state" cannot possibly mean "political subdivision of several foreign states."  In context, the phrase "organ of a foreign state" should be similarly construed.  *See*, *e.g.*, *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)

41

("a word is known by the company it keeps"). Furthermore, other portions of the FSIA interchangeably use the phrases "a foreign state" and "the foreign state," *see* 28 U.S.C. § 1608(b)(3) (providing for service "upon an agency or instrumentality of *a* foreign state" by "delivery of a copy of the summons and complaint, together with a translation of each into the official language of *the* foreign state . . . as directed by an authority of *the* foreign state" (emphases added)), which makes the alleged reference to international organizations even less likely. These various textual considerations cut against Plaintiffs' proposed extension of the FSIA to international organizations, for just as it is "awkward to refer to a person as an 'organ' of the foreign state," *Samantar*, 130 S. Ct. at 2286-87 (holding that FSIA does not cover heads of state), so too is it awkward to refer to an international organization as the "organ of a foreign state." The EC, like the President of France, cannot plausibly be described as an "organ" of France.[3]

---

[3] The Government argues, *see* U.S. Br. at 24 n.9, that "a foreign state" should be interpreted to include several "foreign states" based on the Dictionary Act. *See* 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise[,] words importing the singular include and apply to several persons, parties, or things."). Here, as explained above and below, the context does clearly indicate otherwise. Moreover, the Supreme Court and this Court have "recognize[d] that 'this rule [in 1 U.S.C. § 1] is not one to be applied except where it is necessary to carry out the evident intent of the statute.'" *Toy Mfrs. of Am., Inc. v. Consumer Prods. Safety Comm'n*, 630 F.2d 70, 74 (2d Cir. 1980) (quoting *First Nat'l Bank v. Missouri*, 263 U.S. 640, 657 (1924)). Here, there is no evident intent for § 1603(b) to cover international organizations.

The legislative history of the FSIA reinforces this conclusion.  Specifically, the House Report gives a laundry-list of examples of agencies and instrumentalities, but none of them includes anything even remotely resembling an international organization.  *See* H.R. Rep. No. 1487, 94th Cong., 2d Sess. 8 (1976), at 10, *reprinted in* 1976 U.S.C.C.A.N. at 6614 ("As a general matter, entities which meet the definition of an 'agency or instrumentality of a foreign state' could assume a variety of forms, including a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a governmental procurement agency or a department or ministry which acts and is suable in its own name.").  Moreover, the FSIA's "careful calibration of remedies among the listed types of defendants suggests that Congress did not mean to cover other types of defendants never mentioned in the text."  *Samantar*, 130 S. Ct. at 2288-89.  Neither Section 1603(b) itself, nor even its legislative history, mentions anything like international organizations.

Furthermore, international organizations did not have immunity under international law when the FSIA was enacted.  That is a critical point because the FSIA was intended only to codify prior international law.  *See Samantar*, 130 S. Ct. at 2289; *Permanent Mission of India*, 551 U.S. at 199.  As confirmed by the Restatement, the general rule is that international organizations do *not* enjoy the

immunities of foreign states: "The immunity of an international organization is not determined by the rules . . . as to the immunity of a foreign state." Restatement § 83 cmt. e. In addition, the United States historically "t[ook] the position that there exists no obligation under customary international law to extend to [international organizations] the privileges, exemptions, and immunities accorded to foreign governments." Lawrence Preuss, *The International Organizations Immunities Act*, 40 Am. J. Int'l L. 332, 333 (1946). And the only court to have considered the issue at the time (or later) specifically rejected an argument that an international organization should be deemed the alter-ego of its member states. *See IRO*, 92 F. Supp. at 678. Plaintiffs' proposed construction would make the FSIA flatly inconsistent with this longstanding historical understanding.

