# 11-2475-cv

## United States Court of Appeals

*for the*

## Second Circuit

EUROPEAN COMMUNITY, acting on its own behalf and on behalf of the
Member States it has power to represent, KINGDOM OF BELGIUM,
REPUBLIC OF FINLAND, FRENCH REPUBLIC, HELLENIC REPUBLIC,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

### REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

KRUPNICK CAMPBELL MALONE BUSER
   SLAMA HANCOCK LIBERMAN & MCKEE
12 Southeast 7th Street, Suite 801
Fort Lauderdale, Florida 33301
(954) 763-8181

– and –

SPEISER KRAUSE NOLAN & GRANITO
Two Grand Central Tower
140 East 45th Street, 34th Floor
New York, New York 10017
(212) 661-0011

*Attorneys for Plaintiffs-Appellants*

FEDERAL REPUBLIC OF GERMANY, ITALIAN REPUBLIC, GRAND
DUCHY OF LUXEMBOURG, KINGDOM OF THE NETHERLANDS,
PORTUGUESE REPUBLIC, KINGDOM OF SPAIN, Individually, KINGDOM
OF DENMARK, CZECH REPUBLIC, REPUBLIC OF LITHUANIA,
REPUBLIC OF SLOVENIA, REPUBLIC OF MALTA, REPUBLIC OF
HUNGARY, REPUBLIC OF IRELAND, REPUBLIC OF ESTONIA,
REPUBLIC OF BULGARIA, REPUBLIC OF LATVIA, REPUBLIC OF
POLAND, REPUBLIC OF AUSTRIA, KINGDOM OF SWEDEN, REPUBLIC
OF CYPRUS, SLOVAK REPUBLIC, ROMANIA,

*Plaintiffs-Appellants*,

v.

RJR NABISCO, INC., R.J. REYNOLDS TOBACCO COMPANY, R.J.
REYNOLDS TOBACCO INTERNATIONAL, INC., RJR ACQUISITION
CORP., FKA NABISCO GROUP HOLDINGS CORP., RJR NABISCO
HOLDINGS CORP., R.J. REYNOLDS TOBACCO HOLDINGS, INC.,
NABISCO GROUP HOLDINGS CORP., R.J. REYNOLDS GLOBAL
PRODUCTS, INC., REYNOLDS AMERICAN INC., R.J. REYNOLDS
TOBACCO COMPANY, a North Carolina Corporation,

*Defendants-Appellees*.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ............................................................................. 1

ARGUMENT .................................................................................... 1

   I.    DIVERSITY JURISDICTION EXISTS ............................................. 1

       A.    The EC Is An "Agency or Instrumentality" Under the FSIA ... 1

            1.    The State Department's Determination Is "Conclusive" 1

            2.    The EC Is an "Organ" Under The *Filler* Factors ............ 2

            3.    RJR's Other Arguments Against the EC's "Agency" or "Instrumentality" Status Are Baseless ........................... 7

                (a)    RJR's Statutory Construction of FSIA Is Flawed ..7

                (b)    The EC is Not An Ordinary "International Organization" ...................................................... 10

                (c)    An "International Organization" Can Be An "Organ" ................................................................ 11

                (d)    IOIA Is Irrelevant To This Case ........................... 12

       B.    Alternatively, This Court Should Remand for Further Proceedings ........................................................................... 14

   II.    THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFFS' RICO CLAIMS ............................................................................... 16

       A.    Plaintiffs Allege Sufficient Domestic Contacts ...................... 16

       B.    RICO Is Not Limited to "Domestic Enterprises" ................... 19

            1.    *H.J. Inc.* and *Parness* Are Controlling ........................... 19

            2.    The Newly Fashioned "Nerve Center" Test Is Flawed  20

C.     RICO Is Not Limited to Domestic Injuries.............................. 21

D.     The District Court Erred In Denying Leave to Amend ........... 25

III.     THE DISTRICT COURT ERRED IN DISMISSING THE FEDERAL COMMON-LAW CLAIMS WITHOUT COMMENT...................... 26

CONCLUSION ..................................................................................... 29

CERTIFICATE OF COMPLIANCE ....................................................... 31

# TABLE OF AUTHORITIES

**U.S. Cases**

Agency Holding Corp. v. Malley-Duff Associates, Inc., 483 U.S. 143 (1987) ......17

Baxter v. Sturm, Ruger & Co., Inc., 32 F.3d 48 (2d Cir. 1994) ..............................15

Boyle v. United States, 129 S. Ct. 2237 (2009)........................................................20

City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114 (2d Cir. 2011) .....26

Connecticut v. Am. Elec. Power Co., 582 F.3d 309 (2d Cir. 2009), aff'd in relevant part, 131 S. Ct. 2527 (2011) ........................................................................28

EAL (Delaware) Corp. v. European Organisation for the Safety of Air Navigation, 1994 U.S. Dist. LEXIS 20528 (D. Del. 1994).......................................... 8, 12

EEOC v. Arabian American Oil Co., 499 U.S. 244 (1991)....................................23

Federal Reserve Bank of St. Louis v. Metrocentre Improv. Dist. #1, 657 F.2d 183 (8th Cir. 1981), aff'd, 455 U.S. 995 (1982)..................................................4, 5

Filler v. Hanvit Bank, 378 F.3d 213 (2d Cir. 2004) ....................................... passim

Granville Gold Trust-Switzerland v. Commissione Del Fullimento/Inter Change Bank, 924 F. Supp. 397 (E.D.N.Y. 1996), aff'd, 111 F.3d 123 (2d Cir. 1997) ....................................................................................................................7

H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989) ............. 17, 19, 23, 25

In re Air Crash Disaster Near Roselawn, 96 F.3d 932 (7th Cir. 1996) ....................8

Int'l Refugee Org. v. Republic S.S. Corp., 92 F. Supp. 674 (D. Md. 1950), rev'd on other grounds, 189 F.2d 858 (4th Cir. 1951)..................................................16

LeDonne v. Gulf Air, Inc., 700 F. Supp. 1400 (E.D. Va. 1988) ..............................8

Mangattu v. M/V Ibn Hayyan, 35 F.3d 205  (5th Cir. 1994) ...................................8

Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010) ..... 17, 19, 22, 23

Murphy v. Korea Asset Mgmt. Corp., 421 F. Supp. 2d 627 (S.D.N.Y. 2005), aff'd, 190 Fed. Appx. 43 (2d Cir. 2006) ...............................................................6, 7

Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249 (1994)...............................21

Nat'l Petrochemical Co. of Iran v. M/T Stolt Sheaf, 860 F.2d 551 (2d Cir. 1988) ..2

Norex Petroleum Ltd. v. Access Indus., Inc., 631 F.3d 29 (2d Cir. 2010) (per curiam) ............................................................................................... 17, 22