Moreover, although the FSIA does not mention international organizations at all, another foundational statute—the International Organizations Immunities Act—directly addresses the immunities of international organizations. In 1945, the IOIA modified the traditional rule by vesting certain international organizations with "the same immunity from suit and every form of judicial process as is enjoyed by foreign governments." *See* Pub. L. No. 79-291, §2(b), 59 Stat. 669 (Dec. 29, 1945) (codified at 22 U.S.C. § 288a). As originally enacted, the IOIA applied only to "public international organization[s] in which the United States participates pursuant to any treaty," and only to organizations "designated by the President

44

through appropriate Executive order as being entitled to enjoy" this immunity.  *See* IOIA § 1 (codified at 22 U.S.C. § 288).  The President has designated dozens of international organizations pursuant to that provision.  *See* 22 U.S.C. § 228, historical and statutory notes.  Subsequently, by the time the FSIA was enacted in 1976, the IOIA had been repeatedly amended to apply to certain international organizations in which the United States did not participate, including the European Space Research Organization, *see* Pub. L. No. 89-353, 80 Stat. 5 (Feb. 19, 1966) (codified at 22 U.S.C. § 288f-1), and the Organization of African Unity, *see* Pub. L. No. 93-161, 87 Stat. 635 (Nov. 27, 1973) (codified at 22 U.S.C. § 288f-2).  In 1972, Congress enacted a related statute to address specifically the Commission of the European Communities, a predecessor entity to the EC.  In contrast to earlier amendments to the IOIA, this provision applied only to the Mission to the United States of the Commission, and the statute extended only limited privileges and immunities to the Mission.  *See* Pub. L. No. 92-499, 86 Stat. 815 (Oct. 18, 1972) (codified at 22 U.S.C. § 288h).  In sum, by 1976, the IOIA and various related statutes had comprehensively addressed the question of immunity for international organizations, had provided such immunity only to those international organizations specifically identified by Congress or the President, and had specifically excluded the Commission of the European Communities from the full degree of immunity conferred upon foreign states.

45

The FSIA cannot fairly be construed to supersede this elaborate statutory framework by rendering international organizations as organs entitled to the full immunities of their member states.  Far from expressing any affirmative intent to supersede the IOIA and its progeny, the FSIA explicitly incorporates the IOIA, by extending certain immunities from execution to entities designated as international organizations under the IOIA.  *See* 28 U.S.C. § 1611(a).  That provision would be utterly inexplicable if, as Plaintiffs contend, an international organization were simply deemed an "organ" of its member states.  Moreover, even if the FSIA had been silent on this point, it could not properly be construed to supersede the elaborate IOIA framework through an implausibly broad construction of the undefined phrase "organ of a foreign state."  Such a construction would violate the strong interpretive presumption that later general statutes do not supersede earlier detailed statutes, *see, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143-44 (2000), and the strong interpretive presumption that Congress "does not hide elephants in mouseholes," *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006).

More recent statutes and executive orders reinforce the conclusion that the IOIA, not the FSIA, governs the jurisdictional immunities of international organizations.  Since the FSIA was enacted, Congress has continued to extend the IOIA to additional international organizations.  *See*, *e.g.,* 22 U.S.C. §§ 288f-3 to f-6, 288j to 288l (codifying post-1976 amendments to the IOIA); *see also* 22

46

U.S.C.A. § 288 notes (West 2004 & Supp. 2010) (republishing the Executive Orders necessary to extend the IOIA to additional international organizations). In 2002, Congress amended the IOIA to extend immunity to the European Central Bank, but not to the EC itself. *See* Pub. L. No. 107-278, 116 Stat. 1939 (codified at 22 U.S.C. § 288f-5). None of these amendments would be explicable if international organizations, by operation of the FSIA, already enjoyed the same immunities as their member states.

Finally, several cases have held that international organizations are not covered by the FSIA. *See Prewitt Enters., Inc. v. OPEC*, 353 F.3d 916, 922 n.9 (11th Cir. 2003) ("It is clear that OPEC is not a foreign state or political subdivision of a foreign state."); *Int'l Ass'n of Machinists & Aerospace Workers v. OPEC*, 477 F. Supp. 553, 560 (C.D. Cal. 1979) ("FSIA applies only to foreign sovereignties, which OPEC is not"), *aff'd*, 649 F.2d 1354 (9th Cir. 1981); *Broadbent v. Org. of Am. States*, 481 F. Supp. 907, 908 (D.D.C. 1978) (FSIA inapplicable to "international organizations" such as Organization of American States, which "stand in a different position with respect to the issue of immunity than sovereign nations"), *aff'd on other grounds*, 628 F. 2d 27 (D.C. Cir. 1980); *In re Hashim*, 188 B.R. 633, 641 (Bankr. D. Ariz. 1995) ("If multiple foreign governments could pool their ownership interests to become, by definition, an

agent or instrumentality of a foreign state, and thereby obtain certain immunities, then portions of the IOIA would be rendered somewhat meaningless.").