Patrickson v. Dole Food Co., 251 F.3d 795 (9th Cir. 2001), aff'd, 538 U.S. 468 (2003)................................................................................................................14

Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd., 476 F.3d 140 (2d Cir. 2007)......................................................................................................4, 6

Pfizer Inc. v. Government of India, 434 U.S. 308 (1978) ........................................22

Readco, Inc. v. Marine Midland Bank, 81 F.3d 295 (2d Cir. 1996)........................28

Republic of the Philippines v. Marcos, 862 F.2d 1355 (9th Cir. 1988) (en banc) ..22

Republic of Turkey v. OKS Partners, 797 F. Supp. 64 (D. Mass. 1992) ...............22

Rotella v. Wood, 528 U.S. 549 (2000) ............................................................. 17, 23

Toy Mfrs. Of Am., Inc. v. Consumer Prods. Safety Comm'n, 630 F.2d 70 (2d Cir. 1980) ...................................................................................................................9

TRW Inc. v. Andrews, 534 U.S. 19 (2001) ............................................................10

United States v. Parness, 503 F.2d 430 (2d Cir. 1974)............................... 19, 20, 25

United States v. Restrepo, 986 F.2d 1462 (2d Cir. 1993)........................................26

## Statutes

1 U.S.C. § 1 ............................................................................................................8, 9

18 U.S.C. § 1961(4) ................................................................................................21

18 U.S.C. § 1962................................................................................ 17, 21, 22, 23

18 U.S.C. § 1962(a) and (b) ............................................................ 20, 21

18 U.S.C. § 1962(a), (b), and (c) ...........................................................21

18 U.S.C. § 1964(c) ................................................................ 22, 23, 24

22 U.S.C. § 288 ........................................................................12

22 U.S.C. § 288f-5 ................................................................. 13, 14

22 U.S.C. § 288h .......................................................................13

28 U.S.C. § 1332(a)(2) ...................................................................15

28 U.S.C. § 1332(a)(4) ...................................................................12

28 U.S.C. § 1603(b) ......................................................................9

28 U.S.C. § 1603(b)(2) ..................................................................8, 9

Pub. L. No. 107-278, § 1 ................................................................14

## Other Authorities

Article 28.2, Protocol on the Statute of the European System of Central Banks and of the European Central Bank (O.J. C 191/68 of 29.7.92) ...........................14

Exec. Order No. 12,651, 53 Fed. Reg. 35,287 (Sept. 13, 1988)..............................13

Exec. Order No. 13,307, 68 Fed. Reg. 33,338 (June 3, 2003)................................14

T. Roule, Middle East – The Terrorist Financial Network of the PKK, Jane's Terrorism & Security Monitor (June 17, 2002)............................................29

## Rules

Fed R. Civ. P. 12(b)(6)...................................................................24

Fed. R. Evid. 201(b)....................................................................24

**Foreign Cases**

Case 6/64, Costa v. ENEL, [1964] E.C.R. 585..........................................................10

Judgment of Federal Supreme Court, December 21, 1960 (VIII ZR 1/60) (F.R.G.),
    reported in 56 Am. J. Int'l L. 562 (1962) .....................................................29

Opinion 1/91 of 14 December 1991, [1991] E.C.R. I-6079 ....................................10

Van Gend & Loos v. Nederlandse Adminisratie Der Belastingen,  [1963] E.C.R. 1
    ..................................................................................................................10

**INTRODUCTION**

RJR's 56-page brief offers no substantive defense of the judgment below. (See Brief of Defendants-Appellees ("RJR. Br.").)[1]  For the reasons in Plaintiffs' opening brief ("EC/MS Br.") and in the *amicus curiae* brief of the United States filed herein on October 4, 2011 ("U.S. Br."), the District Court's two critical holdings -- (1) the EC is not an agency or instrumentality of its Member States and may not invoke diversity jurisdiction; and (2) RICO's territorial coverage is limited to "domestic enterprises" -- were wrong as a matter of law.  The judgment should be reversed.

**ARGUMENT**

**POINT I**

**DIVERSITY JURISDICTION EXISTS.**

**A**.  **The EC Is An "Agency or Instrumentality" Under the FSIA.**

Nothing in RJR's brief alters the conclusion that the EC is an "agency or instrumentality" of its Member States and may invoke diversity jurisdiction on that ground.  (EC/MS Br. 23-38; U.S. Br. 23-29.)

**1.  The State Department's Determination Is "Conclusive."**

The EC is an "agency or instrumentality" of its Member States under the FSIA.  (EC/MS Br. 23-38.)  Reaching the same conclusion, the State Department

---

[1] The abbreviations and citation forms adopted in the EC/MS Brief are continued herein.

1

(a signatory to the *amicus* brief) accepted the Member States' representation that the EC is their agency or instrumentality, and determined that the EC is an "agency or instrumentality" of its Member States.    (See U.S. Br. 23-29.)    This determination is "conclusive."  (U.S. Br. 29 (emphasis added).)  This Court should give effect to the State Department's determination that the EC is an "agency or instrumentality" of its Member States and may invoke diversity jurisdiction on that ground.  See, e.g., National Petrochemical Co. of Iran v. M/T Stolt Sheaf, 860 F.2d 551, 555 (2d Cir. 1988) (deferring to the State Department's view that "'the Iranian government and its instrumentality should be afforded access to our courts'" (citation omitted)).

### 2.  **The EC Is an "Organ" Under The *Filler* Factors.**

Under this Court's standards, the EC is an "organ" of its Member States and therefore qualifies as an "agency or instrumentality" of its Member States. (EC/MS Br. 28-38 (applying Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir. 2004)).)  The United States agreed that the EC is an agency or instrumentality of its Member States.  (U.S. Br. 24-29.)  The EC possesses "organ" status under Filler, and the District Court's contrary ruling cannot stand.

***National purpose***.  The EC was formed by the Member States for a national purpose.  (EC/MS Br. 29-30.)  The District Court so held (SPA-40-41) and RJR concedes the point.  (RJR Br. 29-30.)  Similarly, the United States found that the

EC was formed for national purposes.  (U.S. Br. 26.)  This is the most significant factor under <u>Filler</u>.  (EC/MS Br. 29 (citation omitted); U.S. Br. 26 ("The United States has consistently taken the view that the public purpose factor is the most important consideration in determining an entity's organ status").)