In response to all of this, Plaintiffs and the United States downplay any need for close textual analysis of Section 1603, and they entirely ignore both the IOIA and the history regarding treatment of international organizations for immunity purposes.  Instead, Plaintiffs cite a handful of cases for the proposition that the FSIA covers international organizations formed by multiple foreign states.  *See* Appellants' Br. at 26-27.  But Plaintiffs' lead cases all involved the prong of Section 1603(b) that covers entities majority-"owned by a foreign state." *See In re Air Crash Disaster Near Roselawn*, 96 F.3d 932, 937-38 (7th Cir. 1996); *Mangattu v. M/V Ibn Hayyan*, 35 F.3d 205, 208 (5th Cir. 1994); *EAL (Del.) Corp. v. Eur. Org. for the Safety of Air Navigation (Eurocontrol)*, 1994 U.S. Dist. LEXIS 20528, at *10 (D. Del. 1994); *LeDonne v. Gulf Air, Inc.*, 700 F. Supp. 1400, 1405-06 (E.D. Va. 1988).  None of these cases addressed whether an international organization can be, contrary to ordinary meaning, an "organ of a foreign state."  Moreover, the cases are unpersuasive even on their own terms.  *Roselawn*, *Mangattu*, and *Eurocontrol* simply follow *LeDonne*, which reasoned that interpreting the FSIA to exclude international organizations "is an unnecessary literalism that runs counter to the Act's purposes and ignores the well-established international practice of states acting jointly through treaty-created entities for public or sovereign

48

purposes."  700 F. Supp. at 1406.  *LeDonne*'s cavalier disregard of statutory text ("unnecessary literalism") cannot be reconciled with the Supreme Court's careful parsing of FSIA text in *Samantar*.  *See*, *e.g.*, 130 S. Ct. at 2289 ("text does not expressly foreclose petitioner's reading, but it supports the view of respondents and the United States").  And its unsupported assertion about "purposes" and "international practice" ignores the Restatement, the entire statutory framework of the IOIA, and the historical practice of not extending state immunities to international organizations.[4]

> ### 2.    The EC does not satisfy the factors required to be considered an "organ of a foreign state."

In the alternative, even if an international organization could be an "organ of a foreign state" under the FSIA, the EC does not satisfy the factors required to constitute such an "organ."  *See Filler*, 378 F.3d at 217.  The district court applied

---

[4]  Plaintiffs' other authority on this point  is even less substantial.  The *Rios* case contains no reasoning at all.  *See Rios v. Marshall*, 530 F. Supp. 351, 371 (S.D.N.Y. 1981).  In the *Morgan* decisions, the *pro se* plaintiff did not even contest the alleged applicability of the FSIA to Council of Europe, and the decisions of the Magistrate Judge contain no reasoning on that point.  JA 1600, 1616.  The *Methionine* decision addressed only whether the EC was entitled to comity, which is an entirely different question from those presented here.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2010 WL 3420517, at *6 (E.D.N.Y. Aug. 27, 2010) (holding that international comity should preclude certain discovery opposed by EC, but stating that the EC "lacks sufficient powers to be called a nation").  Finally, the "State Department" did not "deem[] Europol" to be covered by the FSIA, Appellants' Br. at 27; instead, a line attorney in the State Department wrote a letter summarizing the holding of the *Europol* decision, with a disclaimer that, under the FSIA, only the courts are authorized to make binding immunity decisions.  JA 1575.

the *Filler* factors to conclude that the EC is not an "organ of a foreign state."  SPA-40-49.  The application of *Filler* to international organizations is a question of first impression because every reported case involves entities created by a *single* state, consistent with our prior argument that international organizations cannot be an "organ of a foreign state."  Indeed, the district court came close to adopting this argument by applying *Filler* in a manner that effectively would screen out most international organizations, by focusing on whether the supposed organ practically functions as a subordinate unit of the foreign states.  In contrast, Plaintiffs would apply *Filler* in a manner whereby international organizations would be routinely granted immunity, which—for the reasons explained above—cannot be correct.