*<u>Supervision</u>*.  The Member States actively supervise the EC.  (EC/MS Br. 30-33.)  The Member States accomplish this through the Member States' delegation of prescribed, sovereign rights to the EC under the EC Treaty, which has been ratified by all Member States, the Member States' direct representation and participation in the Council of Ministers (the EC's primary policy-making and legislative body), and the Member States' role in the appointment of key EC officials, including the European Commission, the Court of Justice, and the Court of Auditors (an EC institution directly involved in "supervision" of the EC).  (EC/MS Br. 31-33; <u>see</u> <u>also</u> U.S. Br. 27.)  The fact that the appointment authority may be "subject to various checks" (RJR Br. 52) does not negate its existence.

RJR's assertion -- that the "Member States do not actively supervise the EC" (RJR Br. 51) -- defies reality.  The District Court recognized that the Council of Ministers "consisted of the Member States themselves" (SPA-42) and was "subject to control by the Member States" (SPA-43), but overlooked the Council's central role in EC governance and status as "'the EC's primary policy-making and legislative body.'"  (EC/MS Br. 31-32 (citation omitted).)  RJR similarly overlooks

the Council's central role.  (RJR Br. 51.)  The Member States supervise the EC in important respects.

RJR argues that the Member States' supervision of the EC is "less" than that which existed in Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co. Ltd., 476 F.3d 140, 143 (2d Cir. 2007) (Financial Supervisory Service ("FSS") was an agency or instrumentality of Korea).  (RJR Br. at 51.)  The EC presents a far stronger case than the FSS for agency or instrumentality status.  The Member States have created and determine the competences of the EC through an agreement ratified by each one of them.  Moreover, they compose the Council of Ministers and thereby have a direct participatory role in the day-to-day decisions of the EC's primary policy-making and legislative body.  In contrast, there is no indication the Korean government itself had any direct participatory role in FSS's work.

Finally, RJR argues that some EC institutions are "independent" and therefore the EC cannot be an agency or instrumentality.  (RJR Br. at 51-52.)  This argument is unsound.  See, e.g., Federal Reserve Bank of St. Louis v. Metrocentre Improv. Dist. #1, 657 F.2d 183, 185 (8th Cir. 1981), aff'd, 455 U.S. 995 (1982) ("Metrocentre").  In Metrocentre, the Federal Reserve Bank of St. Louis claimed immunity from taxation as an agency or instrumentality of the federal government. The municipality challenged the Bank's immunity arguing that "because of the

4

Bank's independence, it cannot be deemed to be an instrumentality." <u>Metrocentre</u>, 657 F.2d at 185 n.2. Rejecting the municipality's argument, the court held that "a governmental instrumentality is one that performs an important governmental function" (<u>id</u>. at 185) and "[t]he Bank is performing such an important governmental function that in spite of great independence it must still be considered to be an instrumentality of the federal government." <u>Id.</u> at 185 n.2. The "independence" of certain EC institutions does not disqualify the EC from agency or instrumentality status.

> ***Public Employees***. <u>Filler</u> calls for consideration of "whether the foreign state requires the hiring of public employees and pays their salaries." <u>Filler</u>, 378 F.3d at 217. The District Court interpreted <u>Filler</u> as requiring EC officials to be direct employees of the Member States (SPA-45) and RJR echoes that position. (RJR Br. 52-53.) Their reading unduly restricts the <u>Filler</u> court's general language. (U.S. Br. 27-28 ("the third *Filler* factor asks whether the state 'requires the hiring of public employees and pays their salaries,' not whether the state itself is the employer") (citation omitted); EC/MS Br. 33 (same).) The EC hires public employees as recognized by the District Court (SPA-45), Plaintiffs (EC/MS Br. 33-35), United States (U.S. Br. 28), and RJR. (RJR Br. 52-53 ("they may be 'public employees'").) Moreover, "the EC member states funded much of the EC's operations, including pay of EC employees." (U.S. Br. 28.)

Moreover, entities have been recognized as agencies or instrumentalities even though they did not hire public employees.  See, e.g, Peninsula, 476 F.3d at 143; Murphy v. Korea Asset Mgmt. Corp., 421 F. Supp. 2d 627, 644 (S.D.N.Y. 2005), aff'd, 190 Fed. Appx. 43 (2d Cir. 2006).  Given that the EC clearly hires public employees, the EC meets the third Filler factor.

*Exclusive Rights*.  The District Court held (SPA-47) and RJR concedes (RJR Br. 51) that the EC has exclusive competence in certain areas of trade and monetary policy.  (See also U.S. Br. 28.)  The EC thus satisfies the fourth Filler factor.

*EC's Treatment by Member States.*  The District Court concluded that the Member States do not treat the EC as an "organ."  (SPA-48.)  That was error. (EC/MS Br. 36-38.)  On October 4, 2011, the United States submitted its *amicus* brief to this Court, and stated:

> Here, every member of the EC but one is a plaintiff in this suit. Through their briefing, these member states informed the district court that they consider the EC to be a governmental entity.  EC Br. 6. Because the State Department accepts the EC member states' representation, that representation should be conclusive.

(U.S. Br. 29.)  The Member States represented to the District Court that the EC was a governmental body created by the Member States (SAC ¶ 5), and that they deemed the EC to be their "agency or instrumentality."  (A-1644-1645; Dkt. 97 at 18-23.)  The Member States made this representation herein.  (EC/MS Br. 23-38.)

The State Department has accepted the Member States' representation. (U.S. Br. 29.)  Accordingly, the State Department's determination that the EC is an agency or instrumentality should be accorded "conclusive" effect in this Court.  <u>Id.</u>

Because the EC meets all five <u>Filler</u> factors, it is an agency or instrumentality of its Member States, and thus is permitted to invoke diversity jurisdiction.

### 3.    RJR's Other Arguments Against The EC's "Agency or Instrumentality" Status Are Baseless.

RJR offers random and indiscriminate arguments to deprive the EC of the ability to invoke the diversity statute as an agency or instrumentality of its Member States.  These additional arguments are meritless.

#### (a)  RJR's Statutory Construction of FSIA Is Flawed.

RJR overlooks the basic rule of construction that Congress intended the terms "agency or instrumentality" and "organ" to be construed and applied in a broad, flexible, and inclusive manner.  (EC/MS Br. 24-26, citing <u>Murphy</u>, 421 F. Supp. 2d at 640 ("the term 'organ' should be interpreted broadly"), <u>aff'd</u>, 190 Fed. Appx. 43 (2d Cir. 2006); <u>Granville Gold Trust-Switzerland v. Commissione Del Fullimento/Inter Change Bank</u>, 924 F. Supp. 397, 405 (E.D.N.Y. 1996) (same), <u>aff'd</u>, 111 F.3d 123 (2d Cir. 1997).)  Instead, it advocates a strict and flawed construction that disregards the FSIA's text, structure, and purpose.