In *Filler*, this Court listed five relevant factors in deciding whether an entity is an "organ of a foreign state":

> (1) whether the foreign state created the entity for a national purpose;
>
> (2) whether the foreign state actively supervises the entity;
>
> (3) whether the foreign state requires the hiring of public employees and pays their salaries;
>
> (4) whether the entity holds exclusive rights to some right in the [foreign] country; and
>
> (5) how the entity is treated under foreign state law.

*Id.* The first and third factors weigh slightly in the EC's favor because the EC was created for a national purpose, and it holds exclusive rights in certain matters of trade and monetary policy. However, the other three factors demonstrate that the EC does not constitute an organ of its Member States because—regardless of its general purpose—it does not actually operate as such an organ.[5]

*First*, the Member States do not actively supervise the EC. As the district court explained, the EC has five basic institutions, only one of which (the Council of Ministers) is controlled by the Member States. *See* SPA-41-44. The other four—the European Parliament, the Commission of the European Communities, the Court of Justice of the European Communities, and the European Court of Auditors—are independent by terms of the treaty, and can therefore make important decisions without the supervision of the Member States. *See id.* Accordingly, the degree of supervision is far less than what would be expected for an "organ of a foreign state." *Cf. Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*, 476 F.3d 140, 143 (2d Cir. 2007) (finding that Korea supervised Financial Supervisory Service of the Republic of Korea by "(1) appointing its

---

[5] Plaintiffs assert that the first factor is most important, *see* Appellants' Br. at 29, citing *Murphy v. Korea Asset Mgmt. Corp.*, 421 F. Supp. 2d 627 (S.D.N.Y. 2005), *aff'd*, 190 Fed. App'x 43 (2d Cir. 2006). However, this Court has never suggested that any one factor is preeminent. Indeed, *Murphy* itself recognized that "*Filler* invites district courts to engage in a balancing process, without particular emphasis on any given factor and without requiring that every factor weigh in favor of, or against, the entity claiming FSIA immunity." *Id.* at 641.

governor and auditor; (2) acting through a related agency, FSC; *and* (3) regulating the inspection fees that FSS can collect").

In response, Plaintiffs note that the Member States delegated powers to the EC in the first place, *see* Appellants' Br. at 31, but delegation of powers in no way suggests supervision as to how the powers are exercised. Plaintiffs also note that Member States appoint several key EC officials. *See* Appellants' Br. at 32. As the district court explained, the appointment authority was subject to various checks. SPA-21. More fundamentally, where the appointed officials must by law be "independent," SPA-22, the power to appoint obviously does not imply the power to supervise, as the domestic example of judges and presidents makes clear.

*Second*, employees of the EC are not public employees of the Member States.[6] The district court correctly concluded that the powers of EC employees come from the public law of the EC, not the public law of the Member States, and the treaty expressly calls for their independence from the governments of the Member States. SPA-45-46. Plaintiffs contend, nonetheless, that EC employees are "public employees" based on their civil-servant status and official immunities. Appellants' Br. at 33-34. However, this conclusion misses the point: they may be

---

[6] Plaintiffs suggest that this factor should be accorded little weight, *see* Appellants' Br. at 33, but the cases they cite state only that an entity can be an "organ of a foreign state" when three or all four other factors weighed in favor of such a finding. *See Peninsula*, 476 F.3d at 143 (four other factors in favor of organ status); *Murphy*, 421 F. Supp. 2d at 642-45 (three other factors in favor of organ status and one neutral).

"public employees," but they are plainly not public employees of the Member States.  This is the inquiry that matters under *Filler*, because it would be strange for the "organ of a foreign state" to have employees other than those of that state.  To take another obvious domestic example, employees of the State Department—an organ of the United States—are also employees of the United States.