7

RJR's main argument is that the FSIA should be strictly construed to encompass only an entity that is "'an agency or instrumentality of *a* foreign state.'" (RJR Br. 41 <u>citing</u> 28 U.S.C. § 1603(b)(2) (emphasis is RJR's).)  RJR argues that the statute's use of the singular "a" means that an entity of several foreign states cannot fit the definition of agency or instrumentality.  (RJR Br. 41, 42 n.3.)  This flawed construction has been rejected by the District Court (SPA-37-40), the United States (U.S. Br. 24 n.9) and, apparently, every court to consider it.  (EC/MS Br. 26-28.)[2]  As the United States observes, "[n]othing in the text or legislative history of the FSIA suggests that Congress intended to disqualify as organs entities created by multiple foreign states."  (U.S. Br. 24 n.9.)  Indeed, this reading is directed by statute.  Congress has established, as a general rule of construction for U.S. statutes, that "words importing the singular include and apply to several persons, parties, or things."  1 U.S.C. § 1.  While RJR argues that the context

---

[2] <u>See</u>, <u>e.g.</u>, <u>In re Air Crash Disaster Near Roselawn</u>, 96 F.3d 932, 938-939 (7th Cir. 1996) (entity created by an intergovernmental agreement between France and Italy is an agency or instrumentality); <u>Mangattu v. M/V Ibn Hayyan</u>, 35 F.3d 205, 208  (5th Cir. 1994) (United Arab Shipping Co., an entity created by governments of the six nations for economic purposes, is an "agency or instrumentality"); <u>LeDonne v. Gulf Air, Inc.</u>, 700 F. Supp. 1400, 1406 (E.D. Va. 1988) (recognizing "the well-established international practice of states acting jointly through treaty-created entities for public or sovereign purposes" and holding that an entity created by a treaty among four Persian Gulf states qualifies as an agency or instrumentality); <u>EAL (Delaware) Corp. v. European Organisation for the Safety of Air Navigation</u>, 1994 U.S. Dist. LEXIS 20528 (D. Del. 1994) ("<u>Eurocontrol</u>") (holding that Eurocontrol, an entity created by treaty among Member States of the EC, is an agency or instrumentality).

"clearly indicate[s] otherwise" (RJR Br. 42), it does not.  Nothing in § 1603(b) suggests that an entity cannot be an "organ" of more than one foreign state.[3]

In the District Court, RJR acknowledged that the EC was an agency or instrumentality of "its twenty-seven Member States collectively."  (EC/MS Br. 28 citing Dkt. 95 at 15.)  That acknowledgement confirms that the EC is an agency or instrumentality of foreign states.

RJR also argues that only a subordinate unit of a foreign state can meet the "organ" test under the FSIA.  (RJR Br. 41, 50.)  This construction would rewrite FSIA.  "Agency or instrumentality" status depends on whether the entity is "an organ of a foreign state or a political subdivision thereof."  28 U.S.C. § 1603(b)(2) (emphasis added).  Using the disjunctive, FSIA provides that an agency or instrumentality includes "an organ of a foreign state" or "a political subdivision [of a foreign state]."  RJR's argument -- that only  a subordinate unit of a foreign state can qualify as an organ -- would:  (a) give effect only to that clause establishing organ status for a "political subdivision" -- i.e., a subordinate unit -- of a foreign state; and (b) void the statutory text extending agency or instrumentality status to

---

[3] The case cited by RJR for the proposition that 1 U.S.C. § 1 is to be applied only where "necessary to carry out the evident intent of the statute" in fact described 1 U.S.C. § 1 as embodying "the typical rule of statutory construction" and applied it where, as here, "nothing in the [statute] explicitly limit[ed]" its application to the singular and the statute's legislative history supported its broad application.  Toy Mfrs. Of Am., Inc. v. Consumer Prods. Safety Comm'n, 630 F.2d 70, 74 (2d Cir. 1980).

"an organ of a foreign state."  RJR's construction would impermissibly render the "organ of a foreign state" clause void and superfluous.  <u>TRW Inc. v. Andrews</u>, 534 U.S. 19, 31 (2001). [4]

### (b)  The EC is Not An Ordinary "International Organization."

Apparently seeking to undermine the EC's status as an agency or instrumentality of the Member States, RJR argues at length that the EC is an ordinary "international organization."  (<u>See</u> RJR Br. 1, 7-8, 33-50; SPA-33-34.)  In fact, however, the European Court of Justice squarely rejected the notion that the EC was an ordinary international organization operating under "an agreement which merely creates mutual obligations between the Contracting States."  <u>Van Gend & Loos v. Nederlandse Adminisratie Der Belastingen</u>, [1963] E.C.R.  1, 12; <u>accord</u> <u>Opinion 1/91 of 14 December 1991</u>, [1991] E.C.R. I-6079 at ¶¶ 20-21; <u>Case 6/64, Costa v. ENEL</u>, [1964] E.C.R. 585, 593.

The EC is not an ordinary international organization.  The Member States have endowed the EC institutions with "sovereign rights."  <u>See</u> <u>Van Gend & Loos</u>, <u>supra</u>.  (EC/MS Br. 9, 40 n.24; U.S. Br. 26; RJR Br. 34 (EC performs "many sovereign functions").)   The EC was established for national purposes and

---

[4] RJR also argues that an "organ" is "smaller -- not larger -- than the 'foreign state' of which it is a part."  (RJR Br. 41.)  In fact, the EC is "smaller" than its Member States.  Applying the only relevant measure, the Member States have delegated only limited powers to the EC, and the Member States retain all powers that are not delegated to the EC.

endowed with sovereign rights. (EC/MS Br. 29-30.) A classical international organization does not possess these features, and RJR's treatment of the EC as an ordinary international organization is incorrect.

### (c) An "International Organization" Can Be An "Organ."

RJR argues that the EC is an ordinary "international organization" and, as such, cannot be an "agency or instrumentality" of its Member States. (RJR Br. 40-49.) RJR's argument is baseless.

At the threshold, there is no authority for RJR's incorrect proposition that an "international organization" can never constitute an "agency or instrumentality" of a foreign state. (RJR Br. 40.) RJR overlooks the rule that treaty-based entities formed by multiple foreign governments for governmental functions are deemed agencies or instrumentalities. (EC/MS Br. 26-28 (collecting authorities).)