*Third*, none of the Member States has treated the EC as an "organ of a foreign state."  To the contrary, consistent with the terms of the governing treaties, Member States have treated the EC as "a truly supranational body with a reasonably autonomous institutional existence of its own," rather than "an intergovernmental body, requiring the consent of each Member State before common action can be taken."  SPA-48 (internal quotations omitted).  "And much unlike an 'organ' of the Member States, the European Community impinged upon—rather than advanced—the autonomy of individual member states."  *Id.* (internal quotations omitted).  In response, Plaintiffs cite a German decision stating that "Member States 'act jointly' through the EC."  Appellants' Br. at 36-37.  However, acting jointly does not answer the question of whether the Member States consider the EC an organ, and, as to this latter question, there is no support for Plaintiffs' claim.  Indeed, the same decision stresses the juridical distance between Germany and the EC, and even "twice mentions the possibility of Germany leaving" the EC.  *See Germany: Federal Constitutional Court Decision*

*Concerning the Maastricht Treaty*, 33 I.L.M. 388, 390-92 (1994). Needless to say, states do not ordinarily mention the possibility of seceding from their own agencies."[7]

## III. THE DISTRICT COURT CORRECTLY DISMISSED THE SUPPOSED FEDERAL COMMON-LAW CLAIMS

Plaintiffs argue that the district court improperly dismissed their federal common-law claims without comment. *See* Appellants' Br. at 59-61. However, following a choice-of-law inquiry by the district court, the parties stipulated that those claims arise, if at all, only under the common law of New York State. *See* Letter Regarding Parties' Agreement on Choice of Law, Nov. 16, 2010, JA 1402-03 ("[T]he parties agree that should the Court reach the issue of whether plaintiffs have stated any common law claims, it should utilize New York substantive law in deciding the motion."); *see also* Oct. 27, 2010 Tr. at 43, JA 1374 (Plaintiffs' counsel stating that "we recognize that we can either get state common-law or federal common-law but not both").

---

[7] The United States argues that the EC must be an organ of the Member States, because that is the position urged here by those parties. U.S. Br. at 29. But government litigating positions are not entitled to any deference at all, much less to conclusive deference. *See*, *e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988). The United States further argues that the EC must be an organ of its Member States because the State Department says so. U.S. Br. at 29. That contention is wrong for the further reason that the FSIA was specifically designed to transfer responsibility for individual immunity decisions from the Executive Branch to the courts. *See Samantar*, 130 S. Ct. at 2285.

Moreover, Plaintiffs had good reason to discard federal common law in favor of state common law: there is no plausible application of federal common law in this case. As the Supreme Court and this Court have explained, federal common law has a very limited scope. In particular, "a case must implicate 'uniquely federal interests' for federal common law to apply," and "such interests arise only in a few areas, such as: (1) the obligations to, and rights of, the United States under its contracts; (2) the liability of federal officers for official acts; and (3) civil liabilities arising out of federal procurement contracts relating to national defense." *Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 127 (2d Cir. 1999) (quoting *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988)). Moreover, "[e]ven when 'uniquely federal interests' are implicated, federal common law applies only where there is a 'significant conflict between some federal policy or interest and the use of state law.'" *Id.* (quoting *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994)). And "a plaintiff seeking to apply federal common law where the United States is not even a party faces a substantial burden in trying to demonstrate an actual, significant conflict between state law and a federal interest." *Id.* Here, there are neither "uniquely federal interests" at stake nor a demonstrated conflict between state law and any such federal interests.

Based on the parties' own agreement and well-established precedent, the district court properly dismissed the federal common-law claims.

55

**CONCLUSION**

For the foregoing reasons, the judgment of the district court should be affirmed.

Dated:          November 10, 2011
                Washington, D.C.

                        Respectfully submitted,


                        /s/ David M. Cooper

                        Gregory G. Katsas
                        JONES DAY
                        51 Louisiana Ave, N.W.
                        Washington, D.C. 20001
                        (202) 879-3939

                        Mark R. Seiden
                        David M. Cooper
                        JONES DAY
                        222 East 41st Street
                        New York, New York 10017
                        (212) 326-3939

                        *Attorneys for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29.  It contains 13,492 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman type.

/s/ David M. Cooper
David M. Cooper

Dated:  November 10, 2011

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system on November 10, 2011.

I certify that counsel for all parties in the appeal are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


/s/ David M. Cooper
David M. Cooper


Dated:  November 10, 2011