In Filler, this Court decided that an entity's status as an "organ" is decided by weighing several factors. Nothing in the FSIA states that an "international organization" cannot qualify as an "organ" or "agency or instrumentality." While the FSIA is inclusive and the term "organ" is broadly construed (EC/MS Br. 24-26), not every international organization will meet the Filler factors. Therefore, RJR's claims (RJR Br. 41, 46, 48) that the International Organizations Immunity Act ("IOIA") might somehow be superseded are unfounded. If an international

11

organization satisfies the <u>Filler</u> factors (and the other prerequisites for agency or instrumentality status), there is no textual basis to deny "organ" status.[5]

### (d)  **IOIA Is Irrelevant To This Case.**

RJR argues that IOIA is the exclusive statutory framework for considering the EC's immunity.  (RJR Br. 40-41, 44-49.)  This is wrong.  The EC invokes a diversity statute that expressly incorporates FSIA, 28 U.S.C. § 1332(a)(4). The EC's status for diversity purposes must be determined under FSIA.  (EC/MS Br. 23-38; U.S. Br. 20-29.)  The courts, given a choice to apply either FSIA or IOIA to a European, treaty-based organization, have held that FSIA -- not IOIA -- is "dispositive." <u>See</u>, <u>e.g.</u>, <u>Eurocontrol</u>, 1994 U.S. Dist. LEXIS 20528 at *7.

The EC is not an international organization under IOIA.  IOIA defines "international organization" as "a public international organization in which the United States participates" and which the President has designated "through an appropriate Executive order."   22 U.S.C. § 288.   The United States never participated in the EC and there is no reason for the President to have designated it.

RJR errs in arguing that Congress "specifically excluded the Commission of the European Communities from the full degree of immunity conferred upon

---

[5] RJR analogizes the EC to OPEC and the OAS (RJR Br. 47); however, OPEC's and OAS' legal status under the FSIA were not addressed under the <u>Filler</u> factors or other Circuit authority.

foreign states." (RJR Br. 45 citing 22 U.S.C. § 288h.)[6] Section 288h was enacted prior to the FSIA for the limited purpose of clarifying the protections available to the European Commission Delegation in the United States. The statute did not address the EC as a whole, but instead addressed the European Commission's diplomatic presence. When Section 288h was amended, President Reagan confirmed: "This order is not intended to abridge in any respect privileges, exemptions or immunities that the Delegation of the Commission of the European Communities may have acquired or may acquire by international agreements or by Congressional action." See Exec. Order No. 12,651, 53 Fed. Reg. 35,287 (Sept. 13, 1988).

RJR contends that an amendment to protect the European Central Bank ("ECB") (22 U.S.C. § 288f-5) is "explicable" only on the ground that FSIA does not cover international organizations. (RJR Br. 47.) RJR overlooks this section's history.

The ECB was organized as a corporation, with prescribed capitalization, and the Member States' national central banks -- not the Member States themselves -- hold the ECB's capital. Article 28.2, Protocol on the Statute of the European

---

[6] RJR incorrectly states that "the Commission of the European Communities" was a "predecessor entity to the EC." (RJR Br. 45.) In fact, the European Commission is an institution of the EC, and not the predecessor to the EC. With regard to the European Space Research Organization (RJR Br. 45), ESRO was an international organization separate and apart from the EC and included non-EU members, such as Switzerland.

System of Central Banks and of the European Central Bank (O.J. C 191/68 of 29.7.92). In 2001, the Ninth Circuit ruled that "tiered" corporations owned by agencies or instrumentalities of foreign states, such as the ECB, were not subject to the FSIA. See Patrickson v. Dole Food Co., 251 F.3d 795 (9th Cir. 2001), aff'd, 538 U.S. 468 (2003). During the appellate process in Patrickson, Congress confirmed that FSIA protections should be available to the ECB, which Congress understood to be a tiered, multinational entity. Markup Before the Committee on International Relations on H.R. 3656 (Mar. 20, 2002), at 41, Serial No. 107-68 (GAO 2002) (bill would provide the ECB "the same immunity from judicial process that we routinely provide to foreign central banks" under FSIA). The bill became law on November 5, 2002. See Pub. L. No. 107-278, § 1. Section 288f-5 addressed a narrow problem posing potential concern to the ECB as a tiered, multinational corporate entity; the EC itself had no such concern. Congress did not express any legislative policy to exclude the EC from FSIA coverage, and the law was designed to supplement, not preempt, the ECB's protections under other laws. See Exec. Order No. 13,307, 68 Fed. Reg. 33,338 (June 3, 2003).

**B. Alternatively, This Court Should Remand for Further Proceedings.**

Diversity exists because the EC is an "agency or instrumentality" of the Member States. If there were any doubt, however, diversity also exists on two alternative grounds: (1) alienage jurisdiction (EC/MS Br. 39-43); and (2) the EC is

14

a "foreign state" for the purpose of diversity jurisdiction. (EC/MS Br. 43-47.) RJR's arguments fail to overcome these separate bases for jurisdiction. In light of word-limits applicable to this brief, Plaintiffs only address RJR's flawed arguments concerning alienage jurisdiction.

RJR concedes that the District Court did not address Plaintiffs' alienage jurisdiction argument. (RJR Br. 39.) RJR asserts that this was due to "the relative lack of attention given to it by Plaintiffs in the district court." Id. In fact, Plaintiffs relied upon alienage jurisdiction as their threshold ground for diversity and maintained: "This Court can and should resolve the issue of diversity jurisdiction based on the alienage diversity statute, 28 U.S.C. § 1332(a)(2)." (See Dkt. 97 at 9.) Appropriate attention was paid to this ground by Plaintiffs. Moreover, the District Court did not address the EC's capacity to invoke alienage jurisdiction under the EC Treaty, which endows the EC with all of the attributes and capacities of "legal persons." (EC/MS Br. 42 citing EC Treaty, art. 282.) These matters should be addressed on remand. Baxter v. Sturm, Ruger & Co., Inc., 32 F.3d 48, 49 (2d Cir. 1994) (reversing and remanding where "district court did not discuss" a relevant legal issue "although it was fairly before that court").

RJR argues that the EC is not "a citizen or subject of any foreign state" and may not invoke alienage jurisdiction. (RJR Br. 36, 38 citing Int'l Refugee Org. v. Republic S.S. Corp., 92 F. Supp. 674, 676-77 (D. Md. 1950), rev'd on other

15

grounds, 189 F.2d 858 (4th Cir. 1951) ("IRO").)  IRO is inapposite.  IRO involved a lawsuit brought by the International Refugee Organization, an "unincorporated organization" based in Geneva, Switzerland, against Republic Steamship Corporation, a Panamanian corporation.  IRO, 92 F. Supp. at 677.  The district court confirmed the unexceptional proposition that "District Courts have no jurisdiction of suits solely between aliens." Id. at 676.  The district court explicitly confirmed that "the federal courts are not closed to [IRO] in suits which involve non-alien defendants."  Id. at 680.  The district court suggested that IRO *could* invoke diversity, provided the suit was brought against non-alien defendants.  IRO has no application.

## POINT II

### THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFFS' RICO CLAIMS.

RJR seeks affirmance of the RICO claims' dismissal on three grounds: (a) it asserts that the SAC does not allege sufficient domestic contacts. (RJR Br. 28); (b) RICO is exclusively limited to "domestic" enterprises (id. 18-20); and (c) RICO is exclusively limited to "domestic injuries."  Id. at 11.  RJR also argues that leave to amend was properly denied.  Id. at 30.  These arguments cannot withstand analysis.

### A.  Plaintiffs Allege Sufficient Domestic Contacts.

This Court has held that RICO does not apply extraterritorially and claims that have only "slim contacts with the United States" are beyond the scope of

16

RICO.  Norex Petroleum Ltd. v. Access Indus., Inc., 631 F.3d 29, 33 (2d Cir. 2010) (per curiam).  In determining whether Plaintiffs' RICO claims fall within RICO's domestic territorial reach, it is necessary to consider the statute's "focus." Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869, 2884 (2010) (addressing "the focus of the Exchange Act").

As the Supreme Court has recognized, Congress "had organized crime as its focus" in enacting RICO.  H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 248 (1989) (emphasis added); accord Rotella v. Wood, 528 U.S. 549, 557 (2000) (the "object of civil RICO" is to eliminate "racketeering activity"); Agency Holding Corp. v. Malley-Duff Associates, Inc., 483 U.S. 143, 154 (1987) ("The heart of any RICO complaint is the allegation of a *pattern* of racketeering") (emphasis in original.)  (See also U.S. Br. 11 ("[a]nother focus of RICO is on 'a pattern of racketeering'").)  Plaintiffs' allegations of domestic organized crime and racketeering by RJR bring this case well within RICO's domestic purview. [7]

Plaintiffs have demonstrated that their RICO claims are not extraterritorial. (EC/MS Br. 48-50.)  Contrary to RJR's argument (RJR Br. 25-26), the SAC is replete with allegations of racketeering by the RJR Defendants and their co-conspirators in the United States.  (See, e.g., SAC ¶¶ 2, 22, 23, 46, 47-49, 51, 52-

_____

[7] RJR argues that "organized crime" is not an element of RICO and cannot "drive the extraterritoriality analysis" (RJR Br. 22); in fact, each of RICO's substantive provisions prohibit conduct associated with a "pattern of racketeering activity."  18 U.S.C. § 1962.

55, 56-57, 60-62, 67-69, 70-72, 73-74, 76-79, 105-108.)  In addition, the SAC explicitly details the way in which criminal proceeds were utilized to acquire the assets of Brown & Williamson Tobacco Company -- specifically identified as the U.S.-based "<u>domestic</u> operations of Brown & Williamson" -- so as to branch out into new money-laundering and racketeering activities.  (SAC ¶¶ 100-103 (emphasis added).)

In response, RJR falls back on the District Court's statements that the SAC "strongly suggests" the money-laundering cycle was directed from South America and Europe, and that RJR Defendants "appear to be" just sellers of fungible goods (RJR  Br. 25).  Yet, the District Court -- and RJR -- ignored the basic tenet that, on a motion to dismiss, inferences must be drawn in favor of the pleader, not the movants.

Also contrary to RJR's argument (RJR Br. 26), the SAC specifically alleges that RJR used the proceeds of racketeering activities to acquire Brown & Williamson.  RJR used or invested, directly or indirectly, racketeering income, or a part thereof, or the proceeds of such income, to acquire an interest in, establish, and operate, the RJR Money-Laundering Enterprise, which included the domestic operations of Brown & Williamson and the Brown & Williamson brands).  (SAC ¶¶ 101-103; 162-163.)

The District Court did not, however, consider or credit these domestic contacts because it incorrectly concluded that RICO was strictly limited to "domestic enterprises" as discussed below.  Applying the correct legal standard and focusing review properly on RJR's domestic conduct, it is clear that the Plaintiffs' claims fall comfortably within RICO's territorial reach.

**B.  RICO Is Not Limited to "Domestic Enterprises."**

The District Court erred in holding that RICO was limited to "domestic enterprises." (EC/MS Br. 50-51.)  The United States convincingly shows that RICO's coverage is not restricted to domestic enterprises.  (U.S. Br. 9-20.)  As discussed below, the District Court's error requires reversal.

**1.  *H.J. Inc.* and *Parness* Are Controlling.**

Congress "had organized crime as its focus" in enacting RICO.  H.J. Inc., 492 U.S. at 248 (emphasis added).  In limiting RICO to "domestic enterprises," the District Court overlooked the relevant "focus" of RICO as defined in H.J. Inc.  The District Court did not mention this Court's controlling precedent -- United States v. Parness, 503 F.2d 430, 439-440 (2d Cir. 1974) -- which considered the text, history, and *focus* of RICO and squarely held that RICO is not limited to domestic enterprises.

RJR argues that Parness cannot be reconciled with Morrison.  (RJR Br. 21.)  In fact, Parness specifically addressed RICO's "focus," considered RICO's text

19

and legislative history, and held that RICO is not limited to "domestic enterprises." Id., 503 F.2d at 439-440.   RJR contends that Parness did not consider the presumption against extraterritoriality.  (RJR Br. 21.)   In fact, Parness squarely addressed the cases declining to find extraterritorial scope "unless 'the affirmative intention of Congress [is] clearly expressed'" and found "reliance on this line of cases misplaced."   Parness, 503 F.2d at 440 (citation omitted).   Parness remains binding Circuit precedent and compels the conclusion that the District Court erred in limiting RICO to "domestic enterprises."  (U.S. Br. 13, 17, 18 n.5.)

### 2. The Newly Fashioned "Nerve Center" Test Is Flawed.

The District Court erred in fashioning and applying a new "nerve center" test to determine the location of the enterprise, and dismissing all RICO claims under the new test. (EC/MS Br. 52-53.)  The United States also disagreed with the District Court's application of a "nerve center" test.  (U.S. Br. 18-19.)  The United States correctly stated that "the 'enterprise' with which RICO is concerned is significantly broader than a formal corporation with an identifiable 'nerve center'" and includes "association-in-fact" enterprises that "need not have a 'nerve center.'" (U.S. Br. 18-19 citing Boyle v. United States, 129 S. Ct. 2237, 2245 (2009).)

The United States also correctly argued that "it makes no sense to focus on the enterprise's 'nerve center' in considering RICO's application" under 18 U.S.C. § 1962(a) and (b) because under those subdivisions "the enterprise does not direct

20

the unlawful activity." (U.S. Br. 19 n.6 citing EC/MS Br. 52-53.) RJR disagrees with this analysis and argues that the term "enterprise" cannot be accorded a different meaning in each subsection of 1962. (RJR Br. 23.) In fact, there is one definition of "enterprise" (18 U.S.C. § 1961(4)), but the *role* of the enterprise is different under 1962(a), (b), and (c), as the Supreme Court has confirmed. (EC/MS Br. 52 citing Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 259 (1994).)

In light of the foregoing, the District Court applied an incorrect legal standard ("domestic enterprise" requirement), implemented that incorrect legal standard with an equally flawed test ("nerve center" test), and dismissed Plaintiffs' RICO claims for failing to satisfy these new and incorrect legal standards. Indeed, the District Court did not even address the merits of Plaintiffs' 1962(a) and (b) claims (EC/MS Br. 51-54) -- claims that cannot possibly be dismissed under a nerve center test. (EC/MS Br. at 52-53; U.S. Br. 19 n.6.) The judgment must be reversed.

## C. **RICO Is Not Limited to Domestic Injuries.**

Recognizing that RICO cannot plausibly be limited to "domestic enterprises," RJR fashions a new test that was not addressed or adopted below and argues that RICO is limited to "domestic injuries." (RJR Br. at 11-18.) RJR cites no case holding that RICO is limited to domestic injuries. Research reveals no

federal or state court case that has embraced this newly proposed limit on RICO. Morrison did not involve RICO, and Norex imposed no such limitation. RJR's novel argument fails.

**First**, RICO's text, which controls, does not impose a domestic injury requirement. Section 1962 does not limit RICO to domestic injuries, and RICO has been utilized in cases involving foreign injuries or victims. See, e.g., Republic of the Philippines v. Marcos, 862 F.2d 1355, 1358 (9th Cir. 1988) (en banc); Republic of Turkey v. OKS Partners, 797 F. Supp. 64, 67 (D. Mass. 1992). Section 1964(c), RICO's private right of action, does not impose a domestic injury requirement, and broadly permits recovery by "any person injured in his business or property" (18 U.S.C. § 1964(c)) -- without discriminating against or otherwise excluding foreign persons or foreign injuries from its scope. Congress did not impose a domestic injury requirement, and the courts will not exclude foreign governments and their injuries from the protections of U.S. law "in the absence of clear legislative intent" compelling such exclusion. See Pfizer Inc. v. Government of India, 434 U.S. 308, 319 (1978).

**Second**, RJR misapplies Morrison. Morrison held that "the focus of the Exchange Act" was on deceptions associated with transactions in securities listed on domestic exchanges. Morrison, 130 S. Ct. at 2884. In ascertaining the territorial focus of a statute, the Supreme Court considers the "statute as a whole."

22

EEOC v. Arabian American Oil Co., 499 U.S. 244, 255 (1991) ("Aramco"), cited with approval, Morrison, 130 S. Ct. at 2884 (adopting the "same mode of analysis" as that employed in Aramco). Under Morrison and Aramco, the appropriate inquiry is the "focus" of RICO "as a whole," not on one or more subdivisions of RICO selectively considered in isolation. Congress "had organized crime as its focus" in enacting RICO. H.J. Inc., 492 U.S. at 248 (emphasis added). The allegations that RJR's domestic organized crime and racketeering caused Plaintiffs' injuries bring this case well within RICO's purview.

**Third**, Section 1964(c) draws its substance from a different section of the statute. It provides a damages remedy to "[a]ny person injured in his business or property by reason of a violation of section 1962" (emphasis added). Thus, because § 1964(c) simply enhances the remedies for a violation of § 1962, its focus must be the same as that of § 1962.

Even assuming that the appropriate inquiry is upon the focus of the private right of action standing alone (18 U.S.C. § 1964(c)), Plaintiffs' claims remain cognizable under RICO. The Supreme Court explained: "The object of civil RICO is . . . not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity." Rotella, 528 U.S. at 557. The overarching objective of 1964(c), like RICO as a whole, is to

combat racketeering activity. Compensation is not, itself, the object or focus of 1964(c); it is one tool to combat and deter organized crime.

**Fourth**, if there is a domestic injury requirement, Plaintiffs have met it. RJR correctly notes that the SAC alleges that Plaintiffs incurred competitive injuries in the form of lost cigarette sales and profits (RJR Br. 17), but goes outside the four corners of the complaint to argue that, as a factual matter, the losses have ended and were incurred solely in Europe. Id. RJR inappropriately asks this Court to take "judicial notice" of "materials" (id.) that are both outside the permissible scope of a motion under Fed R. Civ. P. 12(b)(6) and are "subject to reasonable dispute." Fed. R. Evid. 201(b). RJR misstates the content of the "materials" when it argues that the "European cigarette monopolies were dismantled decades ago." (RJR Br. 17.) This argument is contradicted by the SAC, and by the very "materials" relied upon by RJR which confirm ongoing tobacco operations and sales by Member States at or about the time of the commencement of this action. (See, e.g., A-485 (European Commission described the main tobacco companies operating in Europe to include national companies such as those operating in Austria, Greece, Italy, Norway, Sweden, and Spain).) The SAC also alleges domestic injuries by Plaintiffs, as even RJR acknowledges. (RJR Br. 17 citing SAC ¶ 146(a).) While RJR contends that these allegations are not "sufficiently detailed"

24

(RJR Br. 17), no such finding was made below, and the remedy for any insufficiency is to allow leave to amend – not to dismiss the entire case.[8]

### D.  **The District Court Erred In Denying Leave to Amend**

The District Court created a new and incorrect limit on RICO (the "domestic enterprise" requirement), implemented that erroneous standard by inventing an equally-flawed test (the "nerve center" test), and dismissed Plaintiffs' RICO claims for failing to anticipate and meet these newly fashioned tests, even though the tests conflicted with binding authority such as H.J. Inc. and Parness.  Leave to amend was denied (SPA-52.)

RJR attempts to sidestep this abuse of discretion by suggesting that Plaintiffs are unable to allege sufficient domestic contacts, and amendment would be futile. (RJR Br. 31.)  The District Court, however, did not hold that amendment would be futile; thus, denial of leave to amend should not be reviewed or sustained on that basis.

Contrary to RJR's suggestion, Plaintiffs are prepared to plead and prove additional details of RJR's domestic scheme.  (EC/MS Br. 54-58.)  During the

---

[8] If more detail is needed, Plaintiffs are prepared to plead and prove that Italy, the largest single cigarette market in the European Union, held 100 percent of the cigarette market until 1998, and had cigarette sales in the United States during the pendency of this action.  Thus, if a new domestic injury requirement were to be adopted, and if the SAC's allegations do not suffice to meet the new test, Plaintiffs respectfully request leave to replead to meet any such new test.

pendency of this action, RJR has continued its domestic scheme through, for example, continued sales to UETA (a U.S.-based company), as well as to Giovannex. (A-1563-1564.) In addition, the complaint can be updated to allege sales by RJR to criminal organizations within the past 12 months. Amendment would not be futile.[9]

## POINT III

### THE DISTRICT COURT ERRED IN DISMISSING THE FEDERAL COMMON-LAW CLAIMS WITHOUT COMMENT.

The District Court did not address Plaintiffs' federal common-law claims. (EC/MS Br. 59-61.) This is not disputed. (RJR Br. 54.) Nonetheless, RJR argues that Plaintiffs "waived" the federal common-law claims by stipulation. (RJR Br. 54 citing A-1402-03.) This argument is baseless.

---

[9] RJR argues in a footnote that the RICO claims are flawed for three reasons apart from "extraterritoriality," specifically: (1) the RICO claims are "barred by the revenue and penal-law rules;" (2) the RICO claims for "competitive injuries fail to satisfy RICO's proximate-cause requirement;" and (3) plaintiffs may not assert equitable claims for relief under RICO. (See RJR Br. 32 n.2.) Because RJR makes these arguments in a cursory footnote in a 56-page brief, the arguments are "forfeited." City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011) ("We ordinarily deem an argument to be forfeited where it has not been 'sufficiently argued in the briefs,' such as when it is only addressed in a footnote") (citation omitted); United States v. Restrepo, 986 F.2d 1462, 1463 (2d Cir. 1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review").

The stipulation (which makes no mention of federal common law) was the product of colloquy between the District Court and Plaintiffs' counsel on October 26, 2010:

> THE COURT: There's a choice of laws issue, isn't there here?
>
> MR. MALONE: You mean between state and federal common-law?
>
> THE COURT: Among the States. Aren't there other states involved in this?
>
> Why should we accept New York law?
>
> How is New York law the law which in a choice of law situation we should apply? Have you looked at that?
>
> MR. MALONE: Actually I haven't because I think both sides have assumed that New York law would apply if state law applies.

A-1376:5-19 (emphasis added).

Thereafter, RJR's counsel suggested a stipulation (A-1377:16-17), which Plaintiffs' counsel (A-1377:21-25; 1388-1389) and the District Court (A-1377:18-20) agreed to consider. It was in the context of the Court's express direction that the parties address the choice of law "among the states" -- and specifically *not* in the context of "federal common-law" -- that the parties agreed to a stipulation. Plaintiffs did not waive their federal common-law claims. See Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 303 (2d Cir. 1996) ("A waiver is 'the

27

voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable'" (citation omitted)).

RJR's waiver argument finds no support in the transcript. RJR omits reference to the above-quoted colloquy while distorting other parts of the transcript. (RJR Br. 54 citing "JA 1374 (Plaintiffs' counsel stating that 'we recognize that we can either get state common-law or federal common-law but not both')".) Plaintiffs' counsel's statement (id.) was made in defense of the federal common-law claims. (A-1374.) The comment -- that relief could not be obtained under "both" state and federal common law -- was a clear and candid reference to the rule that "federal and state nuisance law could not both apply to the case." Connecticut v. Am. Elec. Power Co., 582 F.3d 309, 392 (2d Cir. 2009) ("'If state law can be applied, there is no need for federal common law; if federal common law exists, it is because state law cannot be used'") (citation omitted), aff'd in relevant part, 131 S. Ct. 2527, 2540 (2011) (remanding to consider "the availability of a claim under state nuisance law").

RJR's misdirection is compounded by its failure to disclose to this Court that it made the same waiver argument in the District Court. (See Dkt. 95 at 9.) Plaintiffs objected to the claim of waiver. (Dkt. at 97 at 24-25.) The waiver issue was never addressed or decided in the District Court. RJR should not be heard to maintain that such a disputed document should dictate the outcome of this appeal.

Finally, RJR argues that there is no federal interest in this case. As previously demonstrated (EC/MS Br. 59-61), there is a profound federal interest in enjoining a U.S. tobacco company, acting on American soil in violation of U.S. law, from laundering narcotics proceeds through U.S. banks, acquiring a domestic enterprise with money-laundering proceeds, and financing terrorist groups through illicit sales from the United States in violation of the U.S. embargos.  (See EC/MS Br. at 18-19; A-378-382 (RJR sales financing the PKK).)  See also T. Roule, Middle East – The Terrorist Financial Network of the PKK, Jane's Terrorism & Security Monitor (June 17, 2002) (PKK finances its activities through "the smuggling of cigarettes, which are shipped across the border to Iraq" and thereby threatens U.S and Allied Forces in the Middle East).  This grave cross-border scheme threatens U.S. and EU interests.  See Judgment of Federal Supreme Court, December 21, 1960 (VIII ZR 1/60) (F.R.G.), reported in 56 Am. J. Int'l L. 562 (1962) (violation of an American embargo which is designed "to preserve peace and freedom for the entire Western world" cannot be tolerated). The dismissal of the federal common-law claims should be reversed.

## CONCLUSION

This Court should reverse the District Court's judgment or, alternatively, vacate the judgment and remand for further proceedings.

Respectfully Submitted,

/s/ Kevin A. Malone

John J. Halloran, Jr.
SPEISER, KRAUSE, NOLAN
& GRANITO
Two Grand Central Tower
140 East 45th Street (34th Floor)
New York, New York 10017
(212) 661-0011

Kevin A. Malone
Carlos A. Acevedo
KRUPNICK CAMPBELL MALONE
BUSER SLAMA HANCOCK LIBERMAN
& MCKEE, P.A.
Legacy Bank Building
12 S.E. 7th Street, Suite 801
Fort Lauderdale, FL 33301
(954) 763-8181

Attorneys for Plaintiffs-Appellants

November 22, 2011

30

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(a) and Cir. Rule 32.1(a), I certify that the foregoing reply brief complies with the length limitations set forth in Fed. Rule App. Proc. 32(a)(7) because it contains 6980 words, as counted by Microsoft Word.

*/s/ Kevin A. Malone*

STATE OF NEW YORK        )
                         )        ss.:        **AFFIDAVIT OF**
COUNTY OF NEW YORK       )                    **CM/ECF SERVICE**


      I, Antoina Robertson-Coston, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age.

      **On November 22, 2011**

deponent served the within:  **Reply Brief for Plaintiffs-Appellants**

      **upon:**


**Jones Day**
**222 East 42nd Street**
**New York, New York  10017**
**(212) 326-3939**

*Attorneys for Defendants-Appellees*


via the CM/ECF Case Filing System. All counsel of record in this case are registered CM/ECF users. Filing and service were performed by direction of counsel.


**Sworn to before me on November 22, 2011**


**s/ Maria Maisonet**                                <u>s/ Antoina Robertson-Coston</u>
    **MARIA MAISONET**
  Notary Public State of New York
    No. 01MA6204360
   Qualified in Bronx County
Commission Expires Apr. 20, 2013               **Job #  239211**